## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|                          |   |                           |
|--------------------------|---|---------------------------|
| In re:                   | : | Chapter 11                |
|                          | : |                           |
| Isolagen, Inc., *et al.*,[1] | : | Case No. 09-12072 (MFW)   |
|                          | : |                           |
| Debtor.                  | : | Jointly Administered      |
|                          | : |                           |

## FIRST AMENDED DISCLOSURE STATEMENT TO ACCOMPANY THE CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY <u>DEBTORS IN POSSESSION</u>

CIARDI CIARDI & ASTIN
Daniel K. Astin (No. 4068)
Anthony M. Saccullo (No. 4141)
Mary E. Augustine (No. 4477)
Carl D. Neff (No. 4895)
919 N. Market Street, Suite 700
Wilmington, Delaware 19801
Tel: (302) 658-1100
Fax: (302) 658-1300
dastin@ciardilaw.com
asaccullo@ciardilaw.com
maugustine@ciardilaw.com
cneff@ciardilaw.com

*Counsel to the Debtors*

Dated: July 30, 2009
      Wilmington, Delaware

**THE PLAN SUMMARIZED HEREIN AND ATTACHED HERETO IS THE RESULT OF EXTENSIVE NEGOTIATIONS AMONG PRE-PETITION LENDERS AS WELL AS THE DIP FACILITY LENDERS AND THE DEBTORS. AS A RESULT, THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RESULT FOR ALL HOLDERS OF CLAIMS, AND THEREFORE, ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' CREDITORS AND INTEREST HOLDERS. THE DEBTORS STRONGLY URGE ALL HOLDERS OF CLAIMS TO ACCEPT THE PLAN.**

---

[1] The Debtors are Isolagen, Inc., tax identification number **-***8888, and Isolagen Technologies, Inc., tax identification number **-***6974.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION.................................................................................................................3

   A. General Description of the Chapter 11 Reorganization Process: ........................................3
   B. Overview of the Plan Process in these Cases:....................................................................4
   C. Holders of Claims Entitled to Vote ..................................................................................4
   D. Voting Procedures ............................................................................................................5
   E. Confirmation Hearing.......................................................................................................6
   F. Disclaimers and Notices...................................................................................................6
   G. Recommendation by the Debtors .....................................................................................7

II. GENERAL INFORMATION................................................................................................7

   A. Description and History of the Debtor's Business ............................................................7
   B. Existing Indebtedness.......................................................................................................9
   C. Equity Interests..............................................................................................................11
   D. Events Leading to Bankruptcy .......................................................................................11

III. THE CHAPTER 11 CASES...............................................................................................12

IV. SUMMARY OF THE PLAN .............................................................................................12

   A. General Framework of the Plan......................................................................................12
   B. Distributions under the Plan ..........................................................................................13
   C. Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and DIP
   Facility Claims....................................................................................................................16
   D. Exit Financing ...............................................................................................................17
   E. Management Incentive Plan ...........................................................................................18
   F. Permanent Injunction, Release & Exculpation................................................................18
   G. Bar Date.........................................................................................................................21
   H. Executory Contracts .......................................................................................................22
   I. Consolidation for Distribution and Voting Purposes .......................................................22

V. CONFIRMATION AND CONSUMMATION OF THE PLAN ...........................................22

   A. The Confirmation Hearing .............................................................................................23
   B. Confirmation of the Plan ...............................................................................................23
   C. Consummation of the Plan .............................................................................................27

VI. RISK FACTORS TO BE CONSIDERED ..........................................................................27

   A. Certain Risks of Non-Confirmation ...............................................................................27
   B. Risks of Non-Consummation of Plan.............................................................................29
   C. Risks Associated with New Common Stock ...................................................................29

VII. EXEMPTIONS FROM SECURITIES ACT REGISTRATION ...........................................30

A. Generally: .............................................................................................................30
B. Initial Issuance of New Common Stock under the Plan......................................30

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ....31

A. Liquidation under Chapter 7 or Chapter 11........................................................32
B. Alternative Plan of Reorganization ....................................................................32

IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.......................32

A. Consequences to Holders of Allowed Claims in Classes 1, 3, and 4 ..................33
B. Consequences to the Debtors...............................................................................34

X. CONCLUSION AND RECOMMENDATION .......................................................................36

THIS DISCLOSURE STATEMENT IS DESIGNED TO SOLICIT YOUR ACCEPTANCE OF THE ATTACHED PLAN AND CONTAINS INFORMATION RELEVANT TO YOUR DECISION. PLEASE READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE OTHER MATERIALS COMPLETELY AND CAREFULLY. THE PLAN IS ATTACHED AS EXHIBIT "A" TO THIS DISCLOSURE STATEMENT. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ATTACHED HERETO, AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT BEFORE OR CONCURRENTLY WITH THE FILING OF THIS DISCLOSURE STATEMENT.

FURTHERMORE, THE PROJECTED FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL CONTINUE TO BE MATERIALLY ACCURATE; (B) THE DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION; OR (C) THE FINANCIAL INFORMATION SET FORTH HEREIN COMPLIES WITH GENERALLY ACCEPTED ACCOUNTING STANDARDS.

HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, INCLUDING THOSE UNDER "RISK FACTORS," PRIOR TO SUBMITTING BALLOTS VOTING ON THE PLAN. IN MAKING A DECISION TO ACCEPT OR REJECT THE PLAN, EACH HOLDER OF AN IMPAIRED CLAIM MUST RELY ON ITS OWN EXAMINATION OF THE DEBTORS AS DESCRIBED IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. IN ADDITION, CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CONDITIONS PRECEDENT THAT COULD LEAD TO DELAYS IN CONSUMMATION OF THE PLAN. THERE CAN BE NO ASSURANCE THAT EACH OF THESE CONDITIONS WILL BE SATISFIED OR WAIVED (AS PROVIDED IN THE PLAN) OR THAT THE PLAN WILL BE CONSUMMATED. EVEN AFTER THE EFFECTIVE DATE, DISTRIBUTIONS UNDER THE PLAN MAY BE SUBJECT TO SUBSTANTIAL DELAYS FOR HOLDERS OF CLAIMS THAT ARE DISPUTED.

THE DEBTORS WILL REQUEST THAT THE BANKRUPTCY COURT CONFIRM THE PLAN UNDER BANKRUPTCY CODE SECTION 1129(b), WHICH PERMITS CONFIRMATION OF THE PLAN DESPITE REJECTION BY ONE OR MORE CLASSES IF THE BANKRUPTCY COURT FINDS THAT THE PLAN "DOES NOT DISCRIMINATE UNFAIRLY" AND IS "FAIR AND EQUITABLE" AS TO THE CLASS OR CLASSES THAT DO NOT ACCEPT THE PLAN. THE DEBTORS WILL REQUEST THAT THE BANKRUPTCY COURT FIND THAT THE PLAN IS FAIR AND EQUITABLE AND DOES NOT DISCRIMINATE UNFAIRLY AS TO ANY CLASS THAT FAILS TO ACCEPT THE PLAN.

NO PARTY IS AUTHORIZED BY THE DEBTORS TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS OR INFORMATION CONCERNING THE DEBTORS, THEIR FUTURE BUSINESS OPERATIONS, OR THE VALUE OF THEIR PROPERTIES HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH HEREIN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAWS. ENTITIES HOLDING, TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN, OR SECURITIES OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

IF THE REQUISITE ACCEPTANCES OF THE PLAN ARE RECEIVED, THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR TO REJECT THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY) WILL BE BOUND BY THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY—INCLUDING, WITHOUT LIMITATION, THE RELEASES AND EXCULPATIONS SET FORTH IN THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER SUCH COMMISSION NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT, NOR ANY DISTRIBUTION OF PROPERTY PURSUANT TO THE PLAN, WILL CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF, OR THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN OR IN THE AFFAIRS OF THE DEBTORS SINCE THE DATE HEREOF.

EACH CREDITOR OF THE DEBTORS SHOULD CONSULT WITH SUCH CREDITOR'S LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

# I. INTRODUCTION

Isolagen, Inc. ("Isolagen") and Isolagen Technologies, Inc. ("Isolagen Tech"), debtors and debtors in possession (collectively, the "Debtors" or the "Company") in the above-captioned cases, by and through their counsel, hereby submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to Holders[2] of Claims against, and Interests in, the Debtors in connection with: (i) the solicitation of acceptances to the Plan of Reorganization Proposed by the Debtors and Filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and (ii) the hearing before the Bankruptcy Court to consider confirmation of the Plan (the "Confirmation Hearing").

## A.    General Description of the Chapter 11 Reorganization Process:

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and its equity interest holders.  In addition to permitting rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment of similarly-situated creditors and equity interest holders with respect to the distribution of a debtor's assets.  The filing of a Chapter 11 petition creates an estate that is comprised of all of the legal and equitable property interests of the debtor as of the petition date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against, and equity interests in, a debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of plan confirmation and substitutes the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of impaired claims against, or equity interests in, a debtor are permitted to vote to accept or reject the plan.  Before soliciting acceptances of the proposed plan, however, Section 1125 of the Bankruptcy Code requires the proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

Attached as Exhibits to this Disclosure Statement (the "Disclosure Statement") are copies of the following:

- The Plan (Exhibit "A")

- An order of the Bankruptcy Court (the "Disclosure Statement Order"), approving the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (Exhibit "B")

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

- Liquidation Analysis prepared by Miller Coffey Tate LLP (MCT) as financial advisor to the Debtors (Exhibit "C")

- Projected Operations for 12 months post-confirmation (Exhibit "D")

- The Restructuring Agreement with incorporated term sheet (Exhibit "E")

In addition, a Ballot for the acceptance or rejection of the Plan submitted to Holders of Claims entitled to vote to accept or reject the Plan is enclosed with this Disclosure Statement.

**B.  Overview of the Plan Process in these Cases:**

On the Petition Date, the Debtors each filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  On or about June 26, 2009, the Debtors filed the Plan and Disclosure Statement with the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code and in connection with the solicitation of votes to accept or reject the Plan.

After notice and a hearing, the Bankruptcy Court determined that this Disclosure Statement contained "adequate information" of a kind, and in sufficient detail, to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment about the Plan.  Accordingly, the Bankruptcy Court signed the Disclosure Statement Order approving this Disclosure Statement.

The Disclosure Statement Order, a copy of which is annexed to this Disclosure Statement as Exhibit "B," sets forth in detail the deadlines, procedures, and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots.  In addition, detailed voting instructions accompany each Ballot.  **Each holder of a Claim entitled to vote to accept or reject the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order, and the instructions accompanying the Ballots in their entirety before voting on the Plan.**

**C.      Holders of Claims Entitled to Vote**

Under the Plan, only Classes 1, 3, and 4 are entitled to vote on the Plan because they are impaired and will receive a distribution under the Plan.  Accordingly, the Debtors are soliciting acceptances only from the Holders of Allowed Claims in Classes 1, 3, and 4.  Holders of Claims in Class 6 and Interests in Class 5 are impaired and will receive no distribution under the Plan, and thus, are conclusively presumed to have rejected the Plan—so no vote will be solicited from Holders in Classes 5 and 6.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims or interests as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the proposed plan of reorganization.

The Debtors reserve the right to amend the Plan and intend to request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code, which would enable the Plan to be

confirmed regardless of the rejection of the Plan by one or more classes of impaired Claims or Interests entitled to vote. Under Section 1129(b) of the Bankruptcy Code, the Plan may be confirmed if at least one class of impaired Claims accepts the Plan (excluding the votes of insiders) and the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. For a more detailed description of the requirements for confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code, see "Confirmation of the Plan" set forth herein.

**D.      Voting Procedures**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold Claims in more than one Class and each of those Classes is entitled to vote, you will receive separate Ballots for each such Class which must be returned for each separate Class of Claims.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set June 22, 2009, as the record date for voting on the Plan. Accordingly, only Holders of record as of June 22, 2009, that are otherwise entitled to vote on the Plan will receive a Ballot and may vote on the Plan.

**All other creditors entitled to vote on the Plan must return their Ballot(s) to the following address:**

Reliable
Attn: Isolagen Ballots
1007 North Orange Street
Wilmington, DE 19801

**FOR YOUR BALLOT TO BE COUNTED, YOU MUST RETURN IT TO THE ADDRESS SET FORTH ON THE BALLOT SO THAT IT IS <u>ACTUALLY</u> RECEIVED BY 4:00 P.M. PREVAILING EASTERN TIME ON OR BEFORE THE VOTING DEADLINE SET FORTH IN THE ATTACHED DISCLOSURE STATEMENT ORDER (THE "VOTING DEADLINE"). BALLOTS MUST BE DELIVERED BY MAIL, COURIER, OR OTHER DELIVERY SERVICE—FACSIMILE BALLOTS WILL <u>NOT</u> BE ACCEPTED. ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL NOT BE COUNTED.**

Any Holder of a Claim who is entitled to vote under the Plan and who has Filed a Proof of Claim in these Cases shall be entitled to vote in the amount of the value of the Proof of Claim, unless an objection or request for estimation is pending with regard to the Claim. Any Holder of a Claim listed by the Debtors on their Schedules of Assets and Liabilities for which no Proof of Claim has been filed, shall be entitled to vote in the amount Scheduled by the Debtors. In the event that no valid Proof of Claim or Interest is Filed, and the Claim or Interest is not Scheduled by the Debtors in a fixed amount, a Holder of a Claim or Interest must set forth a fixed, liquidated amount for such Claim on the Ballot. The Holder will be permitted to vote in the amount listed on the Ballot unless: (i) a motion to estimate the claim is filed; or (ii) the Claim set forth on the Ballot is subject to an objection on the date or dates during which the confirmation hearing is held.

If you have any questions about the Plan, the Disclosure Statement, or the procedures for voting, please call Daniel K. Astin, Esquire, at Ciardi Ciardi & Astin, counsel to the Debtors at (302) 658-1100.

**E.      Confirmation Hearing**

The hearing to consider confirmation of the Plan (the "Confirmation Hearing") will be held on July 27, 2009 at 4:00 p.m. (Prevailing Eastern Time) before the Honorable Mary F. Walrath, United States Bankruptcy Judge, at the United States Bankruptcy Court, 824 Market Street, 5th Floor, Courtroom 4, Wilmington, Delaware 19801. In the attached Disclosure Statement Order, the Bankruptcy Court has established the deadline by which objections, if any, to confirmation of the Plan must be served and filed. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

**F.      Disclaimers and Notices**

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified, and the delivery of this Disclosure Statement shall not create an implication that there has been no change in the information since the date hereof.

**Any representations or inducements made to secure your acceptance or rejection of the Plan, other than as contained in this Disclosure Statement or the Plan, should not be relied upon in arriving at your decision, and should be reported to counsel to the Debtors, Daniel K. Astin, Esquire, at 302-658-1100.**

**Much of the information contained herein (including in the Exhibits to the Disclosure Statement) has not been subject to a certified audit. Accordingly, the Debtors are unable to warrant or represent that the information contained herein (including in the Exhibits to the Disclosure Statement) is without any inaccuracy, or complies with generally accepted accounting standards. However, reasonable efforts have been made to ensure accuracy.**

For the convenience of Holders of Claims and Interests, this Disclosure Statement summarizes the terms of the Plan, but those summaries are qualified in their entirety by the Plan itself. In the event of any inconsistencies between the Plan and the Disclosure Statement, the Plan is controlling.

The Disclosure Statement may not be relied upon for any purpose other than: (i) to determine whether to vote to accept or reject the Plan; and (ii) to object to the Plan at the Confirmation Hearing. Nothing in this Disclosure Statement shall constitute an admission of any fact or liability by any person, or be admissible in any proceeding involving the Debtors, or any other person, or be deemed conclusive evidence of the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

Certain of the statements contained in this Disclosure Statement are forward-looking and contain estimates and assumptions. There can be no assurance that such statements will be

reflective of actual outcomes. All holders of Claims should carefully read and consider fully the "Risk Factors to Be Considered," as set forth herein before voting to accept or reject the Plan.

### G. Recommendation by the Debtors

**AS PROPONENTS OF THE PLAN, THE DEBTORS SUPPORT THE CONFIRMATION OF THE PLAN. THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO CREDITORS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS. ACCORDINGLY, THE DEBTORS RECOMMEND THAT ELIGIBLE CREDITORS VOTE TO ACCEPT THE PLAN.**

## II. GENERAL INFORMATION

### A. Description and History of the Debtor's Business

Isolagen is a Delaware corporation principally located at 405 Eagleview Boulevard in Exton, Pennsylvania, and is the parent company of Isolagen Tech, a Delaware corporation with the same principal location as Isolagen. Isolagen Tech is wholly owned by Isolagen. Isolagen also has a 57% interest in Agera Laboratories, Inc., a Delaware corporation ("Agera"). Isolagen Tech wholly owns Isolagen Europe Limited, a company organized under the laws of the United Kingdom ("Isolagen Europe"), Isolagen Australia Pty Limited, a company organized under the laws of Australia ("Isolagen Australia"), and Isolagen International, S.A., a company organized under the laws of Switzerland ("Isolagen Switzerland", collectively, with all Isolagen entities, the "Company"). The common stock of Isolagen, par value $0.001 per share, ("Common Stock") is listed on the NYSE Amex exchange (formerly known as the American Stock Exchange or "AMEX") under the symbol "ILE." However, the trading of its stock was halted by AMEX in May 2009 and is expected to be delisted soon.

The Debtors are aesthetic and therapeutic companies focused on developing novel skin and tissue rejuvenation products. The Debtors clinical development product candidates are designed to improve the appearance of skin injured by the effects of aging, sun exposure, acne and burns with a patient's own, or autologous, fibroblast cells produced by the Company's proprietary Isolagen Process. The Company also has a skin care line through its Agera Laboratories, Inc. ("Agera") subsidiary.

Isolagen acquired 57% of the outstanding common shares of Agera on August 10, 2006. Agera offers a complete line of skincare systems based on a wide array of proprietary formulations, trademarks and nano-peptide technology. These skincare products can be packaged to offer anti-aging, anti-pigmentary and acne treatment systems. Agera markets its product in both the United States and Europe (primarily the United Kingdom) via third party distributors primarily.

In October 2006, the Company reached an agreement with the FDA on the design of a Phase III pivotal study protocol for the treatment of nasolabial folds. The randomized, double-blind protocol was submitted to the FDA under the agency's Special Protocol Assessment ("SPA") regulations. Pursuant to this assessment process, the FDA has agreed that the

Company's study design for two identical trials, including patient numbers, clinical endpoints, and statistical analyses, is acceptable to the FDA to form the basis of an efficacy claim for a marketing application. The randomized, double-blind, pivotal Phase III trials will evaluate the efficacy and safety of Isolagen Therapy against placebo in approximately 400 patients with approximately 200 patients enrolled in each trial. The Company completed enrollment of the study and commenced injection of subjects in early 2007. All injections were completed in January 2008 and top line results from this trial were publically announced in August 2008. The data analysis, including safety data, was publically released in October 2008. The related Biologics License Application ("BLA") was submitted to the FDA in March 2009. The BLA was accepted for filing by the FDA in May 2009, and the Debtors are currently waiting for approval from the FDA to market its product.

The Debtors' business model is a biotechnology company focused on developing emergent, novel skin and tissue rejuvenation products for application in certain aesthetic and therapeutic markets. Isolagen was founded in 1995, specializing in the development of the Isolagen Process™, the innovative cellular processing system which creates the Isolagen Therapy™. With seven secured U.S. patents and nine additional U.S. patents pending, Isolagen has an overall approach to aesthetic and therapeutic cellular rejuvenation. Specifically, the Isolagen Therapy has broad potential as a personalized treatment for wrinkles, acne scars, burn scars and periodontal disease.

The Isolagen® Process is a novel process whereby a patient's own collagen-producing cells (fibroblasts) are multiplied to create a living cell therapy which can be returned to the patient's skin. Unlike other applications for the treatment of dermal defects, the Isolagen Therapy is produced utilizing only the patient's unique, living cells. By multiplying a patient's own collagen-producing cells or fibroblasts into tens of millions of new cells, a personalized treatment is created which is then returned to the patient's skin. This treatment, known as the Isolagen Therapy™, is designed to improve skin damage caused by the normal effects of aging, sun damage, acne and burns. Phase III clinical trials were completed in 2008 to evaluate the efficacy and safety of Isolagen Therapy in treating nasolabial folds or wrinkles. A Phase II open-label clinical trial to evaluate the use of Isolagen Therapy to treat fine lines and wrinkles for the full face was also completed in 2008.

In addition to wrinkle correction, Isolagen also conducted a Phase II/III clinical program to investigate Isolagen Therapy™ for the treatment of moderate to severe acne scars. Isolagen is planning clinical trials for the treatment of burn scars (Phase II), which is currently on hold. Isolagen's aesthetics development programs include product candidates to treat targeted areas or wrinkles and to provide full-face rejuvenation that includes the improvement of fine lines, wrinkles, skin texture and appearance. The therapeutic development programs are primarily designed to treat acne scars and restrictive burn scars. All of the product candidates are non-surgical and minimally invasive.

Through December 31, 2008, the Company has been primarily engaged in developing its product technology. In the course of its development activities, the Debtors have sustained losses and expect such losses to continue through at least 2009. The Debtors' ability to operate profitably is largely contingent upon its success in obtaining financing, obtaining regulatory approval to sell one or a variety of applications of the Isolagen Therapy, upon its successful

development of markets for its products and upon the development of profitable saleable manufacturing processes. As of December 31, 2008, the Debtors had cash and cash equivalents of $2.9 million and negative working capital of $87.3 million.

## B.  Existing Indebtedness

*Unsecured Debt.*  On November 3, 2004, Isolagen, Inc. ("Isolagen") completed the private placement of $75.0 million aggregate principal amount of 3.5% Convertible Subordinated Notes Due 2024 (the "3.5% Subordinated Notes").  The 3.5% Subordinated Notes could be due sooner than 2024, as discussed below.  Isolagen received net proceeds of approximately $71.7 million after the deduction of commissions and offering expenses.  Isolagen also granted the purchasers of the 3.5% Subordinated Notes the option to purchase up to $15.0 million of additional 3.5% Subordinated Notes through December 2, 2004.

On November 5, 2004, Isolagen completed the private placement of the additional $15.0 million aggregate principal amount of 3.5% Subordinated Notes.  Isolagen received net proceeds of approximately $14.5 million after the deduction of discounts, commissions and offering expenses.  The total net proceeds to Isolagen were approximately $86.2 million after the deduction of commissions and offering expenses.

Isolagen used approximately $26 million of the net proceeds to repurchase 4,000,000 shares of its common stock, of which 2,000,000 shares were repurchased from former officers, shareholders, and members of the board of directors.  The remaining net proceeds of approximately $60.2 million were added to Isolagen's general working capital.

The 3.5% Subordinated Notes are unsecured obligations and are subordinated in right of payment to all of Isolagen's existing and future senior indebtedness. The 3.5% Subordinated Notes are also effectively subordinated to all indebtedness and other liabilities of Isolagen's subsidiaries.

The 3.5% Subordinated Notes require the semi-annual payment of interest, on May 1 and November 1 of each year beginning May 1, 2005, at 3.5% interest per annum on the principal amount outstanding. The 3.5% Subordinated Notes will mature on November 1, 2024. Prior to maturity, the holders may convert their 3.5% Subordinated Notes into shares of Isolagen's common stock. The initial conversion rate is 109.2001 shares per $1,000 principal amount of 3.5% Subordinated Notes, which is equivalent to an initial conversion price of approximately $9.16 per share.

On or after November 1, 2009, Isolagen may, at its option, redeem the 3.5% Subordinated Notes, in whole or in part, for cash, at a redemption price equal to 100% of the principal amount of the 3.5% Subordinated Notes to be redeemed plus accrued and unpaid interest.

On each of November 1, 2009, November 1, 2014 and November 1, 2019, the holders may require Isolagen to purchase all or a portion of their 3.5% Subordinated Notes at a purchase price in cash equal to 100% of the principal amount of 3.5% Subordinated Notes to be purchased plus accrued and unpaid interest. The holders of the 3.5% Subordinated Notes may also require Isolagen to repurchase their 3.5% Subordinated Notes in the event its common stock (or other

common stock into which the 3.5% Convertible Subordinated Notes are then convertible) ceases to be listed for trading on a U.S. national securities exchange or approved for trading on an established automated over-the-counter market in the United States.

In the event a change in control occurs on or before November 9, 2009, the holders of the 3.5% Subordinated Notes may require Isolagen to purchase all or a portion of their notes at a purchase price equal to 100% of the principal amount of the 3.5% Subordinated Notes to be purchased plus accrued and unpaid interest and the payment of a "make-whole" payment which is based on the date on which the change in control occurs and the price per share paid for Isolagen's common stock in such change in control transaction. Isolagen will be allowed to pay for the repurchase of the 3.5% Subordinated Notes and accrued and unpaid interest in cash or, at its option, shares of its common stock, and Isolagen will be allowed to make the make-whole payment in cash or, at its option, such other form of consideration as is paid to its common stockholders in the change in control transaction. In addition, in the event a change in control occurs on or before November 9, 2009, the holders of the 3.5% Subordinated Notes that convert their 3.5% Subordinated Notes into shares of Isolagen's common stock in connection with such change in control transaction will also be entitled to receive the make-whole payment.

The 3.5% Subordinated Notes were issued in an offering not registered under the Securities Act of 1933, as amended (the "Securities Act"). However, Isolagen was obligated to file with the SEC a shelf registration statement covering resales of the 3.5% Subordinated Notes and the shares of Isolagen's common stock issuable upon the conversion of the 3.5% Subordinated Notes. The shelf registration statement was subsequently declared effective on May 2, 2005. As of December 31, 2008, Isolagen has recorded the 3.5% Subordinated Notes as a current liability on the accompanying consolidated balance sheet as the holders may require Isolagen to purchase all of the 3.5% Subordinated Notes as early as November 2009.

*Unsecured Trade Debt.* Aside from the 3.5% Subordinated Notes, the majority of the Debtors' unsecured debt consists of general trade debt for suppliers of goods and services in the approximate amount of $725,000. In addition, the Debtors have certain outstanding debt and obligations related to their lease of their facility and lawsuits that have been commenced against them. Specifically, the Debtors are liable for the payment of $325,000 to settle a derivative lawsuit.

*Secured Debt.* On April 30, 2009, Isolagen entered into secured promissory notes and security agreements (the "Notes") with eight lenders pursuant to which Isolagen borrowed an aggregate of $500,417.00 in principal amount. The Notes bear interest at a rate of 20% per annum with principal and interest on the Notes due on the earlier of June 20, 2009 or the date that Isolagen files for voluntary or involuntary bankruptcy.

If an event of default under the Notes occurs, the holders of the Notes may declare the Notes to be due and payable. An event of default will occur: (a) if Isolagen defaults in the payment of the Notes or any other amounts payable to the holders of the Notes; (b) if Isolagen defaults in the performance of or compliance with any material term contained in the agreements pursuant to which the Notes were issued and such default shall not have been remedied within five business days after written notice to Isolagen; or (c) if Isolagen defaults (as principal or guarantor or other surety) in the payment of any principal of or premium or interest on any

indebtedness for borrowed money, excluding the interest due May 1, 2009 on Isolagen's pre-existing subordinated notes. The default rate of interest shall be 25% per annum from the date of any event of default under the Notes.

Isolagen is required to redeem the Notes with a 25% premium on the then outstanding principal plus accrued but unpaid interest, upon the (i) receipt of proceeds from the sale of any assets of Isolagen or any of its subsidiaries, excluding sales in the ordinary course of business by Agera Laboratories, Inc.; (b) receipt of the proceeds from any insurance policy held by Isolagen or any of its subsidiaries or pursuant to which Isolagen or any of its subsidiaries are beneficiaries; and (c) receipt of proceeds from the sale of any equity of Isolagen or its subsidiaries or issuance of any indebtedness of Isolagen or any of its subsidiaries. To secure the repayment of the Notes, Isolagen granted the holders of the Notes a security interest in and a lien on the Company's 57% equity interest in Agera.

## C. Equity Interests

As of May 12, 2009, Isolagen had 42,820,380 common stock shares issued, and 38,820,380 common stock shares outstanding.  Further, there were approximately 8,117,000 stock options outstanding.  There were also approximately 8,646,000 shares of contingently issuable common shares outstanding related to Isolagen's $79.2 million of convertible debt (convertible at a common share price equivalent to approximately $9.16).  Isolagen also has preferred stock authorized, none of which is issued and outstanding.

## D. Events Leading to Bankruptcy

The Debtors have incurred losses since their inception, have never generated significant revenue from commercial sales of their products, and have never been profitable. The Debtors are focused on product development, and has expended significant resources on its clinical trials, personnel and research and development.  The Company's consolidated net losses for the years ended 2008 and 2007 were $31.4 million and $35.6 million, respectively. As of December 31, 2008, the Company had an accumulated development stage net loss attributable to common shareholders of $194.1 million. The Company previously failed its Phase III wrinkle trials in 2005.  As a result of this failure, the Company's $90 million of convertible debt did not convert into equity.  Further, the Company utilized its remaining cash resources at the time, which were originally planned to be utilized for a commercial launch had the Phase III trials been successful and approved by the FDA, to re-design and re-perform the Phase III trials.  The Company successfully completed the re-performed Phase III trials in late 2008 under a new management team, however, due to the remaining cash position of the Debtors and the $90 million of debt due as early as November 2009, and further compounded by unprecedented economic downturns with respect to the equity and credit markets, the Debtors are now in an untenable financial position.

Isolagen did not make an interest payment of approximately $1.5 million that was due on May 1, 2009 to the holders of $79.24 million in principal amount of subordinated notes and is now in default. Isolagen does not have the cash or available resources to pay the $1.5 million of interest which was due.

Consequently, on June 15, 2009, the Debtors filed for protection under chapter 11 of the Bankruptcy Code to obtain financing and to restructure its current debt structure so that it may continue its product development.

## III. THE CHAPTER 11 CASES

On June 15, 2009, (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The Debtors cases are being jointly administered. Please refer to the docket in these Cases for the specific relief granted upon the commencement of these Cases.

Contemporaneously with the filing of the voluntary petitions, the Debtors filed the Restructuring Agreement as Exhibit A to the Declaration of Declan Daly in Support of First Day Motions and Applications. The Restructuring Agreement sets forth the key terms of the Plan agreed upon by the Debtors, Viriathus, and the Participating Holders, which include, Ronald Phillips, Morgan Stanley & Co., Incorporated, Credit Suisse Securities (USA) LLC, Highbridge International, LLC, Akanthos Capital Management LLC, CSS, LLC, Alexandra Global Master Fund Ltd, and Context Advantage Master Fund, L.P. The Restructuring Agreement was negotiated and executed prior to the Petition Date and provides for (a) the deadline for plan solicitation, (b) the treatment of classified and unclassified claims and interests under the Plan, (c) corporate governance post-confirmation, and (d) the terms of the Exit Financing. Generally, the Restructuring Agreement provides for a debt to equity swap. The terms of the Restructuring Agreement represent a heavily-negotiated settlement with the key constituents in these Cases. It was negotiated to attempt provide a recovery to interested parties in these Cases. Absent the compromise set forth in the Restructuring Agreement, the Debtors only alternative would have been to file petitions under chapter 7 of the Bankruptcy Code and to liquidate. The Debtors believe that creditors would be extremely unlikely to receive a Distribution if their assets are liquidated in a chapter 7 cases.

On June 17, 2009, the Bankruptcy Court authorized the Debtors, on an interim basis, to borrow up to $1 million from the DIP Lenders. Upon entry of a final order approving debtor-in-possession financing, the Debtors may borrow up to $2.75 million subject to further increase in the discretion of the DIP Lender to fund the 11-week budget proposed by the Debtors. A final hearing on the Debtors' request for debtor-in-possession financing is scheduled for July 6, 2009 at 10:30 a.m.

## IV. SUMMARY OF THE PLAN

The following is a brief summary of the key provisions of the Plan. Holders of Claims and Interests should refer to the Plan for a more detailed description of the terms thereof.

### A.     General Framework of the Plan

The purpose of the Plan is to restructure the Debtors' outstanding indebtedness and equity and resolve the Debtors' liquidity problems, thereby enhancing the recoveries for the Debtors' creditors and enabling the Debtors to continue as a going concern and properly focus upon development of their product technology in light of ongoing clinical trial developments in order to develop a licensed, marketable product.

As is set forth more fully below and in the Plan, the Holders of the Allowed DIP Facility Claims have agreed that, in lieu of accepting Cash on account of their Allowed DIP Lender Claims, the DIP Lenders shall receive, together with the Pre-Petition Lenders, their Pro Rata share of up to 61% of the New Common Stock of the reorganized Isolagen debtor, Renuvagen, subject to dilution by the Exit Financing. The DIP Lenders and the Pre-Petition Lenders have also agreed to compensate Viriathus or its assignee 10% of its Pro Rata Distribution of the New Common Stock. To date, the DIP Lenders and Pre-Petition Lenders have not entered into any agreements or reached any understandings with any party other than the Agent, DIP Lender and/or Prepetition Lender with regard to the transfer or other disposition of the New Common Stock that they will receive under this Plan. Following the Effective Date of the Plan, the DIP Lenders and Pre-Petition Lenders may, in their sole and absolute discretion, transfer or otherwise dispose of their shares of New Common Stock.

The Holders of Allowed Other Secured Claims are not impaired and will be paid in full under the Plan, and each Holder of Allowed Claims arising from or relating to the 3.5% Convertible Notes shall each receive its Pro Rata share of an unsecured note in the principal amount of $6 million (the "New Note") and its Pro Rata share of 33% of the New Common Stock subject to dilution by the Exit Financing.

To facilitate treatment to the Debtors' general unsecured creditors, whose purported Claims total approximately $1,075,000, the Debtors propose to pay Each Holder of an Allowed General Unsecured Claim, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed General Unsecured Claim, their Pro Rata portion of 1% of the New Common Stock, subject to dilution by the Exit Financing.

Finally, no distributions shall be made under the Plan on account of the Old Common Stock and the Intercompany Claims, and any and all liability on account of such Old Common Stock and Intercompany Claims shall be deemed discharged. The Debtors will seek a determination from the Bankruptcy Court that the issuance of the New Common Stock under this Plan shall be exempt from registration under the Securities Act and any state or local law, pursuant to section 1145 of the Bankruptcy Code.

**B.      Distributions under the Plan**

As required by Section 1122 of the Bankruptcy Code, the Plan divides all Claims (other than Administrative Expense Claims, Priority Claims, and DIP Facility Claims) and Interests into separate Classes, based on the similarity of the Holders' legal rights. The following chart summarizes the proposed distributions to Holders of Claims and Interests under the Plan, as well as the Debtor's estimate of the value of such recoveries. The information provided herein is solely for ease of reference, and parties should consult the terms of the Plan for specific treatment of each class of Claims and Interests.

| Class | Treatment if Allowed | Estimated Recovery |
|---|---|---|
| 1— Pre-Petition Lender Claims<br>impaired | Subject to and pursuant to the terms of the Plan, the Holders of the Allowed Pre-Petition Lender Claims have agreed that, in lieu of accepting Cash on account of their Allowed Pre-Petition Lender Claims, the Pre-Petition Lenders shall receive, together with the DIP Lenders as set forth in Section 3.06 of the Plan, their Pro Rata share of up to 61% of the New Common Stock of Renuvagen, subject to dilution by the Exit Financing. | Satisfied under New Common Stock |
| 2—Other Secured<br>Unimpaired | On the Distribution Date, each Holder of an Allowed Class 2 Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Other Secured Claim and at Debtors' exclusive election, either: (i) Cash equal to the amount of such Allowed Other Secured Claim, or (ii) the Collateral which serves as security for such Allowed Other Secured Claim, except to the extent that any Holder of an Allowed Other Secured Claim agrees to less favorable treatment thereof. Upon receipt of the Distribution provided for herein, each Holder of an Allowed Other Secured Claim shall irrevocably release and discharge any and all Liens against the Debtors' property and Assets. | 100% |
| 3—3.5% Unsecured Convertible Notes<br>impaired | Each Holder of an Allowed 3.5% Noteholder Claim shall receive, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed 3.5% Noteholder Claim the following:<br><br>(a) its Pro Rata share of an unsecured note in the principal amount of $6 million (the "New Note"). The New Note shall have the following features:<br><br>1. Type of Security: Unsecured Debentures<br><br>2. Interest: 12.5% payable quarterly in Cash or, at the Reorganized Debtors' option, 15% payable in kind ("PIK") by capitalizing such unpaid amount and adding it to the principal as of the date it was due.<br><br>3. Maturity Date: June 1, 2012<br><br>4. Redemption Rights: At any time prior to the maturity date, the Reorganized Debtors may redeem any portion of the outstanding principal of the New Notes in Cash at 125% of the stated face value of the New Notes.<br><br>5. Mandatory Redemption: The Reorganized | Satisfaction under New Common Stock and New Note |

| | | |
|---|---|---|
| | Debtors will be obligated to redeem all outstanding New Notes upon the following events:<br><br>a) The Reorganized Debtors successfully complete a capital campaign raising in excess of $10,000,000; or<br><br>b) The Reorganized Debtors are acquired by, or sell a majority stake to, an outside party.<br><br>Negative Covenants: The New Notes shall contain customary representations, warranties and covenants, including a covenant that the Reorganized Debtors shall be prohibited from the incurrence of additional debt without obtaining the consent of 66 ⅔% of the New Note holders.<br><br>(b.) its Pro Rata share of 33% of the New Common Stock subject to dilution by the Exit Financing.<br><br>(c.) The Plan allows the 3.5% Noteholder Claims in the amount of the outstanding principal and accrued and unpaid interest as of the Petition Date in the approximate aggregate amount of $81 million (plus any other amounts due under the indenture and allowable under the Bankruptcy Code). | |
| 4—General Unsecured Claims Impaired | Each holder of an Allowed General Unsecured Claim shall, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed General Unsecured Claim, be paid their Pro Rata portion of 1% of the New Common Stock, subject to dilution by the Exit Financing. | Satisfaction under New Common Stock |
| 5—Old Common Stock impaired | On the Effective Date, all Interests in Old Common Stock shall be cancelled and extinguished under the Plan and Holders thereof shall neither retain nor receive any distribution of property or Assets on account of their Interests. | 0% |
| 6—Intercompany Claims impaired | No distributions shall be made under the Plan on account of Intercompany Claims, and any and all liability on account of such Intercompany Claims shall be deemed discharged. | 0% |

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" or "unimpaired" by the plan. If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan (unless the plan provides for no distribution to the holders, in which case, the holder is deemed to reject the plan), and the right to receive under the Chapter 11 plan property of a value that is not less than the value the holder would receive if the debtors were liquidated under Chapter 7.

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable, or contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case, or nonperformance of a non-monetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, or contractual rights. Typically, this means the holder of an unimpaired claim will receive on the later of the effective date or the date on which amounts owing are due and payable, payment in full, in cash, with post-petition interest to the extent appropriate and provided under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtors' obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

The Plan has classified all Claims and Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of a Claim or Interest after solicitation of acceptances of the Plan could necessitate a re-solicitation of acceptances of the Plan.

## C. Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and DIP Facility Claims

The Bankruptcy Code does not require classification of certain priority claims against a debtor. In these chapter 11 Cases, these unclassified claims include Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and DIP Facility Claims. Each of these Claims will receive the treatment set forth in the Plan, which is also set forth below.

Administrative Expense Claims are not impaired under the Plan. Each Holder of an Allowed Administrative Expense Claim, shall, in full and final satisfaction, release and discharge of and in exchange for such Allowed Administrative Expense Claim, be paid either (i) in Cash, in the amount of the Allowed Administrative Expense Claim on the later of (x) the Effective Date or as soon thereafter as is reasonably practicable and (y) the date such Allowed Administrative Expense Claim becomes Allowed, or due and payable in the ordinary course of business or (ii) on such other terms and conditions as may be agreed upon between the Holder of the Allowed Administrative Expense Claim, the Debtors, and Viriathus.

Priority Non-Tax Claims are not impaired under the Plan. Each Holder of an Allowed Priority Non-Tax Claim shall, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Non-Tax Claim, receive Cash in the amount of the Allowed Priority Non-Tax Claim, except to the extent that any Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment thereof, on the later of (x) the Effective Date or as soon thereafter as is reasonably practicable and (y) the date such Allowed Administrative Expense Claim becomes Allowed.

Priority Tax Claims are not impaired under the Plan. Each Holder of an Allowed Priority Tax Claim shall, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, be paid in full through deferred Cash payments in an aggregate principal amount equal to the amount of the Allowed Priority Tax Claim plus interest on the unpaid portion at the rate of 4% per annum from the Effective Date through the date of payment thereof which may be as long as 5 years from the order for relief in these Cases, except to the extent that any Holder of an Allowed Priority Tax Claim agrees to less favorable treatment thereof.

Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, each Holder of an Allowed DIP Facility Claim is entitled to receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed DIP Facility Claim, Cash equal to the Allowed amount of such Claim, except to the extent that such Holder of a particular DIP Facility Claim has agreed to less favorable treatment of such claim. Under the Plan, and pursuant to the settlements and compromises set forth therein, the DIP Facility Claims shall be Allowed in the DIP Facility Maximum Repayment. Subject to and pursuant to the terms of the Plan, the Holders of the Allowed DIP Facility Claims have agreed that, in lieu of accepting Cash on account of their Allowed DIP Lender Claims, the DIP Lenders shall receive, together with the Pre-Petition Lenders as set forth in Section 4.01 of the Plan, their Pro Rata share of up to 61% of the New Common Stock of Renuvagen, subject to dilution by the Exit Financing.

## D. Exit Financing

On the Effective Date, the Reorganized Debtors may issue New Common Stock in Renuvagen to the Plan Funders in exchange for $2 million to fund the Reorganized Debtors' continued operations and the distributions that the Reorganized Debtors must make pursuant to the terms of this Plan. This New Common Stock will be issued at 1½ times the DIP Facility conversion valuation on Schedule A included in the Plan Supplement.

Rights of participation as a Plan Funder shall be extended the DIP Lenders, the Pre-Petition Lenders, and the 3.5% Convertible Noteholders in the amount of $2,000,000.00. A right to participate in future financings of the Reorganized Debtors (other than with respect to (x) issuances pursuant to option or employee plans (y) the sale of equity or equity-linked securities by the Reorganized Debtors pursuant to a *bona fide*, firm underwriting public offering, or (z) the issuance of equity or equity-linked securities by the Reorganized Debtors in connection with a *bona fide* strategic alliance, so long as the equity being offered does not exceed 5% of the equity on a fully-diluted basis immediately prior to such issuance) are extended to (i) the 3.5%

Convertible Noteholders, (ii) the Pre-petition Lenders, and (iii) the DIP Lenders (collectively, the "Covered Investors") such that, for any equity or equity-linked capital raise done by the Reorganized Debtors, the Covered Investors will have the right to invest in such raise up to an amount that would allow them to preserve their existing equity ownership stake on a fully-diluted basis.

## E.    Management Incentive Plan

The management team of the Reorganized Debtors and their subsidiaries shall receive 5% of the New Common Stock, subject to dilution by the Exit Financing.  The management team's equity state shall be subject to a two-year vesting schedule whereby 50% shall vest on the Effective Date, 25% shall vest on the first anniversary, and 25% shall vest on the second anniversary.  The management incentive plan shall be subject to documentation in a form acceptable to the management team and binding upon the Reorganized Debtor on the Effective Date, with such documentation provided on, or prior to, the deadline for submission of the Plan Supplement; provided, however, that the management incentive plan need not be filed with the Bankruptcy Court.

## F.    Permanent Injunction, Release & Exculpation

The Plan provides for the release of claims by parties in interest in these cases and the release of other claims and causes of action.  Each Holder of a Claim or Interest should review and consider the terms and conditions of Section 10 of the Plan.  If the Plan is confirmed, the applicable parties in interest will be bound by the releases and injunctions set forth in the Plan.  In order to give notice to all parties of these provisions, the releases and injunctions set forth in the Plan are reprinted below:

I.    Discharge of Claims:

As of the Effective Date, except as provided in the Confirmation Order or otherwise provided herein, the rights afforded under this Plan and treatment of Claims and Old Common Stock under the Plan shall be in exchange for and complete satisfaction, discharge and release of all Claims from the beginning of time through the Effective Date.  Except as otherwise provided in the Plan, or the Confirmation Order, Confirmation shall, as of the Effective Date, discharge the Debtors from all Claims or other debts that arose before the Effective Date, including, but not limited to, all debts of the kind specified in Bankruptcy Code Sections 502(g), 502(h) or 502(i), whether or not (i) a proof of claim based on such debt is filed or deemed filed pursuant to Bankruptcy Code Section 501, or (ii) a Claim based on such debt is Allowed pursuant to Bankruptcy Code Section 402, or (iii) the Holder of a Claim based on such debt has accepted the Plan.  As of the Effective Date, except as otherwise provided in the Plan, or the Confirmation Order, all Entities shall be precluded from asserting against the Debtors or Reorganized Debtors, or their respective successors or property, any other or further Claims, demands, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in this Plan, or Confirmation Order, the Confirmation Order shall be a judicial determination, as of the Effective Date pursuant to Bankruptcy Code Sections 524 and 1141, of discharge of all such Claims against the Debtors and such discharge shall void any

judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

II.    Injunction:

Except as otherwise set forth in this Plan, on and after the Effective Date, all persons and entities that have held, hold, or may hold (a) any Claim against, or Interest in, the Debtors which arose prior to the Effective Date shall be permanently enjoined from and against: (i) commencing or continuing in any manner any suit, action or other proceeding of any kind against the Debtors, the Reorganized Debtors, their respective affiliates, shareholders, accountants, direct or indirect subsidiaries, agents, attorneys, advisors, (and with regard to all of the foregoing entities, their officers and directors), and/or the estates (collectively, the "Permanent Injunction Parties") with respect to any such Claim or Interest; (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the permanent injunction parties; (iii) creating, perfecting or enforcing any lien or encumbrance of any kind against the permanent injunction parties or against any of their properties or interests in property with respect to such Claim or Interest; and (iv) asserting any right of setoff against any obligation due from the permanent injunction parties or against any property or interest in property of the Debtors or the Reorganized Debtors with respect to any such Claim or Interest; and (b) any Claim, right, action, cause of action against or Interest in the Debtors, the Reorganized Debtors, or the Estates which shall have arisen prior to the confirmation date shall be permanently enjoined from and against commencing or continuing any suit, action, or proceeding against, asserting or attempting to recover any claim against or interest in, or otherwise affecting the permanent injunction parties with respect to any matter that is the subject of this plan.

III.    Exculpation and Limitation of Liability:

None of the Debtors, the Agent, the Pre-Petition Lenders, the DIP Lenders or the Plan Funders or any of the respective shareholders, members, officers, directors, employees, agents, attorneys, consultants, lenders, investment bankers, accountants and affiliates (and each of their respective shareholders, members, officers, directors, employees, agents, attorneys, consultants, lenders, investment bankers, accountants and affiliates of the foregoing, in their respective capacities as such) shall have or incur any liability to any Holder of a Claim or Old Common Stock for any act or omission in connection with, related to, or arising out of, the Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan except for willful misconduct or gross negligence, and, in all respects, the Debtors, the Agent, the DIP Lenders, the Pre-Petition Lenders and the Plan Funders shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

IV.    Releases:

(a)    Compromise of Controversies.    Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, all Claims and Interests arising prior to the Petition Date, whether known or unknown, foreseen or

unforeseen, asserted or unasserted, by or against the Debtors, the Agent, the DIP Lenders, the Pre-Petition Lenders and the Plan Funders, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, creditors, equity holders, and other parties in interest, and are fair, equitable and within the range of reasonableness. The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable. If the Plan is confirmed, the applicable parties in interest will be bound by the releases and injunctions set forth in the Plan.

(b) Releases by the Debtors. As of the Effective Date, the Debtors and their estates hereby waive, release and discharge (i) the DIP Lender, (ii) the Pre-Petition Lenders; (iii) the Agent, (iv) the Plan Funders and (v) the Debtors' present and former officers and directors, and (iv) each of the respective shareholders, members, officers, directors, employees, agents, attorneys, consultants, lenders, investment bankers, accountants and affiliates in their respective capacities as such of the parties released in clauses (i), (ii), and (iii) of this Section, from any Claim, obligation, right, Cause of Action or liability, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Cases or the Plan.

(c) Releases by Holders of Claims or Interests. On the Effective Date, the Debtors, the Reorganized Debtors, the Agent, DIP Lender, the Pre-Petition Lenders and the Plan Funders and their respective affiliates, direct or indirect subsidiaries—along with the present and former officers, directors, agents, shareholders, attorneys, accountants, the estates, and advisors of each of the foregoing (the "Released Parties") will automatically be released from all Claims and Causes of Action of every kind and nature, from the beginning of time through the Effective Date for all acts and omissions occurring both before and after the Petition Date, whether known or unknown, that may be asserted by: (i) the Released Parties; (ii) any Holder of a Claim or Interest in Classes 1, 2, 3, 4, and 6; (iii) Holders of Priority Claims and Holders of Administrative Expense Claims; (iv) the Agent; and (v) the DIP Lenders that in any way relate to, or arise in connection with, the Debtors, the Reorganized Debtors, or these Cases—including, without limitation, the Debtors' present and former businesses, operations, or financing. The release provisions set forth in this section shall act as an injunction against any entity commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim or Causes of Action satisfied, released, or discharged under this Plan. This injunction (the "Injunction") shall apply regardless of whether a Proof of Claim or interest based on such Claim, debt, liability, or Interest is filed or allowed, or whether such entity voted to accept or reject this Plan except for parties in Classes 1, 3, and 4 who submit a ballot indicating that they opt out of this release. Without in any way limiting the foregoing, all Injunctions or stays entered in these Cases and existing immediately prior to the Confirmation Date shall remain in full force and effect until the Effective Date. This release in this subsection binds all parties in interest except for: (i) parties in Classes 1, 3, and 4 who submit a ballot indicating that they opt out of this release, and (ii) Holders of Interests in Class 5.

The foregoing release shall not apply to any duties, obligations, responsibilities, claims or causes of action that in any way relate to, or arise in connection with the Exit Facility.

V.     Injunction Related to Releases and Exculpation:

The Confirmation Order will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, debts, rights, causes of action or liabilities released pursuant to this Plan, including, but not limited to the claims, obligations, suits judgments, damages, demands, debts, rights, causes of action or liabilities released in Article 10 of this Plan.

***

The terms of the Restructuring Agreement, which form the terms of the Plan, represent a heavily-negotiated settlement with the key constituents in these Cases. It was negotiated to attempt to provide a recovery to interested parties in these Cases. Absent the compromise set forth in the Restructuring Agreement, which set forth the terms which comprise the Plan, the Debtors only alternative would have been to file petitions under chapter 7 of the Bankruptcy Code and to liquidate. The Debtors believe that creditors would be extremely unlikely to receive a Distribution if their assets are liquidated in a chapter 7 case. Therefore, the Plan is a compromise under Bankruptcy Rule 9019.

## G.     Bar Date

The Bar Date shall be set by Order of the Bankruptcy Court prior to the Confirmation of the Plan as the Bar Date—*i.e.*, last date by which any Holder of a Claim or Interest, including Administrative Expense Claims pursuant to section 503(b)(9) of the Bankruptcy Code, can assert Claims against the Debtors arising prior to the Petition Date. If a Claim or Interest is not scheduled or is scheduled as disputed, contingent, or unliquidated, the Holder of such claim or interest shall file with this Court a Proof of Claim or Interest (as applicable) or a motion for allowance of an Administrative Claim. All requests for allowance of an Administrative Claim shall be made by Motion to this Court.

Any motions for allowance of an Administrative Expense Claims not arising under section 503(b)(9) of the Bankruptcy Code and not constituting Professional Fees shall be filed by the later of: (i) 30 days after such Claim is incurred, or (ii) 30 days after the Confirmation Date. Service of the Confirmation Order shall constitute reasonable and adequate notice of the Bar Date for Administrative Expense Claims not arising under section 503(b)(9) of the Bankruptcy Code. After the Bar Date, all parties and Entities who fail to file a proof of claim or interest (as applicable) or a motion for allowance of an Administrative Claim shall not be treated as a creditor with respect to such claim or interest (or Administrative Expense Claim) for the purposes of voting and distribution.

After the Bar Date, all parties and entities shall be permanently enjoined from asserting any Claim against, or Interests in, the Debtors, or the Estates, absent further Order of this Court.

## H. Executory Contracts

The Reorganized Debtors shall identify any Executory Contracts to be assumed as of the Effective Date and the amount of cure payments to be provided by Reorganized Debtors in accordance with Bankruptcy Code section 365(b)(1) prior to approval of the Disclosure Statement. Objections to any proposed cure payment must be made by the Voting Deadline and shall be determined, if necessary, at the Confirmation Hearing. A party to an assumed Executory Contract that has not filed an appropriate pleading with the Bankruptcy Court on or before the objection deadline set by the Bankruptcy Court shall be deemed to have waived its right to dispute such amount. The Debtors and the Reorganized Debtors reserve the right to reject any Executory Contract that is listed by the Debtors as an Executory Contract to be assumed. All unpaid cure payments under any Executory Contracts that are assumed or under the Plan shall be made by Reorganized Debtors as soon as practicable after the Effective Date, provided, that, in the event that there is a dispute regarding the amount of any cure payments, the Reorganized Debtors shall make such cure payments as may be required by Bankruptcy Code Section 365(b)(1) within ten (10) days following the entry of a Final Order resolving such dispute.

Each Executory Contract of the Debtors that has not expired by its own terms prior to the Effective Date, that has not been assumed or rejected during these chapter 11 Cases prior to the Effective Date, and is not listed by the Debtors as a Executory Contract to be assumed or is not included in a motion to reject such Executory Contract prior to the Effective Date, shall be deemed rejected by the Debtors pursuant to Bankruptcy Code Section 365 on the Effective Date.

All proofs of claim with respect to Claims arising from the rejection of Executory Contracts shall be filed with the Bankruptcy Court on or before the date established as the last date therefor by the Bar Date Order or other order of the Bankruptcy Court. Any proof of claim that is not timely-filed shall be released, discharged and forever barred from assertion against the Debtors, or their Assets, or Reorganized Debtors.

## I. Consolidation for Distribution and Voting Purposes

On the Effective Date, the Estate of each of the Debtors shall be deemed consolidated with each other such that the assets and liabilities of each of the Debtors shall be merged solely for the purposes of Distribution, voting and Confirmation of the Plan. As a consequence, any guaranties by one of the Debtors of the obligations of the other or any joint obligations shall be deemed liquidated so that the Holder of such Claims shall have one Claim against the consolidated Debtors and shall be deemed to be a single obligation. Additionally, each and every proof of claim filed or to be filed in either case shall be deemed filed against the consolidated Estate. Notwithstanding the foregoing, the deemed consolidation of the Estate shall not affect the legal and organizational structure of the Debtors.

## V. CONFIRMATION AND CONSUMMATION OF THE PLAN

Under the Bankruptcy Code, the following steps must be taken to confirm and implement the Plan.

## A. The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing in respect of the Plan has been scheduled for August 27, 2009 at 2:00 p.m. (Prevailing Eastern Time), before the Honorable Mary F. Walrath, United States Bankruptcy Judge at the United States Bankruptcy Court, 824 Market Street, Fifth Floor, Courtroom Four, Wilmington, Delaware 19801.

## B. Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Section 1129 of the Bankruptcy Code are met. These requirements are briefly summarized below.

### 1. Compliance with the Bankruptcy Code (Sections 1129(a)(1) and 1129 (a)(2))

The Debtors believe that the Plan complies with all the relevant provisions of the Bankruptcy Code and that they have complied with the requirements of the Bankruptcy Code in proposing the Plan.

### 2. Good Faith (Section 1129(a)(3))

The Debtors have proposed the Plan in good faith and not by any means forbidden by law. At the Confirmation Hearing, the Debtors will present evidence of their good faith.

### 3. Court Approval of Payments (Section 1129(a)(4))

The Plan provides for obtaining the Bankruptcy Court's approval of any payment made or to be made by the Debtors for services or for costs and expenses in or in connection with these Cases, or in connection with the Plan and incident to these Cases.

### 4. Disclosure of Directors and Officers (Section 1129(a)(5))

Pursuant to Bankruptcy Code Section 1129(a)(5), the Debtors will disclose, as part of its plan supplement, the identity and affiliations of any other person proposed to serve on the initial board of directors of Reorganized Debtors, and, to the extent such person is an insider other than by virtue of being a director, the nature of any compensation for such person. The classification and composition of the board of Reorganized Debtors shall be consistent with the New Articles of Incorporation. The Debtors assert that the appointment of such individuals will be consistent with the interests of the Debtors' Claims and Interest Holders and with public policy.

### 5. Approval of Rate Change (Section 1129(a)(6))

Section 1129(a)(6) of the Bankruptcy Code does not apply to the Debtors.

### 6. Best Interests Test (Section 1129(a)(7))

With respect to each impaired Class of Claims and Interests, the Bankruptcy Code requires that in order for the Plan to be confirmed, each Holder of a Claim or Interest either (a)

accept the Plan; or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine what Holders of Claims and Interests of each impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' Assets and properties in the context of a chapter 7 liquidation case. The cash amount that would be available for satisfaction of unsecured non-priority Claims and Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtor, augmented by the unencumbered cash held by the Debtors at the time of the commencement of the liquidation case and litigation recoveries, if any. Such cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well those fees that might be payable to attorneys and other professionals that such a trustee might engage. In addition, Claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtor during the pendency of these Cases. The foregoing types of Claims and other Claims that might arise in a liquidation case or result from these pending Cases, including any unpaid expenses incurred by the Debtors during these Cases such as compensation for attorneys, financial advisors, and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-petition general unsecured claims.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, are then compared with the value of the property offered to such Classes of Claims and Equity Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in these Cases, including: (a) the liens asserted in and to the Debtors' assets by the Pre-Petition Lenders; (b) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (c) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail; and (d) the substantial increases in claims which would be satisfied on a priority basis or on parity with creditors in these cases, the Debtors have determined that confirmation of the Plan will provide each Holder of an Allowed Claim or Interest with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtors under chapter 7.

The Debtors also believe that the value of any distributions to each Class of Allowed Claims in a chapter 7 case, including all Secured Claims and Priority Tax Claims, would be less than the value of distributions under the Plan because such distribution in a chapter 7 case would not occur for a substantial period of time. It is likely that distribution of the proceeds of the liquidation could be delayed for years after the completion of such liquidation to resolve Claims

and prepare for distributions. In the likely event litigation was necessary to resolve Claims asserted in the chapter 7 case, the delay could be prolonged.

The Liquidation Analysis of the Debtors and prepared by the Debtors' financial advisor is attached as an Exhibit hereto. Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' financial advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation.

### 7. Confirmation of a Consensual Plan (Section 1129(a)(8))

Section 1129(a)(8) requires that to confirm a consensual Plan, each class must be unimpaired or vote to accept the plan. In these Cases, if each Class does not satisfy this requirement, then the Plan may be confirmed as a non-consensual plan under Sections 1129(a)(10) and 1129(b) as long as the requirements below are satisfied.

### 8. Treatment of Claims Entitled to Priority (Section 1129(a)(9))

The Plan provides for the treatment of Administrative Expense Claims and Priority Claims in the manner required by Section 1129(a)(9) of the Bankruptcy Code.

### 9. Confirmation of a Nonconsensual Plan (Sections 1129(a)(10) and 1129(b))

In the event that any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan if all other requirements under Section 1129(a) of the Bankruptcy Code are satisfied, and if, with respect to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to such Class. Confirmation under Section 1129(b) of the Bankruptcy Code requires that at least one impaired Class of Claims accept the Plan, excluding any acceptance of the Plan by an "insider" (as that term is defined in Section 101 of the Bankruptcy Code). The Debtor intends to seek confirmation of the Plan notwithstanding the non-acceptance of one or more impaired Classes.

The Bankruptcy Code does not define what is meant by "does not discriminate unfairly," but it is generally interpreted to mean that similarly-situated creditors or interest holders must receive similar consideration under the plan. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable," as follows:

<u>Secured Claims</u>

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured claims includes the requirements that (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least

equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

Unsecured Claims

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the following requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

Equity Interests

The condition that a plan be "fair and equitable" with respect to a non-accepting class of equity interests includes the requirements that either: (a) the plan provide that each holder of an equity interest in such class receive or retain under the plan, on account of such equity interest, property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled; (ii) any fixed redemption price to which such holder is entitled; or (iii) the value of such interest; or (b) if the class does not receive such an amount as required under (a), no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors believe that the Plan would not discriminate unfairly against, and is fair and equitable with respect to, any non-accepting Class of Claims or Interests.

*10. Feasibility (Section 1129(a)(11))*

The Bankruptcy Code permits a plan to be confirmed if the Bankruptcy Court finds that it is not likely to be followed by liquidation or the need for further financial reorganization, unless the plan itself provides for a liquidation. This requirement is the so-called "feasibility test." The Plan provides that the Reorganized Debtors will emerge with sufficient Cash and Exit Financing to satisfy, in full, all payments required under the Plan. The Debtors will not accept Exit Financing unless it is sufficient to fund ongoing operations and satisfy, in full, all payments required under the Plan. The Reorganized Debtors intend on raising additional funds post-confirmation to assist in the ongoing development of its assets and to pay its bills as they come due. Confirmation of the Plan is a necessary predicate to raising such additional financing and will make such financing more readily accessible given the significant restructuring of the balance sheet and elimination of pre-petition debt. The Debtors therefore believe that the proposed Exit Financing and the expected post-confirmation capital raising will be sufficient for the Debtors to satisfy their obligations under the Plan and to operate their businesses. The Debtors will provide evidence at the Confirmation Hearing that the post-confirmation financing is achievable and will be sufficient to satisfy Section 1129(a)(11).

The Debtors' businesses successfully completed and re-performed the within-referenced new Phase III trials in late 2008 under a new management team and would like to move forward with the marketing and development of said product technology. As previously described, the Debtors are in the process of seeking approval from the Food and Drug Administration for their

lead product candidate. At present, the Debtors anticipate that this approval will be provided in January 2010, assuming the process progresses at its currently anticipated pace and that no major unanticipated delays are encountered. Upon receiving approval from the FDA, the Debtors will be required to seek substantial funding to allow the Debtors to market its product. Conversely, the Debtors may seek to sell their assets (including the FDA approved technologies) to, or partner with, a party that has the financial wherewithal and industry experience to bring an approved product to market.

*11. Payment of Statutory Fees (Section 1129(a)(12))*

All fees payable pursuant to Section 1930 of title 28 of the United States Code in connection with these Cases, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.

*12. Retiree Benefits (Section 1129(a)(13))*

Section 1129(a)(13) of the Bankruptcy Code contains certain requirements governing non-pension "retiree benefits" that do not apply to the Debtor.

## C. Consummation of the Plan

The Plan will be consummated on the Effective Date. The Effective Date shall be determined and set by the Debtors after the Confirmation Date and shall be a Business Day upon which the conditions precedent to effectiveness of the Plan are satisfied or waived.

## VI. RISK FACTORS TO BE CONSIDERED

The Holders of impaired Claims against the Debtors should carefully consider the following factors before deciding whether to vote to accept or reject the Plan.

## A. Certain Risks of Non-Confirmation

The Plan sets forth certain conditions precedent to the Bankruptcy Court entering the Confirmation Order, which are as follows:

(a) The Debtors shall have reviewed and updated all financial projections, and such financial projections shall be acceptable in form and substance to Agent and the Debtors, in their sole and absolute discretion.

(b) The Post Petition Credit Agreement shall be in full force and effect without any defaults having occurred that have not been waived by Agent.

(c) The Confirmation Order shall be acceptable in form and substance to the Debtors and the Agent, in their sole and absolute discretion.

(d) The Disclosure Statement Approval Order shall have been entered.

(e) There shall have occurred no Material Adverse Changes.

Even if all of the conditions to confirmation are satisfied, the Plan may not be consummated if any of the conditions precedent to the Effective Date, as are set forth in the Plan, are not met. In addition, the Debtors will emerge from bankruptcy with a need for capital. There is a risk that the anticipated additional funding will not be available to the Debtors, or that there will not be sufficient funding available for the Debtors to obtain the FDA approval set forth above, or that there will not be sufficient funding available for the Debtors to continue to seek the FDA approval set forth above. Based upon the current financial projections that are set forth in the Budget attached hereto as Exhibit D, the Debtors anticipate that the Exit Financing will fund their continued operations for a period of 2-3 months subsequent to the Effective Date of the Plan. As is set forth above, the Debtors believe that after the Effective Date, additional funding may be more readily accessible; for, the Reorganized Debtors will have significantly reduced its liabilities and will possess a much less cumbersome equity structure. However, the Debtors do not currently have firm commitments that any funding will be available to them.

Additionally, even if the required acceptances of each of Class 1, 3, and 4 are received, the Bankruptcy Court might find that the solicitation of votes or the Plan did not comply with the solicitation requirements made applicable by Section 1125 of the Bankruptcy Code. In such an event, the Debtors may seek to re-solicit acceptances, but confirmation of the Plan could be substantially delayed and possibly jeopardized. The Debtors believe that their solicitation of acceptances of the Plan complies with the requirements of Section 1125 of the Bankruptcy Code, that duly executed Ballots and master ballots will be in compliance with applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and that, if sufficient acceptances are received, the Plan should be confirmed by the Bankruptcy Court.

The Debtors will request that the Bankruptcy Court confirm the Plan under Bankruptcy Code Section 1129(b). Section 1129(b) permits confirmation of the Plan despite rejection by one or more impaired classes if the Bankruptcy Court finds that the Plan "does not discriminate unfairly" and is "fair and equitable" as to the non-accepting class or classes. Classes 5 and 6 are fully impaired and will not receive or retain any property under the Plan. Because Classes 5 and 6 are deemed not to have accepted the Plan, the Debtors will request that the Bankruptcy Court find that the Plan is fair and equitable and does not discriminate unfairly as to such Classes (and any other class that fails to accept the Plan).

Should the Bankruptcy Court fail to confirm the Plan, the Debtors would then consider all financial and other alternatives available to it at that time. Pursuit of any such alternative could result in a protracted and non-orderly reorganization with all the attendant risk of adverse consequences to the Debtors and their ultimate ability to function effectively and competitively.

If the Plan, or a plan determined by the Bankruptcy Court not to require re-solicitation of acceptances by Classes, were not to be confirmed, it is unclear whether a reorganization could be implemented and what Holders of Claims and Interests would ultimately receive with respect to their Claims and Interests. If an alternative reorganization could not be agreed upon, it is possible that the Debtors would have to liquidate assets, in which case Holders of Claims and Interests could receive less than they would have received pursuant to the Plan.

## B.   Risks of Non-Consummation of Plan

Even if all of the conditions to confirmation are satisfied, the Plan may not be consummated if any of the conditions precedent to the Effective Date, as are set forth in the Plan, are not met.  In addition, the Debtors will emerge from bankruptcy with a  need for capital.  There is a risk that the anticipated additional funding will not be available to the Debtors, or that there will not be sufficient funding available for the Debtors to obtain the FDA approval set forth above, or that there will not be sufficient funding available for the Debtors to continue to seek the FDA approval set forth above.  Based upon the current financial projections that are set forth in the Budget attached hereto as Exhibit D, the Debtors anticipate that the Exit Financing will fund their continued operations for a period of 2-3 months subsequent to the Effective Date of the Plan, without regard to the post Effective Date financing which will be sought by the Reorganized Debtors, which the Debtors expect to obtain.  As is set forth above, the Debtors believe that after the Effective Date, additional funding will be more readily accessible because the Reorganized Debtors will have significantly reduced its liabilities and will possess a much less cumbersome equity structure.  However, the Debtors do not currently have firm commitments that any funding will be available to them.

## C.   Risks Associated with New Common Stock

The ultimate recoveries under the Plan to holders of Claims against the Debtors depend upon the realizable value of the New Common Stock to be issued under the Plan.  The realizable value of the New Common Stock is subject to a number of material risks, including, but not limited to, those specified below.   These factors assume that the Plan is approved by the Bankruptcy Court and that all conditions precedent to the Confirmation Date and the Effective Date are satisfied and/or waived pursuant to the Plan.

The New Common Stock will be issued pursuant to the Plan.  Some of the recipients may prefer to liquidate their investment rather than hold it on a long term basis.  The prices at which the New Common Stock may trade will depend upon a number of factors, including industry conditions, the performance of, and investor expectations for, the Reorganized Debtors, and market factors, such as the number of holders who may wish to dispose of their stock to raise funds or recognize losses for tax purposes or otherwise as well as the projected success of the product technology in future clinical trials.

The Debtor anticipates that dividends may not be paid with respect to the New Common Stock.

**THE DEBTORS MAKE NO REPRESENATIONS OR WARRANTIES THAT THE NEW COMMON STOCK WILL BE FULLY TRADEABLE. ALL PARTIES SHOULD DRAW THEIR OWN CONCLUSIONS REGARDING THE TRANSFERABILITY OF THE NEW COMMON STOCK. NOTHING CONTAINED HEREIN SHALL BE INTERPRETED AS AN INDICATION THAT THE NEW COMMON STOCK IS TRADEABLE.**

# VII. EXEMPTIONS FROM SECURITIES ACT REGISTRATION

**A. Generally:**

Section 1145 of the Bankruptcy Code creates an exemption from the registration and licensing requirements of the Securities Act of 1933 (the "Securities Act") and the corresponding provisions of the state securities laws (together with the Securities Act, the "securities laws") for the issuance and certain resales of the securities issued in connection with a Chapter 11 plan.

**B. Initial Issuance of New Common Stock under the Plan**

Section 1145(a) of the Bankruptcy Code provides that the securities registration and qualification requirements of the securities laws do not apply to the offer or sale of stock, warrants or other securities by a debtor if the offer or sale occurs under a plan of reorganization and the securities are transferred in exchange (or principally in exchange) for a claim against or interest in the debtor.

> **THE DEBTORS MAKE NO REPRESENATIONS OR WARRANTIES WITH RESPECT TO SECTION 1145(a) OF THE BANKRUPTCY CODE. THE DEBTORS ARE SEEKING APPROVAL FROM THE BANKRUPTCY COURT OF THE ISSUANCE OF THE NEW COMMON STOCK UNDER EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY STATE OR LOCAL LAW PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE; HOWEVER THE DEBTORS CANNOT GUARANTEE THAT SUCH EXEMPTION WILL APPLY OR WILL BE GRANTED. ALL PARTIES SHOULD DRAW THEIR OWN CONCLUSIONS REGARDING THE TRANSFERABILITY OF THE NEW COMMON STOCK AND THE APPLICABILITY OF SECTION 1145(a) TO THE ISSUANCE OF THE NEW COMMON STOCK. NOTHING CONTAINED HEREIN SHALL BE INTERPRETED AS AN INDICATION THAT THE NEW COMMON STOCK IS TRADEABLE OR EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY STATE OR LOCAL LAW PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE.**

The views of the SEC have not been sought in this particular case and, therefore, the Debtors can give no assurances regarding the current position of the SEC on ordinary trading transactions. The Debtors have not sought any advice from the staff of the SEC with respect to such transactions.

> **THE DEBTORS HAVE NOT SOUGHT A "NO-ACTION" LETTER FROM THE SEC OR ANY STATE SECURITIES COMMISSION WITH RESPECT TO ANY MATTER DISCUSSED HEREIN.**

Section 1145 of the Bankruptcy Code generally exempts from registration the offer or sale of a debtor's securities of those or an affiliate of, or a successor to, the debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or interest in, or a claim

for an administrative expense concerning such debtor. The Debtors will seek an Order of the Bankruptcy Court seeking the issuance of the New Common Stock to the Creditors who are entitled to the same under the Plan pursuant to Section 1145(a) of the Bankruptcy Code. Therefore, under Section 1145 of the Bankruptcy Code, the issuance of the New Common Stock and the subsequent resale of such securities by entities that are not "underwriters" (as defined in Section 1145(b) of the Bankruptcy Code, a "Section 1145 Underwriter") may not be subject to the registration requirements of Section 5 of the Securities Act of 1933, as amended (the "Securities Act") or equivalent state securities laws. Thus, such shares may be deemed to have been issued in a registered public offering under the Securities Act and, therefore, may be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof unless the holder is a Section 1145 Underwriter. In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code generally defines "underwriter" for purposes of the Securities Act as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities, (d) is an issuer (in this case, the Reorganized Debtor) of the securities within the meaning of section 2(11) of the Securities Act. The reference contained in Bankruptcy Code §1145(b)(1)(D) to Section 2(11) of the Securities Act includes as Section 1145 Underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with, an issuer or securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through ownership of voting securities, by contract, or otherwise. Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor that owns at least ten percent (10%) of the securities of the Reorganized Debtor is a presumptive "control person" of the Reorganized Debtor. To the extent that persons deemed to be "underwriters" receive New Common Stock, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.

**Because of the subjective nature of the question of whether a particular holder may be an underwriter, the Debtors make no representations concerning the ability of any person to dispose of the securities to be distributed under the Plan. Each recipient of securities under the Plan should consult its own legal advisor as to whether resales of such recipient's securities are lawful under federal and state securities laws.**

## VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives for resolution of the Debtors' chapter 11 cases include (a) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, and (b) the preparation and presentation of an alternative plan or plans of reorganization.

## A. Liquidation under Chapter 7 or Chapter 11

If no chapter 11 plan can be confirmed, these Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors. A discussion of the effect that a chapter 7 liquidation would have on the recovery of holders of Claims and Equity Interests is set forth in Section V.B.6 herein. The Debtors believe that liquidation of the Debtors under chapter 7 would result in (i) smaller distributions being made to creditors than those provided in the Plan because of the additional administrative expenses involved in the appointment of a trustee, and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations, and (iii) the failure to realize the greater going concern value of the Debtors' assets.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of liquidation. In a liquidation under chapter 11, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7. Thus, chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. Any distribution to the Holders of Claims under a chapter 11 liquidation plan probably would be delayed substantially. Moreover, the Debtors will likely not have sufficient funds to fund a chapter 11 liquidation. Therefore, a chapter 7 liquidation is more likely if no chapter 11 plan can be confirmed.

## B. Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of its assets. During the course of preparation of the Plan and prior to filing for relief under chapter 11 of the Bankruptcy Code, the Debtors explored various other alternatives and concluded that the Plan represented the best alternative to protect the interests of Creditors and other parties in interest. The Debtors have not changed their conclusions.

## IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain United States federal income tax consequences of the Plan to the Debtors and to Holders of Claims and Interests. This discussion is based on the Internal Revenue Code of 1986, as amended as of the date hereof (the "Tax Code"), treasury regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the IRS as in effect on the date hereof. Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class) and Interests, the Holders' status and method of accounting (including Holders within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein subject to significant uncertainties. No legal

opinions have been requested from counsel with respect to any of the tax aspects of the Plan, and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below. Furthermore, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims and Interests.

This discussion does not purport to address all aspects of United States federal income taxation that may be relevant to the Debtors or the Holders of Claims or Equity Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the United States federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, regulated investment companies and foreign taxpayers). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed.

**The following summary is not a substitute for careful tax planning and advice based upon the personal circumstances of each Holder of a Claim or Equity Interest. Each Holder of a Claim or Interest is urged to consult with his, her, or its tax advisors concerning the United States Federal, state, local, foreign, and other tax consequences applicable under the Plan.**

## A. Consequences to Holders of Allowed Claims in Classes 1, 3, and 4

Pursuant to the Plan, Holders of Allowed Class Claims in Classes 1, 3, and 4 may receive New Common Stock in part in discharge of their Allowed Claims or Interests. Whether or not such a Holder will be required or allowed to recognize gain or loss realized on the exchange of Allowed Claims or Interests for New Common Stock (the "Exchange") depends on whether the Exchange constitutes a "reorganization" as that term is defined in Section 368 of the Tax Code. This determination, in turn, depends upon whether the Allowed Claim constitutes a "security" for United States federal income tax purposes. Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, including the length of the term of a debt instrument, the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.

Assuming the Holder's Allowed Claim is treated as a security for United States Federal Income Tax purposes, the Exchange may qualify as a reorganization pursuant to Section 368(a)(1)(E) of the Tax Code and a Holder may not recognize gain or loss on the Exchange, except that a Holder will be required to recognize taxable income to the extent that a portion of the New Common Stock received is allocable to accrued interest on the Allowed Claims exchanged therefor.

A Holder of an Allowed Claim that does not constitute a "security" for United States Federal Income Tax purposes will recognize gain or loss for United States Federal Income Tax

purposes on the Exchange equal to the difference between (i) the amount realized (*i.e.,* the fair market value of New Common Stock received) in respect of such Allowed Claim (other than amounts allocable to accrued interest) and (ii) such Holder's adjusted tax basis in such Allowed Claim.

The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss recognized by a Holder with respect to an Allowed Claim against the Debtors will be determined by a number of factors, including, but not limited to, the following: (a) the tax status of the Holder, (b) whether the obligation from which the Allowed Claim arose constitutes a capital asset of the Holder, (c) whether the obligation from which the Allowed Claim arose has been held for more than one year or was purchased at a discount, (d) whether the Holder is a financial institution or other entity entitled to special treatment under the United States Federal Income Tax laws and (e) whether and to what extent the Holder has previously claimed a bad debt deduction in respect of the obligation from which the Allowed Claim arose. In addition, a substantial amount of time may elapse between the Effective Date and date on which a Holder may receive distributions under the Plan. Both the timing and ultimate amount of Distributions is uncertain, and the delay in Distributions may defer the recognition of gain or loss to Holders. Holders should consult their own tax advisors to determine the United States Federal Income Tax consequences of the consummation of and the receipt of Distributions under the Plan.

## B.    Consequences to the Debtors

### 1. Cancellation of Indebtedness Income

Subject to certain exceptions, a debtor recognizes cancellation of debt ("COD") income upon satisfaction of its outstanding indebtedness equal to the excess of (i) the amount of the indebtedness discharged, over (ii) the issue price of any new indebtedness issued, the amount of cash paid, and the fair market value of any other consideration (including stock of the debtor) given in satisfaction of the indebtedness. As discussed below, there is a bankruptcy exception to the recognition of COD income which will apply to the Debtors in connection with the Plan.

A debtor is not required to include COD income in gross income if the debt discharge occurs under chapter 11 of the Bankruptcy Code. However, under the Tax Code, the debtor must reduce certain tax attributes (in general, first its Net Operating Loss ("NOL") carryovers and then certain tax credits, capital loss carryovers, the tax basis of its assets, and foreign tax credits) by the amount of COD income excluded from gross income by this exception. As an exception to the order of tax attribute reduction described above, a taxpayer can elect to reduce its tax basis in its depreciable assets first, then its NOL carryovers.

### 2. Limitation of Net Operating Loss Carryovers

Pursuant to Section 382 of the Tax Code, and subject to certain exceptions discussed below, if there is an "ownership change" with respect to a corporation with NOL carryovers, such corporation will be subject to a limitation on its use of any NOL carryover incurred prior to the ownership change to offset taxable income earned after the ownership change (a "Section 382 Limitation"). Except as discussed below, the Section 382 Limitation on such corporation's NOL carryover will be equal to the product of (i) the net equity value of all of the corporation's stock

immediately before the ownership change and (ii) the long-term tax-exempt rate as determined under IRS rules. The long-term tax exempt rate is published monthly by the Treasury Department and is intended to represent current interest rates on long-term tax-exempt debt obligations.

In general, an "ownership change" occurs if the percentage of stock of the corporation owned actually or constructively by one or more "5% shareholders" increases by more than 50 percentage points on any "testing date" (taking into account all relevant adjustments as of the end of a "testing date") as compared to the lowest percentage of stock of the corporation owned by those 5% shareholders at any time during the statutory "testing period" (generally, the past three years or, if shorter, the period since the last ownership change). Generally, a "testing date" is any date on which there is any change in the ownership of stock that affects the percentage stock ownership of a 5% shareholder. A "5% shareholder" is one who owns at least 5% of the stock of the corporation, and all stock owned by shareholders who are not 5% shareholders is generally treated as being owned by one 5% shareholder.

If the Plan causes an ownership change with respect to the Debtors, then to the extent any NOL carryover and certain other tax attributes allocated to the Debtors are not reduced by the amount of realized COD income and subject to any preexisting Section 382 Limitation on the Debtor's ability to offset the NOL carryover and such other tax attributes against taxable income, the use of the remaining NOL carryover and such other tax attributes will be subject to the Section 382 Limitation unless the exception in Section 382(a)(5) applies.

If the exchanges contemplated by the Plan qualify for the tax treatment under Section 382(l)(5), the Debtors' NOL carryover will be available for future use without any Section 382 Limitation (subject to any preexisting Section 382 Limitation and after reduction of the Debtors' NOL carryover by the Disqualified Interest). If the exchanges do not qualify for the tax treatment under Section 382(l)(5) or the Debtors elect not to utilize Section 382(l)(5), the Debtors' use of the NOL carryover to offset taxable income earned after the ownership change will be subject to the Section 382 Limitation (as well as any preexisting Section 382 Limitation).

In the Restructuring Agreement, the Debtors agreed to take all reasonable and appropriate steps to attempt to preserve some or all of the NOLs and to structure any transactions contemplated by the Restructuring Agreement and Plan in a manner to preserve NOLs; provided, however, that to the extent that the restructuring set forth in the Restructuring Agreement and Plan will not result in a preservation of some or all of the NOLs, it is expressly understood by and between the parties that the Debtors will move forward with the terms of the Restructuring Agreement and Plan regardless of the potential loss of the NOLs.

*3. Alternative Minimum Tax*

Alternative minimum tax ("AMT") must be paid by a corporation when and to the extent that its liability for AMT exceeds its regular tax liability. AMT is equal to 20% of alternative minimum taxable income ("AMTI") less certain allowable credits. AMTI generally equals regular taxable income, increased or decreased by certain adjustments and preference items.

**THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY RESPECTS, UNCERTAIN. THE**

FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND, AS SUCH, DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF CLASS 1, 3, AND 4 CLAIMS OR INTERESTS. ALL HOLDERS OF SUCH CLAIMS OR INTERESTS ARE STRONGLY URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN THAT ARE RELEVANT TO THEIR PARTICULAR CIRCUMSTANCES.**

## X. CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any alternatives because it will provide the greatest chance of maximizing recoveries to Creditors. In addition, alternatives may involve significant delay, uncertainty, and substantial additional administrative costs. **The Debtors urge Holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received no later than the Voting Deadline.**

Dated: July 30, 2009
      Wilmington, Delaware                CIARDI CIARDI & ASTIN

                                     */s/ Mary E. Augustine*
                                     Daniel K. Astin (No. 4068)
                                     Anthony M. Saccullo (No. 4141)
                                     Mary E. Augustine (No. 4477)
                                     Carl D. Neff (No. 4895)
                                     919 N. Market Street, Suite 700
                                     Wilmington, Delaware 19801
                                     Tel: (302) 658-1100
                                     Fax: (302) 658-1300
                                     dastin@ciardilaw.com
                                     asaccullo@ciardilaw.com
                                     maugustine@ciardilaw.com
                                     cneff@ciardilaw.com

                                     *Counsel for the Debtors*

EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | Case No. 09-12072 (MFW) |
| Isolagen, Inc., *et al.*,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |

## FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY DEBTORS IN POSSESSION

CIARDI CIARDI & ASTIN
Daniel K. Astin (No. 4068)
Anthony M. Saccullo (No. 4141)
Mary E. Augustine (No. 4477)
Carl D. Neff (No. 4895)
919 N. Market Street, Suite 700
Wilmington, Delaware 19801
Tel: (302) 658-1100
Fax: (302) 658-1300
dastin@ciardilaw.com
asaccullo@ciardilaw.com
maugustine@ciardilaw.com
cneff@ciardilaw.com

*Counsel for the Debtors and
Debtors-in-Possession*

Dated: July 30, 2009
       Wilmington, Delaware

---

[1] The Debtors are Isolagen, Inc., tax identification number **-***8888, and Isolagen Technologies, Inc., tax identification number **-***6974.

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 8

II. DEFINITIONS ............................................................................................................... 8

Section 2.01    3.5% Convertible Notes:.................................................................. 8

Section 2.02    3.5% Noteholder Claims: ................................................................ 8

Section 2.03    Adjusted Amounts:.......................................................................... 8

Section 2.04    Administrative Expense Claim:....................................................... 8

Section 2.05    Affiliate:.......................................................................................... 8

Section 2.06    Agent: .............................................................................................. 8

Section 2.07    Allowed: .......................................................................................... 8

Section 2.08    Asset(s): ........................................................................................... 9

Section 2.09    Avoidance Actions: ......................................................................... 9

Section 2.10    Bankruptcy Code: ........................................................................... 9

Section 2.11    Bankruptcy Court: ........................................................................... 9

Section 2.12    Bankruptcy Rules: ........................................................................... 9

Section 2.13    Bar Date:.......................................................................................... 9

Section 2.14    Business Day: ................................................................................... 9

Section 2.15    Cases:............................................................................................. 10

Section 2.16    Cash: .............................................................................................. 10

Section 2.17    Causes of Action:.......................................................................... 10

Section 2.18    Claim: ............................................................................................ 10

Section 2.19    Class: ............................................................................................. 10

Section 2.20    Collateral: ...................................................................................... 10

Section 2.21    Confirmation Date: ....................................................................... 10

1

Section 2.22    Confirmation Hearing: ................................................................... 10

Section 2.23    Confirmation Order: ..................................................................... 11

Section 2.24    Debtors: ......................................................................................... 11

Section 2.25    DIP Facility Claim: ....................................................................... 11

Section 2.26    DIP Facility Maximum Repayment: ............................................. 11

Section 2.27    DIP Lenders: .................................................................................. 11

Section 2.28    Disclosure Statement: ................................................................... 11

Section 2.29    Disputed: ....................................................................................... 11

Section 2.30    Disputed Claims Reserve Amount: ............................................... 11

Section 2.31    Distribution: ................................................................................... 11

Section 2.32    Effective Date: ............................................................................... 11

Section 2.33    Entity: ............................................................................................ 12

Section 2.34    Estates: .......................................................................................... 12

Section 2.35    Executory Contract: ...................................................................... 12

Section 2.36    Exit Financing: .............................................................................. 12

Section 2.37    File, Filed, Filing, or Files: .......................................................... 12

Section 2.38    Final Order: ................................................................................... 12

Section 2.39    General Unsecured Claim: ............................................................ 12

Section 2.40    Holder: ........................................................................................... 12

Section 2.41    Intercompany Claims: ................................................................... 12

Section 2.42    Lien: ............................................................................................... 12

Section 2.43    Material Adverse Change: ............................................................. 12

Section 2.44    New By-Laws: ................................................................................ 13

Section 2.45    New Certificate of Incorporation: ................................................. 13

Section 2.46    New Common Stock: ..................................................................... 13

Section 2.47    New Directors: ........................................................................................ 13

Section 2.48    New Notes: ............................................................................................. 13

Section 2.49    Old Common Stock: ................................................................................ 13

Section 2.50    Other Definitions: .................................................................................. 13

Section 2.51    Other Secured Claim: ............................................................................. 13

Section 2.52    Participating Holders: ............................................................................. 14

Section 2.53    Permanent Injunction: ............................................................................. 14

Section 2.54    Petition Date: ......................................................................................... 14

Section 2.55    Plan Funders: ......................................................................................... 14

Section 2.56    Plan Supplement: ................................................................................... 14

Section 2.57    Post-Petition Credit Agreement: ............................................................. 14

Section 2.58    Pre-Petition Lender Claims: ................................................................... 14

Section 2.59    Pre-Petition Lender Notes: ..................................................................... 14

Section 2.60    Pre-Petition Lenders: ............................................................................. 14

Section 2.61    Priority Claim: ....................................................................................... 14

Section 2.62    Priority Tax Claim: ................................................................................ 14

Section 2.63    Professionals: ......................................................................................... 14

Section 2.64    Proof of Claim or Proof of Interest: ....................................................... 14

Section 2.65    Pro Rata: ................................................................................................ 15

Section 2.66    Record Date: ........................................................................................... 15

Section 2.67    Renuvagen: ............................................................................................. 15

Section 2.68    Reorganized Debtors: .............................................................................. 15

Section 2.69    Restructuring Agreement: ....................................................................... 15

Section 2.70    Schedules: .............................................................................................. 15

Section 2.71    Solicitation Procedures Order: ................................................................ 15

| Section 2.72 | Unclaimed Distribution: | 15 |
|---|---|---|
| Section 2.73 | Unsatisfied: | 15 |
| Section 2.74 | U.S. Trustee Fees: | 15 |
| Section 2.75 | Viriathus: | 15 |

**III. TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX AND NON-TAX CLAIMS, AND U.S. TRUSTEE FEES** ............ 15

| Section 3.01 | Treatment of Administrative Expense Claims: | 15 |
|---|---|---|
| Section 3.02 | Allowance of Professional Fees and Expenses: | 16 |
| Section 3.03 | Priority Non-Tax Claims: | 16 |
| Section 3.04 | Treatment of Priority Tax Claims: | 16 |
| Section 3.05 | U.S. Trustee Fees: | 16 |
| Section 3.06 | DIP Facility Claims: | 16 |

**IV. CLASSIFICATION AND TREATMENT OF CLAIMS AND OLD COMMON STOCK** ..... 17

| Section 4.01 | Class 1—Pre-Petition Lender Claims: | 17 |
|---|---|---|
| Section 4.02 | Class 2—Other Secured Claims | 18 |
| Section 4.03 | Class 3—3.5% Convertible Notes | 18 |
| Section 4.04 | Class 4—General Unsecured Claims: | 19 |
| Section 4.05 | Class 5—Old Common Stock: | 19 |
| Section 4.06 | Class 6—Intercompany Claims: | 20 |

**V. ACCEPTANCE OR REJECTION OF THE PLAN** .............. 20

| Section 5.01 | Classes Entitled to Vote: | 20 |
|---|---|---|
| Section 5.02 | Entitlement to Vote: | 20 |
| Section 5.03 | Acceptance by an Impaired Class of Claims: | 20 |

**VI. MEANS FOR IMPLEMENTATION OF THE PLAN** .............. 20

| Section 6.01 | Pre-Effective Date Management and Operation of Debtors: | 20 |
|---|---|---|
| Section 6.02 | Implementation on the Effective Date: | 21 |

4

Section 6.03      Consolidation for Distribution and Voting Purposes: ................................... 21

Section 6.04      Vesting of Assets in Reorganized Debtors: ................................................. 21

Section 6.05      Post-Effective Business of Reorganized Debtors:........................................ 21

Section 6.06      Name Change: ............................................................................................ 21

Section 6.07      Cancellation of Existing Securities and Agreements: ................................. 22

Section 6.08      Issuance of New Common Stock: ............................................................... 22

Section 6.09      Authorized Share Capital: .......................................................................... 22

Section 6.10      Issuance of New Notes: .............................................................................. 22

Section 6.11      Exit Financing: ........................................................................................... 23

Section 6.12      Board of Directors of the Reorganized Debtors: ......................................... 23

Section 6.13      Management Team of the Reorganized Debtors: ......................................... 23

Section 6.14      Management Incentive Plan: ....................................................................... 24

Section 6.15      Change of Control: ...................................................................................... 24

Section 6.16      No Corporate Action Required:................................................................... 24

Section 6.17      Exemption from Securities Laws: ............................................................... 24

Section 6.18      Exemption from Transfer Taxes:................................................................. 24

Section 6.19      Plan Supplement:........................................................................................ 25

VII. CONDITIONS PRECEDENT ........................................................................................ 25

Section 7.01      Conditions to Confirmation:........................................................................ 25

Section 7.02      Conditions Precedent to Effective Date: ..................................................... 25

Section 7.03      Failure of Conditions:................................................................................. 26

Section 7.04      Waiver of Conditions: ................................................................................. 27

VIII. DISTRIBUTIONS ........................................................................................................ 27

Section 8.01      Requirement for Allowance of Claims :....................................................... 27

Section 8.02      Method of Distribution: ............................................................................... 27

Section 8.03      Method of Payment: ................................................................... 27

Section 8.04      Timing of Payment: ................................................................... 27

Section 8.05      Interest on Claims: .................................................................... 27

Section 8.06      Setoff: ....................................................................................... 27

Section 8.07      *De Minimis* Cash Distributions: .............................................. 28

Section 8.08      Delivery of Distributions and Undeliverable or Unclaimed
Distributions: ........................................................................... 28

Section 8.09      Rounding; Fractional Portions: .................................................. 29

Section 8.10      Means of Cash Payments: .......................................................... 29

Section 8.11      Treatment of Disputed Claims: .................................................. 29

Section 8.12      Disputed Claims Reserve: ......................................................... 30

Section 8.13      Bar Date: ................................................................................... 30

IX. EXECUTORY CONTRACTS ............................................................... 31

Section 9.01      Assumption of Certain Executory Contracts and Unexpired Leases
and Cure Payments: .................................................................. 31

Section 9.02      Rejection of Unexpired and Unrejected Contracts and Leases: ... 31

Section 9.03      Bar Date for Rejection Damages: ............................................... 31

X. EFFECTS OF CONFIRMATION ........................................................... 31

Section 10.01      Discharge of Claims: ................................................................ 31

Section 10.02      Injunction: ................................................................................ 32

Section 10.03      Exculpation and Limitation of Liability: ................................... 33

Section 10.04      Binding Effect: ......................................................................... 33

Section 10.05      Other Documents and Actions: .................................................. 33

Section 10.06      Term of Injunctions or Stays: .................................................... 33

Section 10.07      Preservation of Insurance: ........................................................ 33

Section 10.08      Releases: ................................................................................... 34

Section 10.09    Injunction Related to Releases and Exculpation: .......................................... 35

Section 10.10    Retention of Jurisdiction: ............................................................................. 35

Section 10.11    Jurisdiction: ................................................................................................. 36

Section 10.12    Subordination Rights: .................................................................................. 36

Section 10.13    Effectuating Documents: ............................................................................. 36

Section 10.14    Ratification of Actions Taken: ..................................................................... 37

XI. MISCELLANEOUS PROVISIONS ............................................................................... 37

Section 11.01    Construction: ............................................................................................... 37

Section 11.02    Time: ........................................................................................................... 37

Section 11.03    Headings: ..................................................................................................... 37

Section 11.04    Governing Law: ........................................................................................... 37

Section 11.05    Payment of Statutory Fees: ......................................................................... 37

Section 11.06    Cramdown: .................................................................................................. 38

Section 11.07    Post Consummation Effect of Evidences of Claims or Old Common
Stock: .......................................................................................................... 38

Section 11.08    Successors and Assigns: .............................................................................. 38

Section 11.09    Legal Binding Effect: .................................................................................. 38

Section 11.10    Inconsistencies: ........................................................................................... 38

Section 11.11    Compliance with Applicable Law: .............................................................. 38

Section 11.12    Modification of this Plan: ............................................................................ 38

Section 11.13    Section 1125(e) of the Bankruptcy Code: ................................................... 39

Section 11.14    Reorganized Debtors as Party in Interest and Standing to Object to
Claims: ........................................................................................................ 39

Section 11.15    Severability: ................................................................................................ 39

# I.
## INTRODUCTION

Isolagen, Inc. and Isolagen Technologies, Inc., debtors and debtors in possession (collectively, the "Debtors") in the above-captioned case, by and through their counsel, hereby propose this chapter 11 plan of reorganization (the "Plan") pursuant to section 1121(c) of title 11 of the United States Code (the "Bankruptcy Code").

# II.
## DEFINITIONS

As used in this Plan, the following terms shall have the respective meanings specified below (such meanings to be equally applicable to the singular and plural, and the masculine, feminine, and neuter forms of the terms defined):

**Section 2.01  3.5% Convertible Notes:** Means the 3.5% Convertible Subordinated Notes, due November 2024, issued by Isolagen, Inc. as Issuer to The Bank of New York Trust Company, N.A., as Trustee pursuant to that certain Indenture dated November 3, 2004, in the approximate non-converted aggregate principal amount of $90 million.

**Section 2.02  3.5% Noteholder Claims:** Means any and all Claims arising out of related to the 3.5% Convertible Notes.

**Section 2.03  Adjusted Amounts:** Means, with respect to a Disputed Claim, to the extent such Disputed Claim is (a) a liquidated Claim, the maximum face amount of such Disputed Claim as asserted in the relevant proof of Claim or such other amount as the Bankruptcy Court shall determine on or prior to the Effective Date in accordance with the Bankruptcy Code is adequate for the purpose of determining the amount of Cash to be deposited in the Disputed Claims Reserve Accounts, and (b) is an unliquidated or contingent Claim, an amount that the Bankruptcy Court shall determine on or prior to the Effective Date in accordance with the Bankruptcy Code is adequate for the purpose of determining the amount of Cash to be deposited in the Disputed Claims Reserve Accounts, and in each such case, such amount shall be the maximum allowable amount of such Claim unless the Bankruptcy Court shall order otherwise.

**Section 2.04  Administrative Expense Claim:** Means any Unsatisfied Claim for payment of any costs or expenses of administration of the Case incurred after the commencement of the Case and before the Effective Date that is Allowed under sections 503(b) and entitled to priority under 507(a)(1) of the Bankruptcy Code.

**Section 2.05  Affiliate:** Shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

**Section 2.06  Agent:** Means Viriathus as agent for the Pre-Petition Lenders and the DIP Lenders.

**Section 2.07  Allowed:** Means, with respect to any Claim (including any Administrative Expense Claim), Interest, or Old Common Stock, the Claim or portion thereof or Interest or Old Common Stock (a) for which proof thereof was filed with the Bankruptcy Court prior to the Bar Date, and as to which no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery

with respect thereto, shall have been interposed on or before the applicable Claim Objection Deadline or within such other period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order of the Bankruptcy Court; (b) for which no proof thereof was filed, to the extent that such Claim has been listed by the Debtors in their Schedules, as such Schedule was or may be amended from time to time in accordance with Bankruptcy Rule 1009 prior to the closing of the Chapter 11 Cases, as liquidated in amount and not disputed or contingent as to liability, and as to which no objection to allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, shall have been interposed within such period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order of the Bankruptcy Court, (c) which arises from the recovery of property under Section 550 or Section 553 of the Bankruptcy Code and is allowed in accordance with Section 502(h) of the Bankruptcy Code; (d) which is allowed under this Plan; or (e) which is allowed by Final Order; provided; however; that with reference to any Claim, the term "Allowed" for purposes of Distribution under the Plan shall not include, unless otherwise specified in the Plan, interest on such Claim from and after the Petition Date; provided; further; however, that with reference to any Claim, the term "Allowed" shall not include amounts previously paid pursuant to a Final Order of the Court.

**Section 2.08    Asset(s):** Means all (a) assets, property, interests and effects, real and personal, tangible and intangible, including, but not limited to, all cash, real property interests, fixtures, equipment, furniture, other tangible property, accounts receivable, tax refunds, contract rights, intellectual property, other intangible property, interests in employee benefit plans, Causes of Action, claims and rights of any kind of the Debtors, including any property of the Debtors' Estates for purposes of section 541 of the Bankruptcy Code; and (b) proceeds, products, rents and profits of all the foregoing.

**Section 2.09    Avoidance Actions:** Means any Cause of Action to avoid or recover a transfer of property of the Debtors' Estates or an interest of the Debtors in property, including, without limitation, actions arising under Sections 542, 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code and other applicable federal, state or common law, whether or not litigation has been commenced with respect to such causes of action as of the Effective Date.

**Section 2.10    Bankruptcy Code:** Means title 11 of the United States Code, as such title has been, or may be amended from time to time, to the extent any such amendment is applicable to the Cases.

**Section 2.11    Bankruptcy Court:** Means the United States Bankruptcy Court for the District of Delaware, or any court having competent jurisdiction to hear appeals or *certiorari* proceedings therefrom, or any successor thereto that has competent jurisdiction over these Cases.

**Section 2.12    Bankruptcy Rules:** Means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms or the local rules of the Bankruptcy Court, as each has been, or may be amended from time to time, to the extent any such amendment is applicable to these Cases.

**Section 2.13    Bar Date:** Has the meaning set forth in Sections 8.13 and 9.03 of this Plan and any bar date orders entered by the Bankruptcy Court.

**Section 2.14    Business Day:** Means any day except Saturday, Sunday, or a "legal holiday," as such term is defined in Bankruptcy Rule 9006(a).

**Section 2.15** **Cases:** Means the above-captioned cases under chapter 11 of the Bankruptcy Code.

**Section 2.16** **Cash:** Means cash and cash equivalents, including, but not limited to, bank deposits, wire funds, checks and legal tender of the United States of America or equivalents thereof.

**Section 2.17** **Causes of Action:** Means, without limitation, any and all actions, causes of action, suits, accounts, controversies, liabilities, obligations, rights, damages, judgments, Claims, and demands, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise including, without limitation, the Avoidance Actions, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Cases, including through the Effective Date of the Plan.

**Section 2.18** **Claim:** Means (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or (c) any amount listed by the Debtors in their Schedules, as such Schedule was or may be amended from time to time in accordance with Bankruptcy Rule 1009 prior to the closing of the Cases, as liquidated in amount and not disputed or contingent as to liability.

**Section 2.19** **Class:** Means a class of Claims or Old Common Stock as classified in this Plan.

**Section 2.20** **Collateral:** Means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or is otherwise invalid under the Bankruptcy Code or applicable law.

**Section 2.21** **Confirmation Date:** Means the date the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**Section 2.22** **Confirmation Hearing:** Means the hearing before the Bankruptcy Court to consider confirmation of this Plan.

**Section 2.23    Confirmation Order:** Means a Final Order of the Bankruptcy Court confirming this Plan, as amended, supplemented, or modified.

**Section 2.24    Debtors:** Means Isolagen, Inc. and Isolagen Technologies, Inc.

**Section 2.25    DIP Facility Claim:** Means any Claim of the DIP Lenders arising from or in connection with the Post-Petition Credit Agreement.

**Section 2.26    DIP Facility Maximum Repayment:** Shall equal $2,750,000 (the amount due and owing under the Post-Petition Credit Agreement as of the Date of the filing of this Plan) plus all accrued post-petition interest, fees and expenses allowable thereunder, or such higher amounts actually funded under the Post-Petition Credit Agreement in accordance with the terms thereof and any applicable Orders of the Bankruptcy Court.

**Section 2.27    DIP Lenders:** Means, collectively, the lenders identified on the signature pages of the Post-Petition Credit Agreement, together with their respective successors and permitted assigns, each a "DIP Lender."

**Section 2.28    Disclosure Statement:** Means the Disclosure Statement Filed by the Debtors in connection with this Plan, and acceptable in form and substance to Viriathus pursuant to the Restructuring Agreement, including all exhibits, appendices, schedules and annexes attached thereto, prepared and submitted pursuant to Section 1125 of the Bankruptcy Code and approved by the Bankruptcy Court, as it may be altered, amended, supplemented, or modified from time to time, and distributed in accordance with Sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3018.

**Section 2.29    Disputed:** Means any Claim, which: (a) is listed in the Schedules as disputed, contingent or unliquidated and for which a proof of claim has been timely filed pursuant to the Plan, the Bankruptcy Code, or any Final Order of the Bankruptcy Court, (b) is objected to in whole or in part on or before the Claim Objection Deadline or for which a request for estimation has been filed in accordance with the Bankruptcy Code and the Bankruptcy Rules and as to which no Final Order allowing such Claim has been entered, or (c) is held by a party that is adverse to the Debtors in any litigation or contested matter pending at the time of Distribution and as to which no Final Order resolving such litigation or contested matter has been entered.  To the extent an Objection relates to the allowance of only part of a Claim, such Claim shall be Disputed only to the extent of the Objection.

**Section 2.30    Disputed Claims Reserve Amount:** Means the reserve maintained by the Reorganized Debtors as described in Article VIII of the Plan.

**Section 2.31    Distribution:** Means any Cash, stock or any other value provided pursuant to this Plan.

**Section 2.32    Effective Date:** Means a Business Day occurring after the Confirmation Date and upon which:  (a) no stay of the Confirmation Order is in effect; and (b) the conditions to the Effective Date set forth in this Plan have been satisfied or waived.  The closing of the transactions contemplated by this Plan shall occur contemporaneously on the Effective Date.  The Debtors shall file a notice of the Effective Date within three Business Days after its occurrence, which shall be served upon those requesting notice in these Cases pursuant to Bankruptcy Rule 2002.

**Section 2.33    Entity:** Means an "entity" within the meaning of section 101(5) of the Bankruptcy Code.

**Section 2.34    Estates:** Means the estates of the Debtors created pursuant to section 541 of the Bankruptcy Code upon the commencement of these Cases.

**Section 2.35    Executory Contract:** Means any executory contract or unexpired lease subject to Section 365 of the Bankruptcy Code, between any Debtor and any other Entity.

**Section 2.36    Exit Financing:** Means the exit financing to be raised pursuant to Section 6.13 of the Plan.

**Section 2.37    File, Filed, Filing, or Files:** Means file, filed, filing, or files, respectively, with the Bankruptcy Court in these Cases.

**Section 2.38    Final Order:** Means an order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for *certiorari*, or request for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for *certiorari*, reargue, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtors or, in the event that an appeal, *writ* of *certiorari*, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or *certiorari*, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing shall have expired; <u>provided</u>, <u>however</u>, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order, shall not cause such order not to be a Final Order.

**Section 2.39    General Unsecured Claim:** Means any unsecured Claim against the Debtors that is not an Administrative Expense Claim, Priority Non-Tax Claim, Priority Tax Claim, DIP Facility Claim, Other Secured Claim, Pre-Petition Lender Claim, 3.5% Convertible Note Claim, or Intercompany Claim.

**Section 2.40    Holder:** Means any Entity holding a Claim or Interest, and includes the beneficial Holder of such Claim or Interest.

**Section 2.41    Intercompany Claims:** Means all Claims asserted by any Debtor against another Debtor or all Claims asserted by any subsidiary or affiliate of any of the Debtors against a Debtor.

**Section 2.42    Lien:** Means any charge against or interest in property to secure payment or performance of a Claim, debt or obligation.

**Section 2.43    Material Adverse Change:** Means a state of facts, event, change or changes in, or effect on the Assets that is individually, or in the aggregate, reasonably likely to be materially adverse to or materially impairs, the Assets by an amount greater than 10% of the Value of the Assets, where "Value" is determined on an anticipated revenue basis for revenue generating Assets and the fair market value of the other Assets as of the Effective Date, including any change or effect in any way resulting from or arising in connection with this Plan or any of the transactions contemplated by this Plan.

**Section 2.44    New By-Laws:** Means the new or amended by-laws of the Reorganized Debtors, in a form reasonably satisfactory to the Agent, to be effective from and after the Effective Date, which shall be Filed no later than three days prior to the Confirmation Hearing.

**Section 2.45    New Certificate of Incorporation:** Means the new or amended certificate of incorporation of the Reorganized Debtors, in a form reasonably satisfactory to the Agent, to be effective from and after the Effective Date, which shall be Filed no later than five days prior to the Confirmation Hearing, which certificate of incorporation shall, among other things, (a) include, pursuant to section 1123(a)(6), a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6); (ii) authorize Renuvagen to issue up to 250 million shares of New Common Stock; and (iii)  to approve the name change of Isolagen, Inc. to Renuvagen, Inc., or such other name as determined by the Reorganized Debtors.

**Section 2.46    New Common Stock:** Means the newly-issued shares of common stock of Renuvagen to be authorized and available to be issued pursuant to this Plan.  The New Common Stock is issued in this Plan in reliance on the exemption from registration provided under section 1145 of the Bankruptcy Code.  The number of shares to be authorized and available for distribution shall be included in the New Certificate of Incorporation.  The New Common Stock shall have such rights with respect to dividends, liquidation, voting, and other matters as set forth in the New Certificate of Incorporation, the New By-Laws, and as provided under applicable non-bankruptcy law.

**Section 2.47    New Directors:** Means those director(s) who shall constitute the board of directors of the Reorganized Debtor on and after the Effective Date, which director(s) shall be determined by the DIP Lenders and Plan Funders and disclosed in a Filing by the Debtors not later than three days prior to the Confirmation Hearing.

**Section 2.48    New Notes:** Has the meaning ascribed to it in Section 4.03(ii)(a) of the Plan.

**Section 2.49    Old Common Stock:** Means any equity security within the meaning of Section 101(16) of the Bankruptcy Code including, without limitation, all issued, unissued, authorized or outstanding shares of stock or other equity interests (including common and preferred), together with any warrants, options, convertible securities, liquidating preferred securities or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto.

**Section 2.50    Other Definitions:** A term used and not defined herein, but that is defined in the Bankruptcy Code, shall have the meaning set forth therein.  The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.  The word "including" shall mean "including, without limitation."

**Section 2.51    Other Secured Claim:** Means a Claim against the Debtors that has arisen prior to the Petition Date, and which is a secured claim within the meaning of, and to the extent Allowed under, section 506 of the Bankruptcy Code; provided, however, that the value of any Secured Claim shall be limited to the value of the Collateral pledged for the Claim, but excluding the Claims of the DIP Lenders and the Pre-Petition Lenders.

**Section 2.52** **Participating Holders:** Means the Holders of 3.5% Notes who are parties to the Restructuring Agreement.

**Section 2.53** **Permanent Injunction:** Has the meaning set forth in Section 10.02 herein.

**Section 2.54** **Petition Date:** Means June 15, 2009, the date upon which the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

**Section 2.55** **Plan Funders:** Means the Entities who are providing funding pursuant to Section 6.13 of the Plan.

**Section 2.56** **Plan Supplement:** Means the appendices and/or supplements that may be filed prior to the Confirmation Date including, but not limited to, the New Certificate of Incorporation, the New By-Laws, and such other documents as may be necessary or appropriate.

**Section 2.57** **Post-Petition Credit Agreement:** Means the Post-Petition Senior Secured Super-Priority Credit Agreement by and between the Debtors and Viriathus, which was filed by the Debtors in connection with the Motion of Debtors and Debtors in Possession for Interim and Final Orders: (I) Authorizing and Approving Debtors' Post-Petition Financing; (II) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (III) Modifying Automatic Stay; and (V) Scheduling a Final Hearing, as such agreement may have been amended from time to time, and any other documents related thereto.

**Section 2.58** **Pre-Petition Lender Claims:** Means any Claim of the Pre-Petition Lenders arising from or related to the Pre-Petition Lender Notes.

**Section 2.59** **Pre-Petition Lender Notes:** Means the Secured Promissory Note and Security Agreements between the Pre-Petition Lenders and Isolagen, Inc., dated April 30, 2009.

**Section 2.60** **Pre-Petition Lenders:** Means the Holders of the Pre-Petition Lenders Notes and their respective successors and permitted assigns (each a "Pre-Petition Lender").

**Section 2.61** **Priority Claim:** Means any Claim that is entitled to priority of payment under sections 507(a)(2) through (7) or 507(a)(9) of the Bankruptcy Code.

**Section 2.62** **Priority Tax Claim:** Means any Claim that is entitled to priority of payment under section 507(a)(8) of the Bankruptcy Code.

**Section 2.63** **Professionals:** Means each Entity employed and retained in these Chapter 11 Cases pursuant to Sections 327 or 328 of the Bankruptcy Code or otherwise and each Entity seeking compensation or reimbursement of expenses in connection with these Chapter 11 Cases pursuant to Sections 328, 330 and 503(b)(4) of the Bankruptcy Code whose compensation or reimbursement of expenses must be authorized by Order of the Bankruptcy Court pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, or pursuant to any order authorizing the retention of professionals utilized in the ordinary course of business.

**Section 2.64** **Proof of Claim or Proof of Interest:** Means a Filed Proof of Claim or Filed Proof of Interest.

**Section 2.65** **Pro Rata:** Means the proportion that the Allowed Claim in a particular Class bears to the aggregate amount of (a) Allowed Claims in such class as of the date of determination; plus (b) Disputed Claims (in their aggregate face amounts or such other amounts as may be estimated) in such Class as of the date of determination, (i) as calculated by the Debtors or Reorganized Debtors on or before the date of any such Distribution or (ii) as determined by a Final Order of the Court estimating such claim.

**Section 2.66** **Record Date:** Means the date on which Creditors or Interest Holders entitled to vote on this Plan are determined by their record ownership of Claims or Old Common Stock, which date shall be June 22, 2009.

**Section 2.67** **Renuvagen:** Means Renuvagen, Inc., the reorganized entity of Isolagen, Inc.

**Section 2.68** **Reorganized Debtors:** Means Renuvagen and reorganized Isolagen Technologies, Inc.

**Section 2.69** **Restructuring Agreement:** Means the restructuring agreement, made by and among the Debtors and Viriathus, Filed as Exhibit A to the Declaration of Declan Daly in Support of First Day Motions and Applications.

**Section 2.70** **Schedules:** Means the Schedules of Assets and Liabilities and Statements of Financial Affairs, as amended or modified, Filed by the Debtors in accordance with section 521 of the Bankruptcy Code and the Bankruptcy Rules, as each has been or may be, amended and supplemented from time to time.

**Section 2.71** **Solicitation Procedures Order:** Means the order to be entered by the Bankruptcy Court approving the Disclosure Statement and procedures to solicit ballots to vote to accept or reject this Plan.

**Section 2.72** **Unclaimed Distribution:** Means, in respect of any Class of Claims or Interest, all property deemed to be "Unclaimed Distributions" pursuant to Section 8.08 of this Plan.

**Section 2.73** **Unsatisfied:** Means, with regard to any Claim, Class, Interest or Administrative Expense, any Allowed amount that has accrued or is otherwise due and owing and which: (i) remains unpaid by the Debtors or any third party; or (ii) has not been released, or otherwise compromised, by the Holder of the Claim or Administrative Expense.

**Section 2.74** **U.S. Trustee Fees:** Shall mean any fees arising in these Cases due and owing to the Office of the United States Trustee.

**Section 2.75** **Viriathus:** Shall mean Viriathus Holdings LLC, Viriathus Services LLC Series as agent for the Pre-Petition Lenders and the DIP Lenders.

III.
## TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX AND NON-TAX CLAIMS, AND U.S. TRUSTEE FEES

**Section 3.01** **Treatment of Administrative Expense Claims:**

Administrative Expense Claims are not impaired under the Plan. Each Holder of an Allowed Administrative Expense Claim, shall, in full and final satisfaction, release and discharge of and in exchange for such Allowed Administrative Expense Claim, be paid either (i) in Cash, in the amount of the Allowed Administrative Expense Claim on the later of (x) the Effective Date or as soon thereafter as is reasonably practicable and (y) the date such Allowed Administrative Expense Claim becomes Allowed, or due and payable in the ordinary course of business, or (ii) on such other terms and conditions as may be agreed between the Holder of the Allowed Administrative Expense Claim, the Debtors and/or the Reorganized Debtors, and the Agent.

**Section 3.02    Allowance of Professional Fees and Expenses:**

All requests by Professionals, if any, for final allowance of compensation and reimbursement of expenses accrued as of the Effective Date must be Filed with the Bankruptcy Court within thirty days after the Confirmation Date. Any Allowed Administrative Expense Claim of a Professional will be paid by the Reorganized Debtors within five days after entry of a Final Order approving such Allowed Administrative Expense Claim, and such payment shall not exceed the budgeted amounts set forth in the final debtor in possession financing order approved by the Court.

**Section 3.03    Priority Non-Tax Claims:**

Priority Non-Tax Claims are not impaired under the Plan. Each Holder of an Allowed Priority Non-Tax Claim shall, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Non-Tax Claim, receive Cash in the amount of the Allowed Priority Non-Tax Claim, except to the extent that any Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment thereof, on the later of (x) the Effective Date or as soon thereafter as is reasonably practicable and (y) the date such Allowed Administrative Expense Claim becomes Allowed.

**Section 3.04    Treatment of Priority Tax Claims:**

Priority Tax Claims are not impaired under the Plan. Each Holder of an Allowed Priority Tax Claim shall, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, be paid in full through deferred Cash payments in an aggregate principal amount equal to the amount of the Allowed Priority Tax Claim plus interest on the unpaid portion at the rate of 4% per annum from the Effective Date through the date of payment thereof which may be as long as 5 years from the order for relief in these Cases, except to the extent that any Holder of an Allowed Priority Tax Claim agrees to less favorable treatment thereof.

**Section 3.05    U.S. Trustee Fees:**

The Debtors shall pay in Cash on the Effective Date all outstanding U.S. Trustee Fees payable on or before the Effective Date. After the Effective Date, the Reorganized Debtors shall continue to comply with all reporting and payment requirements set forth in the Bankruptcy Code, Bankruptcy Rules and Local Rules until these Cases are closed by the Bankruptcy Court, dismissed, or converted.

**Section 3.06    DIP Facility Claims:**

Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, each Holder of an Allowed DIP Facility Claim is entitled to receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed DIP Facility Claim, Cash equal to the Allowed amount of such Claim, except to the extent that such Holder of a particular DIP Facility Claim has agreed to less favorable treatment of such claim. Under this Plan, and pursuant to the settlements and compromises set forth therein, the DIP Facility Claims shall be Allowed in the DIP Facility Maximum Repayment amount. Subject to and pursuant to the terms of the Plan, the Holders of the Allowed DIP Facility Claims have agreed that, in lieu of accepting Cash on account of their Allowed DIP Lender Claims, the DIP Lenders shall receive, together with the Pre-Petition Lenders as set forth in Section 4.01, their Pro Rata share of up to 61% of the New Common Stock of Renuvagen, subject to dilution by the Exit Financing. The DIP Lenders and the Pre-Petition Lenders have also agreed to compensate Viriathus or its assignee 10% of its Pro Rata Distribution of the New Common Stock.

## IV.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND OLD COMMON STOCK

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against, and Old Common Stock in, the Debtors. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim is also placed in a particular Class for the purpose of voting on, and receiving distribution pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

In accordance with 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Non-Tax Claims, Priority Tax Claims, and DIP Facility Claims have not been classified, and their treatment are set forth in Article III herein.

Pursuant to section 1123(a)(4) of the Bankruptcy Code, all Allowed Claims or Old Common Stock of a particular Class shall receive the same treatment unless the Holder of a particular Allowed Claim or Interest agrees to less favorable treatment for such Allowed Claim or Interest. Pursuant to section 510(a) of the Bankruptcy Code, this Plan shall give effect to subordination agreements, which are enforceable under applicable non-bankruptcy law, except to the extent the beneficiary thereof agrees to less favorable treatment. By way of further explanation, this Plan shall also give effect to the subordination provisions of sections 510(b) and (c) of the Bankruptcy Code.

The inclusion of a Creditor by name in any Class is for purposes of general description only, and includes all Entities claiming as beneficial interest holders, assignees, heirs, devisees, transferees, or successors in interest of any kind of the named Creditor.

**Section 4.01   Class 1—Pre-Petition Lender Claims:**

    **(i.)**   **Description:** Class 1 consists of the Pre-Petition Lender Claims. Pursuant to the settlements and compromises set forth herein and based on the Pre-Petition Lender Agreements, the Pre-Petition Lender Claims are Allowed in the amount of the amount of $500,417, plus interest, costs and fees.

**(ii.) Treatment:** Subject to and pursuant to the terms of the Plan, the Holders of the Allowed Pre-Petition Lender Claims have agreed that, in lieu of accepting Cash on account of their Allowed Pre-Petition Lender Claims, the Pre-Petition Lenders shall receive, together with the DIP Lenders as set forth in Section 3.06, their Pro Rata share of up to 61% of the New Common Stock of Renuvagen, subject to dilution by the Exit Financing. The DIP Lenders and the Pre-Petition Lenders have also agreed to compensate Viriathus or its assignee 10% of its Pro Rata Distribution of the New Common Stock.

**(iii.) Impaired Status:** Class 1 is impaired, and Holders of Class 1 Pre-Petition Lender Claims and DIP Facility Claims are entitled to vote to accept or reject this Plan.

## Section 4.02    Class 2—Other Secured Claims

**(i.) Description**: Class 2 shall consist of all Other Secured Claims.

**(ii.) Treatment**: On the Distribution Date, each Holder of an Allowed Class 2 Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Other Secured Claim and at Debtors' exclusive election, either: (i) Cash equal to the amount of such Allowed Other Secured Claim, or (ii) the Collateral which serves as security for such Allowed Other Secured Claim, except to the extent that any Holder of an Allowed Other Secured Claim agrees to less favorable treatment thereof. Upon receipt of the Distribution provided for herein, each Holder of an Allowed Other Secured Claim shall irrevocably release and discharge any and all Liens against the Debtors' property and Assets.

**(iii.) Impaired Status**: Class 2 Claims are unimpaired under the Plan. The Holders of Class 2 Claims are conclusively presumed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

## Section 4.03    Class 3—3.5% Convertible Notes

**(i.) Description:** Class 3 consists of all Holders of Claims arising from or relating to the 3.5% Convertible Notes.

**(ii.) Treatment:** Each Holder of an Allowed 3.5% Noteholder Claim shall receive, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed 3.5% Noteholder Claim the following:

**(a.)** its Pro Rata share of an unsecured note in the principal amount of $6 million (the "New Note"). The New Note shall have the following features:

1. Type of Security:      Unsecured Debentures

2. Interest: 12.5% payable quarterly in Cash or, at the Reorganized Debtors' option, 15% payable in kind ("PIK") by capitalizing such unpaid amount and adding it to the principal as of the date it was due.

3. Maturity Date:       June 1, 2012

4. Redemption Rights: At any time prior to the maturity date, the Reorganized Debtors may redeem any portion of the outstanding principal of the New Notes in Cash at 125% of the stated face value of the New Notes.

5. Mandatory Redemption: The Reorganized Debtors will be obligated to redeem all outstanding New Notes upon the following events:

   a) The Reorganized Debtors successfully complete a capital campaign raising in excess of $10,000,000; or

   b) The Reorganized Debtors are acquired by, or sell a majority stake to, an outside party.

6. Negative Covenants: The New Notes shall contain customary representations, warranties and covenants, including a covenant that the Reorganized Debtors shall be prohibited from the incurrence of additional debt without obtaining the consent of 66 ⅔% of the New Note holders.

**(b.)** its Pro Rata share of 33% of the New Common Stock subject to dilution by the Exit Financing.

**(c.)** This Plan allows the 3.5% Noteholder Claims in the amount of the outstanding principal and accrued and unpaid interest as of the Petition Date in the approximate aggregate amount of $81 million (plus any other amounts due under the indenture and allowable under the Bankruptcy Code).

**(iii)** **Impaired Status:** Class 3 is impaired and Holders of Allowed Class 3, 3.5% Noteholder Claims are entitled to vote to accept or reject this Plan.

**Section 4.04** **Class 4—General Unsecured Claims:**

**(i.)** **Description:** Class 4 consists of all Allowed General Unsecured Claims against the Debtors.

**(ii.)** **Treatment:** Each holder of an Allowed General Unsecured Claim shall, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed General Unsecured Claim, be paid their Pro Rata portion of 1% of the New Common Stock, subject to dilution by the Exit Financing.

**(iii.)** **Impaired Status:** Class 4 is impaired, and Holders of Allowed Class 4 General Unsecured Claims are entitled to vote to accept or reject this Plan.

**Section 4.05** **Class 5—Old Common Stock:**

**(i.)** **Description:** Class 5 consists of Holders of Old Common Stock.

**(ii.)** **Treatment:** On the Effective Date, all Interests in Old Common Stock shall be cancelled and extinguished under the Plan, and the Holders thereof shall neither retain nor receive any distribution of property or Assets on account of their Interests.

**(iii.)** **Impaired Status:** Class 5 is impaired and, because Holders of Class 5 Old Equity Interests will receive no distribution under this Plan in respect of their Interests, Class 5 is deemed to reject the Plan by operation of law.

**Section 4.06 Class 6—Intercompany Claims:**

**(i.)** **Description:** Class 6 consists of all Holders of Intercompany Claims.

**(ii.)** **Treatment:** No distributions shall be made under the Plan on account of Intercompany Claims, and any and all liability on account of such Intercompany Claims shall be deemed discharged.

**(iii.)** **Impaired Status:** Class 6 is impaired and, because Holders of Class 6 Intercompany Claims will receive no distribution under this Plan, Class 6 is deemed to reject the Plan by operation of law.

V.
## ACCEPTANCE OR REJECTION OF THE PLAN

**Section 5.01 Classes Entitled to Vote:**

Classes 1, 3, 4, 5, and 6 are impaired under this Plan, and Holders of Claims in Classes 1, 3, and 4 are entitled to vote to accept or reject this Plan. Holders of Interests in Class 5 and Holders of Claims in Class 6 are not receiving disbursements under the Plan, are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to accept or reject this Plan.

**Section 5.02 Entitlement to Vote:**

Provided that Claims in Classes 1, 3 and 4 are not Disputed Claims, any Holder of an Unsatisfied Claim shall be entitled to vote to accept or reject this Plan.

**Section 5.03 Acceptance by an Impaired Class of Claims:**

A Class of Claims shall have accepted this Plan if the Plan is accepted by Holders of at least two-thirds in the aggregate dollar amount and more than one-half in number of the Unsatisfied Claims of such Class that have properly voted to accept or reject this Plan.

VI.
## MEANS FOR IMPLEMENTATION OF THE PLAN

**Section 6.01 Pre-Effective Date Management and Operation of Debtors:**

After the Confirmation Date and until the Effective Date, the current directors and officers of each Debtor are authorized to serve in such capacities, subject to changes as may be determined by the board of directors of such Debtor in accordance with the current by-laws and certificates of incorporation of such Debtor (or comparable organizational documents). On the Effective Date, the current directors and officers of the Debtors shall be deemed to have resigned.

**Section 6.02    Implementation on the Effective Date:**

The Plan shall be implemented on the Effective Date.  The funds necessary to implement the Plan shall derive from the Debtors' Cash and the proceeds of the Exit Financing.

**Section 6.03    Consolidation for Distribution and Voting Purposes:**

On the Effective Date, the Estate of each of the Debtors shall be deemed consolidated with each other such that the assets and liabilities of each of the Debtors shall be merged solely for the purposes of Distribution, voting and Confirmation of the Plan.  As a consequence, any guaranties by one of the Debtors of the obligations of the other or any joint obligations shall be deemed liquidated so that the Holder of such Claims shall have one Claim against the consolidated Debtors and shall be deemed to be a single obligation.  Additionally, each and every proof of claim filed or to be filed in either case shall be deemed filed against the consolidated Estate.  Notwithstanding the foregoing, the deemed consolidation of the Estates shall not affect the legal and organizational structure of the Debtors.

**Section 6.04    Vesting of Assets in Reorganized Debtors:**

On the Effective Date, all Assets of the Debtors and property of the Debtors' Estates, including all of the Debtors' claims, rights and Causes of Action, any net operating losses, and any property acquired by the Reorganized Debtors in connection with this Plan, shall vest in Reorganized Debtors free and clear of all Claims, liens, charges, other encumbrances and Old Common Stock other than those Liens Claims or Old Common Stock retained or created pursuant to this Plan.  The Reorganized Debtors intend to preserve net operating losses to the maximum extent permitted under applicable law.  On and after the Effective Date, Reorganized Debtors may operate their business and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.

Except as otherwise provided in the Plan, the Confirmation Order or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code Section 1123(b), all Causes of Action shall be transferred to Reorganized Debtors on the Effective Date.  Reorganized Debtors may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action.  The failure of the Debtors to list a Cause of Action shall not constitute a waiver or release of such claim, right of action, suit or proceeding.

**Section 6.05    Post-Effective Business of Reorganized Debtors:**

Following the Effective Date, Reorganized Debtors will engage in any business appropriate under its organizational documents.

**Section 6.06    Name Change:**

On the Effective Date, Isolagen, Inc. shall continue to be a public company and be known as Renuvagen, Inc.  The Reorganized Debtors shall take any action required to register the name Renuvagen, Inc. with all required federal, state and local authorities and exchanges.

**Section 6.07    Cancellation of Existing Securities and Agreements:**

On the Effective Date, (i) all 3.5% Convertible Notes, and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors shall be cancelled, and (ii) the obligations of the Debtors under any agreements, indentures or certificates of designation governing the Old Common Stock and the 3.5% Convertible Notes, and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of, or Old Common Stock in, the Debtors, shall be discharged.  This provision does not apply to any notes or other instruments evidencing indebtedness or obligations of the Debtors that are unimpaired, reinstated, or amended and restated under this Plan.

**Section 6.08    Issuance of New Common Stock:**

On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors will issue and deliver, in accordance with the provisions hereof, the shares of New Common Stock to those Entities entitled to receive it under this Plan.  It is an integral and essential element of the Plan that the issuance of the New Common Stock pursuant to the Plan shall be exempt from registration under the Securities Act and any state or local law, pursuant to section 1145 of the Bankruptcy Code.  The Order will include a finding and conclusion, binding on all parties to the Cases, the Debtors, the Reorganized Debtors, the Securities and Exchange Commission and all other federal, state and local regulatory enforcement agencies, to the effect that such offer and issuance fall within the exemption(s) from registration under the Securities Act and any state or local law pursuant to section1145 of the Bankruptcy Code.  To date, the DIP Lenders and Pre-Petition Lenders have not entered into any agreements or reached any understandings with any party other than the Agent, DIP Lender and/or Prepetition Lender with regard to the transfer or other disposition of the New Common Stock that they will receive under this Plan.  Following the Effective Date of the Plan, the DIP Lenders and Pre-Petition Lenders may, in their sole and absolute discretion, transfer or otherwise dispose of their shares of New Common Stock.

**Section 6.09    Authorized Share Capital:**

Upon consummation of the Plan, Renuvagen shall, without the need for any further corporate act or other action under any applicable law, regulation, order or rule, have 250,000,000 shares of authorized New Common Stock, of which 14,666,666 shall be issued on or as soon as reasonably practicable after the Effective Date.  The authorized number of shares of Preferred Stock is, and will remain, 5,000,000 shares par value .001.  Renuvagen reserves the right to increase or amend the foregoing post-Effective Date.

**Section 6.10    Issuance of New Notes:**

On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors will issue and deliver, in accordance with the provisions hereof, the New Notes and such other agreements and instruments contemplated thereby.

**Section 6.11    Exit Financing:**

On the Effective Date, the Reorganized Debtors may issue New Common Stock in Renuvagen to the Plan Funders in exchange for $2 million to fund the Reorganized Debtors' continued operations and the distributions that the Reorganized Debtors must make pursuant to the terms of this Plan.  This New Common Stock will be issued at 1½ times the DIP Facility conversion valuation on Schedule A included in the Plan Supplement.

Rights of participation as a Plan Funder shall be extended to the DIP Lenders, the Pre-Petition Lenders, and the 3.5% Convertible Noteholders in the amount of $2,000,000.00.   A right to participate in future financings of the Reorganized Debtors (other than with respect to (x) issuances pursuant to option or employee plans (y) the sale of equity or equity-linked securities by the Reorganized Debtors pursuant to a *bona fide*, firm underwriting public offering, or (z) the issuance of equity or equity-linked securities by the Reorganized Debtors in connection with a *bona fide* strategic alliance, so long as the equity being offered does not exceed 5% of the equity on a fully-diluted basis immediately prior to such issuance) are extended to (i) the 3.5% Convertible Noteholders, (ii) the Pre-petition Lenders, and (iii) the DIP Lenders (collectively, the "Covered Investors") such that, for any equity or equity-linked capital raise done by the Reorganized Debtors, the Covered Investors will have the right to invest in such raise up to an amount that would allow them to preserve their existing equity ownership stake on a fully-diluted basis.

**Section 6.12    Board of Directors of the Reorganized Debtors:**

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial Board of Directors of the Reorganized Debtors shall be determined by the DIP Lenders and the Plan Funders. Pursuant to Bankruptcy Code section 1129(a)(5), the Debtors will disclose, as part of its Plan Supplement, the identity and affiliations of any other person proposed to serve on the initial board of directors of Reorganized Debtors, and, to the extent such person is an insider other than by virtue of being a director, the nature of any compensation for such person.   The classification and composition of the board of the Reorganized Debtors shall be consistent with the New Articles of Incorporation.

**Section 6.13    Management Team of the Reorganized Debtors:**

The management team of the Reorganized Debtors and its subsidiaries shall be selected by DIP Lenders and Plan Funders and report to the New Board of Directors of the Reorganized Debtors. The management team shall be Declan Daly and Todd Greenspan and any other individual selected by the DIP Lenders and Pre-Petition Lenders (the "Management Team").

On, or prior to, the deadline for submission of the Plan Supplement, each member of the Management Team shall be provided with an executed employment agreement binding upon the Reorganized Debtors on the Effective Date; provided, however, that employment agreements need not be filed with the Bankruptcy Court.

All Executory Contracts that exist with any member of the Management Team shall be rejected as of the Effective Date and all Claims arising from such rejection or any other Claim of the Management Team against the Debtors is hereby released, waived and discharged.

**Section 6.14    Management Incentive Plan:**

The management team of the Reorganized Debtors and their subsidiaries shall receive 5% of the New Common Stock, subject to dilution by the Exit Financing.  The management team's equity state shall be subject to a two-year vesting schedule whereby 50% shall vest on the Effective Date, 25% shall vest on the first anniversary, and 25% shall vest on the second anniversary.  The management incentive plan shall be subject to documentation in a form acceptable to the management team and binding upon the Reorganized Debtor on the Effective Date, with such documentation provided on, or prior to, the deadline for submission of the Plan Supplement; provided, however, that the management incentive plan need not be filed with the Bankruptcy Court.

**Section 6.15    Change of Control:**

Any acceleration, vesting or similar change of control rights under employment, benefit or other arrangements triggered by the consummation of the Plan are hereby waived and cancelled.

**Section 6.16    No Corporate Action Required:**

As of the Effective Date, the issuance of the New Common Stock, the adoption, execution, delivery, and implementation of all contracts, leases, documents, instruments, and other agreements related to or contemplated by this Plan, and the other matters provided for, under, or in furtherance of, this Plan involving action to be taken by or required of the Debtors or the Reorganized Debtors shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by stockholders or directors of the Debtors or the Reorganized Debtors.  All documents or instruments which must be executed and delivered by the Debtors or the Reorganized Debtors under this Plan shall be deemed appropriately executed if signed by either of the President or Chief Executive Officer of the Debtors or Reorganized Debtors.

**Section 6.17    Exemption from Securities Laws:**

Pursuant to Bankruptcy Code Section 1145, the issuance, transfer or exchange of the New Common Stock, Old Common Stock, or the New Notes shall be exempt from registration under the Securities Act and any state or local law.

**Section 6.18    Exemption from Transfer Taxes:**

Pursuant to Bankruptcy Code Section 1146(a), (a) the issuance, transfer or exchange of notes or equity securities under this Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, any merger agreements; agreements of consolidation, restructuring, disposition, liquidation or dissolution; deeds; bills of sale; and transfers of tangible property, will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales or use tax or other similar tax.  Any transfers pursuant to this Plan shall not be subject to any such taxes, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any

such tax or governmental assessment. Any and all of the foregoing transactions whether taken on or after to the Effective Date shall be deemed to have been in furtherance of, or in connection with, this Plan.

**Section 6.19   Plan Supplement:**

Any and all exhibits, lists, or schedules not filed with this Plan shall be Filed on or before the date that is five days prior to the first scheduled hearing to consider confirmation of this Plan. Upon its filing with the Bankruptcy Court, the plan supplement may be inspected in the Office of the Clerk of the Bankruptcy Court during normal Bankruptcy Court hours. Holders of Claims or Old Common Stock may obtain a copy of the plan supplement(s) upon written request to Debtors. Any plan supplement (and amendments thereto) filed by Debtors shall be deemed an integral part of the Plan and shall be incorporated by reference as if fully set forth therein.

VII.
**CONDITIONS PRECEDENT**

**Section 7.01   Conditions to Confirmation:**

The following are conditions precedent to the Bankruptcy Court entering the Confirmation Order:

(a)     The Debtors shall have reviewed and updated all financial projections, and such financial projections shall be acceptable in form and substance to Agent and the Debtors, in their sole and absolute discretion.

(b)     The Post Petition Credit Agreement shall be in full force and effect without any defaults having occurred that have not been waived by Agent.

(c)     The Confirmation Order shall be acceptable in form and substance to the Debtors and the Agent, in their sole and absolute discretion.

(d)     The Disclosure Statement Approval Order shall have been entered.

(e)     There shall have occurred no Material Adverse Changes.

**Section 7.02   Conditions Precedent to Effective Date:**

The occurrence of the Effective Date is subject to the satisfaction, or waiver, of each of the following conditions:

**(i.)**     The Confirmation Order in a form reasonably acceptable to the Debtors, the Agent, and the Plan Funders has become a Final Order;

**(ii.)**    The Plan Funders and the Debtors have executed all documents necessary to effectuate the Exit Financing;

**(iii.)**   The appointment of the New Board of Directors of the Reorganized Debtors is approved;

**(iv.)** The following agreements or instruments, in form and substance satisfactory to Agent, in its sole discretion, shall be in full force and effect or shall become effective concurrently with the transactions contemplated by the Effective Date, and if applicable, all conditions precedent contained therein shall have been satisfied: (a) the New Bylaws and the New Articles of Incorporation; and (b) the New Notes and all related documents provided for therein or contemplated thereby;

**(v.)** All organizational documents contemplated under the Plan shall have been filed, as necessary, with the appropriate authority in accordance with such jurisdiction's corporation laws;

**(vi.)** All Debtors or Reorganized Debtors shall be substantially current on all federal, state or local tax and security law filing requirements;

**(vii.)** All actions, documents and agreements necessary to implement this Plan shall have been effected or executed and shall be acceptable to Debtors and Agent, in their sole and absolute discretion;

**(viii.)** No Material Adverse Change shall have occurred since the approval of the Disclosure Statement;

**(ix.)** The employment agreements for each member of the management team shall be delivered by the Reorganized Debtors, in a manner that is binding upon the Reorganized Debtors on the Effective Date, and in a form acceptable to each member of the management team;

**(x.)** The management incentive plan shall be prepared and executed by the Reorganized Debtors in a form acceptable to each member of the management team;

**(xi.)** An investment banking agreement with Viriathus—in a form consistent with the terms set forth in the DIP Term Sheet executed by the Debtors and Viriathus and in a form acceptable to Viriathus and the Debtors, has been executed by Reorganized Debtors; and

**(xii.)** The Plan Funders shall have committed $2 million to fund the Exit Financing.

## Section 7.03    Failure of Conditions:

In the event that one or more of the conditions specified in Sections 7.01 or 7.02 of the Plan have not occurred, (a) if the Confirmation Order has been entered by the Bankruptcy Court, the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Old Common Stock shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (d) the Debtors' obligations with respect to Claims and Old Common Stock shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Old Common Stock by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

**Section 7.04    Waiver of Conditions:**

The Debtors, and the Agent, without further order of the Court, may by mutual, written agreement, waive any of the foregoing conditions precedent.

VIII.
# DISTRIBUTIONS

**Section 8.01    Requirement for Allowance of Claims :**

No payments or other Distributions shall be made on account of any Claim to the extent it is not an Allowed Claim.

**Section 8.02    Method of Distribution:**

All distributions under this Plan shall be made by the Debtors or the Reorganized Debtors, as set forth herein.

**Section 8.03    Method of Payment:**

Any payment made by the Debtors and the Reorganized Debtors pursuant to this Plan shall be in Cash, and paid either by check drawn on a domestic bank or by wire transfer.

**Section 8.04    Timing of Payment:**

Any payment or Distribution required to be made under this Plan on a day other than a Business Day shall be due on the next succeeding Business Day.

**Section 8.05    Interest on Claims:**

Unless otherwise specifically provided for or contemplated in this Plan, the Post-Petition DIP Facility Agreements, the Pre-Petition Lender Notes or the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid upon any Disputed Claim from the Petition Date to the date a final distribution is made thereon when such Disputed Claim becomes an Allowed Claim.

**Section 8.06    Setoff:**

The Reorganized Debtors may, pursuant to Bankruptcy Code Section 553 or applicable non-bankruptcy law, but shall not be required to, setoff against any Allowed Claim and the payments or other Distributions to be made pursuant to this Plan in respect of such Allowed Claim, claims of any nature whatsoever that the Debtors or Reorganized Debtors may have against the Holder of such Allowed Claim; provided, however, that neither the failure to do so, nor the allowance of any Claim hereunder, shall constitute a waiver or release by Reorganized Debtors of any such claim that the Debtors or Reorganized Debtors may have against such Holder.

**Section 8.07    *De Minimis* Cash Distributions:**

Any parties required to make a distribution under this Plan shall not be required to make a Cash distribution if the total amount due to a Holder is less than $100.00.

**Section 8.08    Delivery of Distributions and Undeliverable or Unclaimed Distributions:**

<u>Delivery of Distributions in General</u>.  Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' records or as otherwise available to the Debtors unless such addresses are superseded by any proofs of claim or transfers of claim that may be filed pursuant to Bankruptcy Rule 3001.  The Reorganized Debtors shall have no obligation to recognize the transfer of, or the sale of any portion or all of, any Allowed Claim that occurs after the close of business on the Record Date.

<u>Undeliverable and Unclaimed Distributions</u>.

(i)     If the Distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors as undeliverable or is otherwise unclaimed, no further Distributions shall be made to such Holder unless and until the Reorganized Debtors are notified in writing of such Holder's then current address. Undeliverable and unclaimed Distributions shall be deposited in the Unclaimed Distribution Reserve until such time as a Distribution becomes deliverable or is claimed.

(ii)    Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an undeliverable or unclaimed Distribution within one hundred eighty (180) days after the Distribution Date with respect to such Claim shall be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any Claim for an undeliverable or unclaimed Distribution against the Debtors, the Estates, the Reorganized Debtors, or their property.  Nothing contained in this Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

(iii)   These provisions shall all apply to the Distribution of any New Common Stock pursuant to the Plan.

**Section 8.09   Rounding; Fractional Portions:**

Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent, with one-half cent being rounded up to the nearest whole cent.  To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as Unclaimed Distribution under Section 8.08 herein.  Whenever any distribution of a fraction of a share of New Common Stock would otherwise be called for, the actual distribution will reflect a rounding of such fraction down to the nearest whole number of shares.

**Section 8.10   Means of Cash Payments:**

(a)   Cash payments under this Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of Debtors or the Reorganized Debtors, as the case may be, by (i) checks drawn on, or (ii) wire transfers from, a domestic bank selected by Reorganized Debtors.  Cash payments to foreign creditors may be made at the option of the Debtors or the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(b)   Checks issued in respect of Distributions under this Plan will be null and void if not negotiated within ninety (90) days after the date of issuance.  Any amounts paid by the Reorganized Debtors in respect of such check will be voided.  Requests for reissuance of any check will be made directly to Reorganized Debtors by the Holder of an Allowed Claim with respect to which such check was originally issued.  Any claim in respect of such check must be made before the later of (i) the second (2nd) anniversary of the Effective Date, or (ii) ninety (90) days after the issuance of such check, if such check represents a final Distribution under this Plan on account of such Claim. After such date, all claims in respect of voided checks and the underlying Distributions will be discharged and forever barred.

**Section 8.11   Treatment of Disputed Claims:**

Disputed Claims shall be treated as follows under this Plan:

   **(i.)    Objections to Claims:** Except as otherwise provided by the Bankruptcy Court or in this Plan, upon the Effective Date, the Reorganized Debtors shall have the sole and exclusive right and obligation to object to Disputed Claims.  In no event shall the Debtors or any of their professionals be responsible for the adjudication of Claims and Interests in these cases after the Confirmation Date.  All objections to Disputed Claims shall be Filed and served on the Holders of such Claims on or before the later of: (i) 120 days after the Effective Date; and (ii) such additional date as the Bankruptcy Court may fix upon application of the Reorganized Debtors;

   **(ii.)    Distributions Pending Allowance:** Notwithstanding any other provision of this Plan to the contrary, no distribution shall be made to the Holder of a Disputed Claim or the Holder of a Claim which is the subject of a proceeding against it by the Debtors or the Reorganized Debtors, unless and until such Disputed Claim becomes an Allowed Claim or such proceeding is resolved; and

**(iii.) Distributions after Allowance or Disallowance:** Once a Disputed Claim becomes an Allowed Claim, distributions on account of such Claim shall be made in accordance with the provisions of this Plan governing the Class of Claims to which the respective Claim belongs.

## Section 8.12  Disputed Claims Reserve:

(a)     Except to the extent the Bankruptcy Court shall determine that a lesser amount is adequate, the Reorganized Debtors shall reserve for each Class or category of Claims in which there are Disputed Claims, Cash or New Common Stock equal to the Distributions that would have been made to Holders of Disputed Claims in such Class or category if such Claims were Allowed Claims in the Adjusted Amount.

(b)     All interest and earnings on funds deposited in the Disputed Claims Reserve Accounts shall be held in trust in the Disputed Claims Reserve Accounts and shall be distributed only in the manner described in this Plan.

(c)     At such time as all or any portion of a Disputed Claim becomes an Allowed Claim, the Distributions reserved for such Disputed Claim or such portion (including interest earned thereon or property distributed on account thereof) shall be released by the Reorganized Debtors from the appropriate Disputed Claims Reserve Account and paid or distributed, as the case may be, by the reorganized Debtors to the Holder of such Allowed Claim, net of any taxes in respect thereof, if any.  At such time as all or any portion of any Disputed Claim is determined by the Bankruptcy Court not to be an Allowed Claim, the Distribution reserved for such Disputed Claim or such portion (including such interest and dividend thereon or property distributed on account thereof) shall be released from the appropriate Disputed Claims Reserve Account and shall revest in the Reorganized Debtors.

## Section 8.13  Bar Date:

The Bar Date shall be set by Order of the Court prior to the Confirmation of the Plan as the Bar Date—*i.e.*, last date by which any Holder of a Claim or Interest, including Administrative Expense Claims pursuant to section 503(b)(9) of the Bankruptcy Code, against the Debtor arising prior to the Petition Date and whose claim or interest is not scheduled or is scheduled as disputed, contingent, or unliquidated shall file with this Court a Proof of Claim or Interest (as applicable) or a motion for allowance of an Administrative Claim.  All requests for allowance of an Administrative Claim shall be made by Motion to this Court.

Any motions for allowance of Administrative Expense Claims not arising under section 503(b)(9) of the Bankruptcy Code and not constituting Professional Fees shall be filed by the later of: (i) 30 days after such Claim is incurred, or (ii) 30 days after the Confirmation Date.  Service of the Confirmation Order shall constitute reasonable and adequate notice of the Bar Date to file any motions for allowance of Administrative Expense Claims not arising under section 503(b)(9) of the Bankruptcy Code.  After the Bar Date, all parties and Entities who fail to file a proof of claim or interest (as applicable) or a motion for allowance of an Administrative Claim shall not be treated as a creditor with respect to such claim or interest (or Administrative Expense Claim) for the purposes of voting and distribution.

## IX.
## EXECUTORY CONTRACTS

### Section 9.01    Assumption of Certain Executory Contracts and Unexpired Leases and Cure Payments:

The Reorganized Debtors shall identify any Executory Contracts to be assumed as of the Effective Date and the amount of cure payments to be provided by Reorganized Debtors in accordance with Bankruptcy Code Section 365(b)(1) prior to approval of the Disclosure Statement by the filing of a notice with the Bankruptcy Court.  Objections to any proposed cure payment must be made by the Voting Deadline and shall be determined, if necessary, at the Confirmation Hearing.  A party to an assumed Executory Contract that has not filed an appropriate pleading with the Bankruptcy Court on or before the objection deadline set by the Bankruptcy Court shall be deemed to have waived its right to dispute such amount.  The Debtors and Reorganized Debtors reserve the right to reject any Executory Contract that is listed by the Debtors as an Executory Contract to be assumed.  All unpaid cure payments under any Executory Contracts that are assumed or under the Plan shall be made by Reorganized Debtors as soon as practicable after the Effective Date, provided, that, in the event that there is a dispute regarding the amount of any cure payments, Reorganized Debtors shall make such cure payments as may be required by Bankruptcy Code Section 365(b)(1) within ten (10) days following the entry of a Final Order resolving such dispute.

### Section 9.02    Rejection of Unexpired and Unrejected Contracts and Leases:

Each Executory Contract of the Debtors that has not expired by its own terms prior to the Effective Date, that has not been assumed or rejected during the Chapter 11 Case prior to the Effective Date, and is not listed by the Debtors as a Executory Contract to be assumed or on a motion to reject such Executory Contract prior to the Effective Date, shall be deemed rejected by the Debtors pursuant to Bankruptcy Code Section 365 on the Effective Date.

### Section 9.03    Bar Date for Rejection Damages:

All proofs of claim with respect to Claims arising from the rejection of Executory Contracts shall be filed with the Bankruptcy Court on or before the date established as the last date therefor by the Bar Date Order or other order of the Bankruptcy Court.  Any proof of claim that is not timely filed shall be released, discharged and forever barred from assertion against the Debtors, or their Assets, or the Reorganized Debtors.

## X.
## EFFECTS OF CONFIRMATION

### Section 10.01  Discharge of Claims:

***As of the Effective Date, except as provided in the Confirmation Order or otherwise provided herein, the rights afforded under this Plan and treatment of Claims and Old Common Stock under the Plan shall be in exchange for and complete satisfaction, discharge and release of all Claims from the beginning of time through the Effective Date.  Except as otherwise provided in the Plan, or the Confirmation Order, Confirmation shall, as of the Effective Date, discharge***

31

*the Debtors from all Claims or other debts that arose before the Effective Date, including, but not limited to, all debts of the kind specified in Bankruptcy Code Sections 502(g), 502(h) or 502(i), whether or not (i) a proof of claim based on such debt is filed or deemed filed pursuant to Bankruptcy Code Section 501, or (ii) a Claim based on such debt is Allowed pursuant to Bankruptcy Code Section 402, or (iii) the Holder of a Claim based on such debt has accepted the Plan. As of the Effective Date, except as otherwise provided in the Plan, or the Confirmation Order, all Entities shall be precluded from asserting against the Debtors or Reorganized Debtors, or their respective successors or property, any other or further Claims, demands, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in this Plan, or Confirmation Order, the Confirmation Order shall be a judicial determination, as of the Effective Date pursuant to Bankruptcy Code Sections 524 and 1141, of discharge of all such Claims against the Debtors and such discharge shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.*

**Section 10.02 Injunction:**

EXCEPT AS OTHERWISE SET FORTH IN THIS PLAN, ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD (A) ANY CLAIM AGAINST, OR INTEREST IN, THE DEBTORS WHICH AROSE PRIOR TO THE EFFECTIVE DATE SHALL BE PERMANENTLY ENJOINED FROM AND AGAINST: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THEIR RESPECTIVE AFFILIATES, SHAREHOLDERS, ACCOUNTANTS, DIRECT OR INDIRECT SUBSIDIARIES, AGENTS, ATTORNEYS, ADVISORS, (AND WITH REGARD TO ALL OF THE FOREGOING ENTITIES, THEIR OFFICERS AND DIRECTORS), AND/OR THE ESTATES (COLLECTIVELY, THE "PERMANENT INJUNCTION PARTIES") WITH RESPECT TO ANY SUCH CLAIM OR INTEREST; (II) THE ENFORCEMENT, ATTACHMENT, COLLECTION, OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE PERMANENT INJUNCTION PARTIES; (III) CREATING, PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST THE PERMANENT INJUNCTION PARTIES OR AGAINST ANY OF THEIR PROPERTIES OR INTERESTS IN PROPERTY WITH RESPECT TO SUCH CLAIM OR INTEREST; AND (IV) ASSERTING ANY RIGHT OF SETOFF AGAINST ANY OBLIGATION DUE FROM THE PERMANENT INJUNCTION PARTIES OR AGAINST ANY PROPERTY OR INTEREST IN PROPERTY OF THE DEBTORS OR THE REORGANIZED DEBTORS WITH RESPECT TO ANY SUCH CLAIM OR INTEREST; AND (B) ANY CLAIM, RIGHT, ACTION, CAUSE OF ACTION AGAINST OR INTEREST IN THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATE WHICH SHALL HAVE ARISEN PRIOR TO THE CONFIRMATION DATE SHALL BE PERMANENTLY ENJOINED FROM AND AGAINST COMMENCING OR CONTINUING ANY SUIT, ACTION, OR PROCEEDING AGAINST, ASSERTING OR ATTEMPTING TO RECOVER ANY CLAIM AGAINST OR INTEREST IN, OR OTHERWISE AFFECTING THE

**PERMANENT INJUNCTION PARTIES WITH RESPECT TO ANY MATTER THAT IS THE SUBJECT OF THIS PLAN.**

### Section 10.03 Exculpation and Limitation of Liability:

*None of the Debtors, the Agent, the Pre-Petition Lenders, the DIP Lenders or the Plan Funders or any of the respective shareholders, members, officers, directors, employees, agents, attorneys, consultants, lenders, investment bankers, accountants and affiliates (and each of their respective shareholders, members, officers, directors, employees, agents, attorneys, consultants, lenders, investment bankers, accountants and affiliates of the foregoing, in their respective capacities as such) shall have or incur any liability to any Holder of a Claim or Old Common Stock for any act or omission in connection with, related to, or arising out of, the Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan except for willful misconduct or gross negligence, and, in all respects, the Debtors, the Agent, the DIP Lenders, the Pre-Petition Lenders and the Plan Funders shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.*

### Section 10.04   Binding Effect:

The rights, benefits and obligations conferred on any person or entity by the Plan will be binding upon, and inure to the benefit of the executors, successors, heirs and assigns of any person or entities claiming an interest in any and all property in which the Debtors have an interest within the meaning of Bankruptcy Code Section 541.

### Section 10.05  Other Documents and Actions:

The Debtors are authorized to execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.

### Section 10.06  Term of Injunctions or Stays:

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code Sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed.

### Section 10.07  Preservation of Insurance:

Except as necessary to be consistent with the Plan, the Plan and the discharge provided herein shall not diminish or impair the enforceability of insurance policies that may cover Claims against the Debtors, their Estates, or Assets or any other Entity in effect.

**Section 10.08  Releases:**

(a)  <u>Compromise of Controversies</u>.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, all Claims and Interests arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against the Debtors, the Agent, the DIP Lenders, the Pre-Petition Lenders and the Plan Funders, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, creditors, equity holders, and other parties in interest, and are fair, equitable and within the range of reasonableness.  The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

(b)  *__Releases by the Debtors__.  As of the Effective Date, the Debtors and their estates hereby waive, release and discharge (i) the DIP Lender, (ii) the Pre-Petition Lenders; (iii) the Agent, (iv) the Plan Funders and (v) the Debtors' present and former officers and directors, and (iv) each of the respective shareholders, members, officers, directors, employees, agents, attorneys, consultants, lenders, investment bankers, accountants and affiliates in their respective capacities as such of the parties released in clauses (i), (ii), and (iii) of this Section, from any Claim, obligation, right, Cause of Action or liability, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Cases or the Plan.*

(c)  *__Releases by Holders of Claims or Interests__.  On the Effective Date, the Debtors, the Reorganized Debtors, the Agent, DIP Lender, the Pre-Petition Lenders and the Plan Funders and their respective affiliates, direct or indirect subsidiaries—along with the present and former officers, directors, agents, shareholders, attorneys, accountants, the estates, and advisors of each of the foregoing (the "Released Parties") will automatically be released from all Claims and Causes of Action of every kind and nature, from the beginning of time through the Effective Date for all acts and omissions occurring both before and after the Petition Date, whether known or unknown, that may be asserted by: (i) the Released Parties; (ii) any Holder of a Claim or Interest in Classes 1, 2, 3, 4, and 6; (iii) Holders of Priority Claims and Holders of Administrative Expense Claims; (iv) the Agent; and (v) the DIP Lenders that in any way relate to, or arise in connection with, the Debtors, the Reorganized Debtors, or these Cases—including, without limitation, the Debtors' present and former businesses, operations, or financing.  The release provisions set forth in this section shall act as an injunction against any entity commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim or Causes of Action satisfied, released, or discharged under this Plan.  This injunction (the "Injunction") shall apply regardless of whether a Proof of Claim or interest based on such Claim, debt, liability, or Interest is filed or allowed, or whether such entity voted to accept or reject this Plan except for parties in Classes 1, 3, and 4 who submit a ballot indicating that they opt out of*

*this release. Without in any way limiting the foregoing, all Injunctions or stays entered in these Cases and existing immediately prior to the Confirmation Date shall remain in full force and effect until the Effective Date. This release in this subsection binds all parties in interest except for: (i) parties in Classes 1, 3, and 4 who submit a ballot indicating that they opt out of this release, and (ii) Holders of Interests in Class 5.*

*The foregoing release shall not apply to any duties, obligations, responsibilities, claims or causes of action that in any way relate to, or arise in connection with the Exit Facility.*

**Section 10.09 Injunction Related to Releases and Exculpation:**

*The Confirmation Order will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, debts, rights, causes of action or liabilities released pursuant to this Plan, including, but not limited to the claims, obligations, suits judgments, damages, demands, debts, rights, causes of action or liabilities released in Section 10 of this Plan.*

**Section 10.10 Retention of Jurisdiction:**

Following the Effective Date, the Bankruptcy Court shall retain sole and exclusive jurisdiction with respect to all matters of enforcement and interpretation on the Plan and Confirmation Order including but not limited to retaining jurisdiction to:

(i.) adjudicate all controversies concerning the classification or allowance of any Claims;

(ii.) liquidate, allow, or disallow any Claims which are disputed, contingent, or unliquidated;

(iii.) determine any and all objections to the allowance of Claims, or counterclaim(s) to any Claim(s);

(iv.) determine any and all applications for allowance of compensation and reimbursement of expenses and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or this Plan;

(v.) determine any applications pending on the Effective Date for the rejection or assumption of executory contracts or unexpired leases or for the assumption and assignment, as the case may be, of executory contracts or unexpired leases to which any Debtor is a party or with respect to which it may be liable, and to hear and determine, and if need be, to liquidate, any and all Claims arising therefrom;

(vi.) adjudicate any actions brought by the Debtors on any Causes of Action, at any time prior to expiration of the relevant statute of limitations;

(vii.) determine any and all applications, adversary proceedings, and contested or litigated matters that may be pending on the last date for objections to Claims;

(viii.) consider any modifications of this Plan, remedy any ambiguity, defect, or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order, to the extent authorized by the Bankruptcy Code;

(ix.) determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement, or consummation of this Plan;

(x.) consider and act on the compromise and settlement of any Claim or Cause of Action by or against the Debtors or the Estates, including but not limited to, determining all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of such compromises and settlements previously approved by the Bankruptcy Court or that may be approved in the future;

(xi.) issue orders in aid of execution of this Plan to the extent authorized by section 1142 of the Bankruptcy Code;

(xii.) determine such other matters as may be set forth in the Confirmation Order or which may arise in connection with this Plan or the Confirmation Order;

(xiii.) adjudicate disputes regarding the issuance of New Common Stock;

(xiv.) enforce, effectuate and implement any and all of the terms and conditions set forth in the Plan and Confirmation Order and any adjudicate matters arising after the Effective Date with respect to the Reorganized Debtors; and

(xv.) adjudicate any matters related to the continued administration of these bankruptcy cases through and including entry of a final decree.

## Section 10.11 Jurisdiction:

THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ACTION AGAINST ANY OF THE ENTITIES EXCULPATED OR RELEASED PURSUANT TO THIS PLAN BASED UPON ANY ACT OR OMISSION IN CONNECTION WITH, OR ARISING OUT OF, THE CASE, THE PROPOSED CONFIRMATION OR CONSUMMATION OF THIS PLAN, OR THE ADMINISTRATION OF THE CASE OR THIS PLAN, OR THE PROPERTY TO BE DISTRIBUTED UNDER THIS PLAN. PROVIDED HOWEVER, THAT THE PLAN FUNDERS SHALL RETAIN THE RIGHT TO PURSUE REMEDIES WITH RESPECT TO THE EXIT FINANCING AGAINST THE REORGANIZED DEBTORS.

## Section 10.12 Subordination Rights:

The classification and treatment of all Claims and Old Common Stock under this Plan shall be in full settlement and satisfaction of any contractual, legal, and equitable subordination rights, whether arising under general principles of equitable subordination, section 510(c) of the Bankruptcy Code, or otherwise, that a Holder of a Claim or Interest may have against other Claim Holders with respect to any distribution made pursuant to this Plan.

## Section 10.13 Effectuating Documents:

The Debtors and the Reorganized Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. All transactions that are required to occur on the Effective Date under the terms of this Plan shall be

deemed to have occurred simultaneously. Creditors, including the Holder(s) of the Pre-Petition Lender and DIP Facility Claims against the Debtors, shall deliver in recordable form all documents or instruments reasonably requested by the Debtors, or the Reorganized Debtors, to cancel all mortgages, liens, security interests, and encumbrances of record on any purported collateral for their Claims. The Bankruptcy Court shall retain jurisdiction to issue an order directing any necessary party to execute, deliver, or to join the execution or delivery of an instrument or document, and to perform any act necessary for the consummation of this Plan.

**Section 10.14 Ratification of Actions Taken:**

**ENTRY OF THE CONFIRMATION ORDER AND THE OCCURRENCE OF THE EFFECTIVE DATE SHALL RATIFY ALL TRANSACTIONS EFFECTED BY THIS PLAN FROM AND INCLUDING THE PETITION DATE THROUGH THE EFFECTIVE DATE. AFTER ENTRY OF THE CONFIRMATION ORDER, ALL CREDITORS AND INTEREST HOLDERS SHALL BE ENJOINED AND RESTRAINED FROM COMMENCING OR CONTINUING ANY ACTION OR PROCEEDING ARISING OUT OF, OR RELATED TO, THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS PLAN.**

XI.
## MISCELLANEOUS PROVISIONS

**Section 11.01 Construction:**

The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to construction of this Plan.

**Section 11.02 Time:**

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein, the provisions of Bankruptcy Rule 9006 shall apply.

**Section 11.03 Headings:**

The headings used in this Plan are inserted for convenience only and neither constitute a portion of this Plan nor are intended in any manner to affect any interpretation of the provisions of this Plan.

**Section 11.04 Governing Law:**

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties, and obligations of any Entity arising under this Plan shall be governed by, construed and enforced in accordance with, the internal laws of the State of Delaware, without regard to choice of law provisions.

**Section 11.05 Payment of Statutory Fees:**

No later than the Effective Date, the Debtors shall have paid all fees due to the United States Trustee through the Effective Date. Such fees that accrue after the Effective Date and until these Cases are closed shall be the sole responsibility of, and shall be payable by, the Reorganized Debtors.

**Section 11.06  Cramdown:**

At the Confirmation Hearing, the Debtors intend to seek Confirmation of this Plan notwithstanding the rejection or deemed rejection of this Plan by impaired Classes of Creditors or Old Common Stock.

**Section 11.07  Post Consummation Effect of Evidences of Claims or Old Common Stock:**

Any Pre-Petition Lender Notes, 3.5% Convertible Notes, stock certificates, and other evidence of Claims against the Debtors shall, effective on the Effective Date, represent only the right to participate in the distributions contemplated by this Plan.

**Section 11.08  Successors and Assigns:**

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the heir, executor, administrator, successor, or assignee of such Entity.

**Section 11.09  Legal Binding Effect:**

The provisions of the Plan shall bind all holders of Claims and Interests and their respective successors and assigns, whether or not they accept the Plan.

**Section 11.10  Inconsistencies:**

In the event that there is any inconsistency between this Plan, the Disclosure Statement, any exhibit to this Plan, or any other instrument or document created or executed pursuant to this Plan, this Plan shall govern.

**Section 11.11  Compliance with Applicable Law:**

It is intended that the provisions of this Plan (including the implementation thereof) shall be in compliance with applicable law including, without limitation, the Bankruptcy Code, the Securities Act of 1933, and the Internal Revenue Code, each as amended, as well as any rules and regulations promulgated thereunder.  This Plan may be modified, as the Debtors deem necessary, to bring this Plan into compliance therewith, subject to the provisions herein governing amendment of this Plan.

**Section 11.12  Modification of this Plan:**

Subject to section 1127 of the Bankruptcy Code and with the consent of the Agent, the Debtors, or after the Effective Date, the Reorganized Debtors, may amend or modify this Plan to remedy any defect or omission, or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.  Every amendment or modification of this Plan shall supersede and render null and void all prior versions of this Plan.

**Section 11.13  Section 1125(e) of the Bankruptcy Code:**

The Debtors have, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtors (and its respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and purchase of the securities offered and sold under this Plan, and therefore are not—and on account of such offer, issuance, sale, solicitation, and/or purchase will not be—liable for the violation (if any) of any applicable law, rule, or regulation governing the solicitation of acceptances or rejection of this Plan or the offer, issuance, sale, or purchase of the securities offered and sold under this Plan.

**Section 11.14  Reorganized Debtors as Party in Interest and Standing to Object to Claims:**

Notwithstanding anything herein to the contrary, the Reorganized Debtors shall remain a party in interest and shall have standing to investigate, assert, prosecute, object to, and compromise any and all Claims including without limitation, Administrative Expense Claims and General Unsecured Claims. The Reorganized Debtors shall fund all fees and expenses associated with claims objections filed by the Reorganized Debtors and shall pay all Allowed Administrative Expenses in full.

**Section 11.15  Severability:**

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors and the Plan Funders, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provision of the Plan shall remain in full force and effect, and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

Remainder of page intentionally left blank.

Dated: July 30, 2009  
Wilmington, Delaware

CIARDI CIARDI & ASTIN

*/s/ Mary E. Augustine*
Daniel K. Astin (No. 4068)
Anthony M. Saccullo (No. 4141)
Mary E. Augustine (No. 4477)
Carl D. Neff (No. 4895)
919 N. Market Street, Suite 700
Wilmington, Delaware 19801
Tel:  (302) 658-1100
Fax:  (302) 658-1300
dastin@ciardilaw.com
asaccullo@ciardilaw.com
maugustine@ciardilaw.com
cneff@ciardilaw.com

*Counsel for the Debtor and
Debtor-In-Possession*

EXHIBIT B

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | Case No. 09-12072 (MFW) |
| Isolagen, Inc., *et al.*,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | **Ref. No. 67** |

### ORDER (A) APPROVING ADEQUACY OF DISCLOSURE STATEMENT, (B) ESTABLISHING PROCEDURES FOR SOLICITATION AND TABULATION OF VOTES TO ACCEPT OR REJECT THE DEBTORS' PLAN OF REORGANIZATION, (C) SCHEDULING A HEARING ON CONFIRMATION OF THE DEBTORS' PLAN OF REORGANIZATION AND APPROVING RELATED NOTICE PROCEDURES, AND (D) GRANTING RELATED RELIEF

This matter coming before the Court on the motion (the "Motion"),[2] of Isolagen, Inc.

and Isolagen Technologies, Inc., the above-captioned debtor and debtor-in-possession (collectively,

the "Debtors"), for an order under 11 U.S.C. §§ 105(a), 1125(b) and 1126(b), Fed. R. Bankr. P.

2002, 3017, 3018 and 3020 and Del. Bankr. L.R. 3017-1, (a) approving the adequacy of the

Disclosure Statement, (b) establishing the procedures for solicitation and tabulation of votes to

accept or reject the Plan, including approval of (i) the forms of ballots for submitting votes on the

Plan, (ii) the deadline for submission of ballots, (iii) the contents of the proposed solicitation

packages to be distributed to creditors and other parties in interest in connection with the solicitation

of votes on the Plan (collectively, the "Solicitation Packages"), (iv) the proposed record date for

Plan voting and (v) certain related relief, (b) scheduling a hearing on Confirmation of the Plan

(the "Confirmation Hearing") and approving related notice procedures and (c) granting related

relief, all as more particularly described in the Motion; and the Court having determined that the

---

[1] The Debtors are Isolagen, Inc., tax identification number **-***8888, and Isolagen Technologies, Inc., tax identification number **-***6974.

relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest; and it appearing that notice of the Motion and opportunity for a hearing thereon was good and sufficient under the particular circumstances and that no other or further notice need be given; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor,

THE COURT HEREBY FINDS THAT:[3]

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

B.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

C.      The Disclosure Statement contains adequate information and complies with 11 U.S.C. §§ 1125(a)(1) and 1125(b).

D.      Notice of the Motion and the Disclosure Statement Hearing, made in the manner described in the Motion, was sufficient and appropriate under the circumstances and complied with the applicable requirements of title 11 of the United States Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

---

(. . . continued)

[2]      Capitalized terms not otherwise defined in this Order have the meanings ascribed to them in the Motion.

[3]      To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such.

-2-

E.     The relief requested in the Motion and granted herein is warranted under the circumstances and is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest.

F.     The form of the ballots attached hereto as Exhibit "A" (collectively, the "Ballots") (1) is consistent with Official Form No. 14, (2) adequately addresses the particular needs of these chapter 11 cases, (3) is appropriate for each Class of Claims entitled to vote to accept or reject the Plan and (4) complies with Bankruptcy Rule 3017(d).

G.     Ballots need not be provided to holders of unclassified Claims and Claims in Class 2 because under the Plan the holders of unclassified Claims and Claims in Class 2 are unimpaired and are conclusively presumed to accept the Plan in accordance with section 1126(f) of the Bankruptcy Code and holders of Claims and Interests in Classes 5 and 6 are conclusively presumed to reject the Plan in accordance with section 1126(g) of the Bankruptcy Code.

H.     The period during which the Debtors may solicit votes to accept or reject the Plan, as established by this Order, provides sufficient time for: (1) the holders of Claims entitled to vote on the Plan to make informed decisions to accept or reject the Plan and submit timely Ballots.

I.     The procedures for the solicitation and tabulation of votes to accept or reject the Plan, as approved herein, provide a fair and equitable voting process and are consistent with section 1126 of the Bankruptcy Code.

J.      The contents of the Solicitation Packages and the procedures for providing notice of the Confirmation Hearing and the other matters set forth in the Confirmation Hearing Notice, the Notice of Non-Voting Status, and the Notice of Deemed Rejecting Status as revised hereby (collectively, the "Notices") comply with Bankruptcy Rules 2002 and 3017 and constitute adequate information and sufficient notice to all interested parties in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

K.      Publication notice is not required in these cases because sufficient notice will be provided through service of the Notices.

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      The Disclosure Statement attached hereto as Exhibit "B" is APPROVED.

3.      The Disclosure Statement Notice is APPROVED.

4.      The Ballots, substantially in the forms attached hereto as Exhibit "A", including the instructions attached to each Ballot, are APPROVED. The appropriate Ballots shall be distributed to holders of Claims in the following Classes entitled to vote to accept or reject the Plan:

| | |
|---|---|
| Ballot No. 1 | Ballot for the Class 1-Pre-Petition Lender Claims under the Plan. |
| Ballot No. 2 | Ballot for the Class 3-3.5% Convertible Note Claims under the Plan |
| Ballot No. 3 | Ballot for the Class 4-General Unsecured Claims under the Plan |

5.      To be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed and delivered to the Balloting Agent either (a) by mail in the return envelope provided with each Ballot, (b) by overnight courier or (c) by hand or personal delivery so

-4-

that, in each case, they are received by the Balloting Agent no later than **4:00 p.m., Prevailing Eastern Time, on August 22, 2009** (the "Ballot Deadline").

      6.      Solely for purposes of voting to accept or reject the Plan—and not for the purpose of the allowance of, or distribution on account of, a Claim and without prejudice to the rights of the Debtors or any other party in interest in any other context—each Claim within a Class of Claims entitled to vote to accept or reject the Plan shall be temporarily allowed or disallowed in accordance with the following rules (the "Tabulation Rules"):

      (a)      unless otherwise provided in these Tabulation Rules, a Claim will be deemed temporarily allowed for voting purposes only in an amount equal to: (i) the amount of such Claim as set forth in the Schedules; or (ii) if a proof of Claim has been timely filed in respect of such Claim, the amount set forth in such proof of Claim;

      (b)      if a Claim is deemed allowed in accordance with the Plan, such Claim will be temporarily allowed for voting purposes in the deemed allowed amount set forth in the Plan;

      (c)      if a Claim for which a proof of Claim has been timely-filed and has not been disallowed is listed or marked or otherwise referenced on its face as contingent, unliquidated or disputed, either in whole or in part, or is for an unknown amount, such Claim shall be disallowed for voting purposes;

      (d)      if a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, such Claim will be temporarily allowed for voting purposes in the amount so estimated or allowed by the Court;

      (e)      with respect to a Claim as to which the Claim is listed in the Schedules as contingent, unliquidated or disputed and a proof of Claim was not timely filed, such Claim will be allowed for voting purposes for numerosity only and not for amount;

      (f)      with respect to a Claim as to which the Claim is not listed in the Schedules and a proof of Claim was not timely filed, such Claim will be disallowed for voting purposes;

      (g)      if the Debtors have filed and served an objection as to the amount, classification or allowance of a Claim at least five (5) days before the Ballot Deadline, such Claim will be temporarily allowed, disallowed

-5-

or reclassified for voting purposes as if the relief requested in the objection were granted; and

(h)     if a Claim holder identifies a Claim amount on its Ballot that is less than the amount otherwise calculated in accordance with the Tabulation Rules, the Claim will be temporarily allowed for voting purposes in the lesser amount identified on such Ballot.

7.     If any party in interest seeks to challenge the classification, allowance or disallowance of its Claim for voting purposes in accordance with the Tabulation Rules, such claimant must file a motion, pursuant to Bankruptcy Rule 3018(a), for an order temporarily allowing such Claim in a different amount or classification for purposes of voting to accept or reject the Plan (a "Rule 3018 Motion") and serve such motion on the on the Notice Parties (as defined at the end of this paragraph), so that it is received no more than ten (10) calendar days after the later of (a) the date of service of the Confirmation Hearing Notice and (b) the date of service of a notice of an objection, if any, to the underlying Claim. Rule 3018 Motions must: (a) be in writing; (b) state the name and address of the entity asserting the Rule 3018 Motion; (c) state with particularity the legal and factual bases for the Rule 3018 Motion; and (d) be timely filed with the Court and served on the following: (i) the Debtors, Isolagen, Inc. and Isolagen Technologies, Inc., 405 Eagleview Blvd., Exton, PA 19341 (Attn: Declan Daly); (ii) counsel for the Debtors, Ciardi Ciardi & Astin, 919 N. Market St., Suite 700, Wilmington, DE 19801 (Attn: Daniel K. Astin and Anthony M. Saccullo); (iii) counsel for the Agent, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, P.O. Box 2087, Wilmington, Delaware 19899-2087 (Attn: Adam G. Landis and Kerri K. Mumford) and Olshan Grundman Frome Rosenzweig & Wolosky LLP, 65 East 55th St., New York, NY 10022 (Attn: Adam H. Friedman); and (iv) the United States Trustee, Office of the United States Trustee, 844 King Street, Rm. 2207, Wilmington, Delaware 19801 (Attn: David Klauder) (collectively, the "Notice Parties"). Any Ballot submitted by a holder of a Claim that files a Rule 3018 Motion shall

-6-

be counted solely in accordance with the Tabulation Rules and the other applicable provisions of this Order unless and until the underlying Claim is temporarily allowed by the Court for voting purposes in a different amount, after notice and a hearing.

8.     In tabulating the Ballots, the following additional procedures shall be utilized:

(a)     any Ballot that is properly completed, executed and timely returned to the Balloting Agent but does not indicate an acceptance or rejection of the Plan will not be counted for the purposes of rejecting or accepting the Plan;

(b)     if no votes to accept or reject the Plan are received with respect to a particular Class, such Class will not be counted for the purposes of rejecting or accepting the Plan;

(c)     if a Holder of a Claim casts more than one Ballot voting the same Claim before the Ballot Deadline, the last Ballot received before the Ballot Deadline will be deemed to reflect the voter's intent and thus will supersede any prior Ballots;

(d)     Holders of multiple Claims will be required to vote all of their Claims within a particular Class under the Plan either to accept or reject the Plan and may not split their votes; thus, a Ballot (or a group of Ballots) within a Class received from a single Holder of a Claim that partially rejects and partially accepts the Plan will not be counted; and

(e)     for purposes of determining whether the numerosity and Claim amount requirements of sections 1126(c) and 1126(d) of the Bankruptcy Code have been satisfied, the Debtor will tabulate only those Ballots cast by the Ballot Deadline.

9.     The Confirmation Hearing is scheduled to be conducted on **August 27, 2009 at 2:00 p.m. (Prevailing Eastern Time).** The Confirmation Hearing may be continued from time to time by the Debtors or the Court without further notice other than the filing of a notice of adjournment (which may be the Hearing Agenda required under Local Rule 9029-3) and/or the announcement of the adjourned date(s) at the Confirmation Hearing or any continued hearing.

-7-

10. Objections to Confirmation of the Plan, if any, must: (a) be in writing; (b) state the name and address of the objecting party and the nature of the Claim or Interest of such party or represented by such party; (c) state with particularity the basis and nature of any objection to the Confirmation of the Plan; and (d) be filed with the Court and served on each of the Notice Parties so that they are received no later than **August 22, 2009 at 4:00 p.m. (Prevailing Eastern Time)** (the "Confirmation Objection Deadline").

11. Pursuant to Bankruptcy Rule 3017(d), **June 22, 2009**, shall be the record date for purposes of determining which holders of Claims and Interests are entitled to receive Solicitation Packages and, where applicable, vote on the Plan (the "Voting Record Date").

12. The Confirmation Hearing Notice, substantially in the form attached hereto as Exhibit "C", is hereby APPROVED. Within one (1) business days of the date of entry of this Order, or as soon thereafter as is reasonably practicable, the Debtors shall mail or cause to be mailed by first class U.S. mail, postage prepaid, a copy of the Confirmation Hearing Notice to the General Service List.

13. The Debtors are not required to publish notice of the Confirmation Hearing, and any publication requirement is hereby WAIVED.

14. The Notice of Non-Voting Status, substantially in the form attached hereto as Exhibit "D" (the "Notice of Non-Voting Status"), is hereby APPROVED. Within one (1) business day of the date of entry of this Order, or as soon thereafter as is reasonably practicable, the Debtors shall cause the Notice of Non-Voting Status to be mailed by first class U.S. mail, postage prepaid to the holders of Administrative, Priority and DIP Facility Claims and Claims in Class 2.

15. The Notice of Deemed Rejecting Status, substantially in the form attached hereto as Exhibit "E" (the "Notice of Deemed Rejecting Status") is hereby APPROVED. Within

-8-

one (1) business day of the date of entry of this Order, or as soon thereafter as is reasonably practicable, the Debtors shall cause the Notice of Deemed Rejecting Status to be mailed by first class U.S. mail, postage prepaid to holders of Claims in Class 6 (Intercompany Claims) and record holders of Interests in Class 5 (Old Common Stock).

16. With respect to a transferred Claim, the transferee shall be entitled to receive a Solicitation Package or other notices in connection with the confirmation of the Plan and, if otherwise permitted, cast a Ballot on account of such transferred Claim only if (a) all actions necessary to effect the transfer of the Claim pursuant to Bankruptcy Rule 3001(e) have been completed or (b) the transferee files by the Voting Record Date (i) the documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (ii) a sworn statement of the transferor supporting the validity of the transfer. Each transferee will be treated as a single holder for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code and the other voting and solicitation procedures set forth herein.

17. Within one (1) business day of the date of entry of this Order, or as soon thereafter as is reasonably practicable, the Debtors shall cause the Solicitation Packages to be mailed by first class U.S. mail, postage prepaid, to holders of Claims in Classes 1 (Pre-petition Lender Claims), 3 (3.5% Convertible Note Claims) and 4 (General Unsecured Claims), who are impaired and entitled to vote on the Plan. The Solicitation Package shall contain: (a) a copy or conformed printed version of the disclosure statement to accompany the Plan (the "Disclosure Statement"), including a copy of the Plan as an exhibit; (b) a copy or conformed printed version of this Order; (c) the Confirmation Hearing Notice; and (d) one or more Ballots (and a pre-addressed, postage-prepaid return envelope) appropriate for the specific holder of the Claim. The Debtors shall not be required to provide any additional documents or materials in the Solicitation Packages.

18.     Holders of Claims or Interests holding unclassified Claims or Claims or Interests in Classes 2, 5 and 6 and also Claims in a Class that is designated as impaired and entitled to vote under the Plan shall receive only the Solicitation Package appropriate for that impaired Class. Holders of Claims who have filed duplicate proofs of Claim in any given Class (a) shall receive only one Solicitation Package and one Ballot for voting with respect to that Class and (b) shall be entitled to vote their Claim only once with respect to that Class.

19.     The Debtors are excused from mailing Solicitation Packages to those entities for which the Debtors have only Undeliverable Addresses, based on returned mail in connection with the mailing of the Disclosure Statement Notice or earlier mailings in these cases, unless the Debtors are provided with accurate addresses for such entities, in writing, on or before three (3) Business Days after entry of this Order. Failure to mail Solicitation Packages to such entities shall not constitute inadequate notice of the Confirmation Objection Deadline, the Confirmation Hearing, the Ballot Deadline or any other matter.

20.     With respect to those parties that were scheduled by the Debtors or have filed a proof of Claim against the Debtors and (i) have had those scheduled or claimed obligations completely satisfied by the Debtor under authority granted by the Court or otherwise, or (ii) have had their Claims objected to and disallowed by Order of this Court, because they are no longer creditors, such parties are not entitled to vote on confirmation of the Plan and the Debtors shall have no obligation to send any notices or documentation to such parties. Those parties that filed multiple Claims against the Debtors and have one or more of those Claims remaining, notwithstanding the disallowance of certain of their other Claims, shall receive the appropriate Solicitation Package or other notices as set forth under this Order.

21.     Consistent with the provisions of the Plan concerning changes and modification, the Debtors are authorized to take or refrain from taking any action necessary or appropriate to implement the terms of, and the relief granted in, this Order (including, without limitation, making minor edits to the Plan, Disclosure Statement, notices or ballots after entry of this Order for the purpose of conforming the documents to each other), without seeking any further order of the Court.

Dated: Wilmington, Delaware
       July 30, 2009

_____
The Honorable Mary F. Walrath
United States Bankruptcy Judge

The Exhibits to the Disclosure Statement Order have been intentionally omitted.

To obtain copies of the exhibits, at the Debtors' expense, please contact Reliable at (302) 654-8080.

EXHIBIT C

## PROCEDURAL HISTORY

On June 15, 2009 (the "Petition Date"), Isolagen, Inc. and Isolagen Technologies, Inc.(collectively, the "Debtors") each filed voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware. The Debtors are aesthetic and therapeutic companies focused on developing novel skin and tissue rejuvenation products. The Debtors' clinical development product candidates are designed to improve the appearance of skin injured by the effects of aging, sun exposure, acne and burns with a patient's own, or autologous, fibroblast cells produced by the Debtors' proprietary Isolagen Process. The Debtors also have a skin care line through their Agera Laboratories, Inc. ("Agera") subsidiary.

Through December 31, 2008, the Debtors have been primarily engaged in developing their product technology. In the course of their development activities, the Debtors have sustained losses and expect such losses to continue through at least 2009. The Debtors' ability to operate profitably is largely contingent upon their success in obtaining financing, obtaining regulatory approval to sell one or a variety of applications of the Isolagen Therapy, upon their successful development of markets for their products and upon the development of profitable saleable manufacturing processes. As of December 31, 2008, the Debtors had cash and cash equivalents of $2.9 million and negative working capital of $87.3 million. In 2009, the Debtors' cash position further deteriorated, and the Debtors' increased debt resulted in the need to file for bankruptcy protection under chapter 11 of the Bankruptcy Code.

Contemporaneously with the filing of the voluntary petitions, the Debtors filed the Restructuring Agreement. The Restructuring Agreement sets forth the key terms of the Plan agreed upon by the Debtors, Viriathus, and the Participating Holders, which include, Ronald Phillips, Morgan Stanley & Co., Incorporated, Credit Suisse Securities (USA) LLC, Highbridge International, LLC, Akanthos Capital Management LLC, CSS, LLC, Alexandra Global Master Fund Ltd, and Context Advantage Master Fund, L.P. The Restructuring Agreement was negotiated and executed prior to the Petition Date and provides for (a) the deadline for plan solicitation, (b) the treatment of classified and unclassified claims and interests under the Plan, (c) corporate governance post-confirmation, and (d) the terms of the Exit Financing. Generally, the Restructuring Agreement provides for a debt to equity swap.

## BACKGROUND

The purpose of the Liquidation Analysis ("Analysis") is to provide information to the Court to allow for the determination that the Debtors' Chapter 11 Plan of Reorganization (the "Plan") is in the best interests of all classes of creditors and equity holders impaired by the Plan.

If no Plan of Reorganization can be confirmed, the Debtors' cases may be converted to cases under Chapter 7 of the Bankruptcy Code, whereby the Debtors' assets would be

liquidated for distribution to holders of Claims in accordance with the priority scheme established by the Bankruptcy Code. Conversion to cases under Chapter 7 of the Bankruptcy Code would likely result in significant additional costs to the Debtors' estates. The costs of liquidation under Chapter 7 would consist of a Chapter 7 trustee, as well as counsel and other professionals retained by the Chapter 7 trustee, expenses related to asset disposition, and claims arising from the immediate cessation of business activity due to the conversion of the cases to Chapter 7.

The Debtors' financial advisor prepared the Analysis, which is based upon the hypothetical disposition of assets and distribution on Claims under Chapter 7 liquidation. The Analysis utilizes estimates and assumptions that are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors. Actual results may vary significantly from the calculations provided in the Analysis. As such, the Analysis is speculative in nature, and no representation or warranty can be or is being made with respect to the actual proceeds that could be achieved in a Chapter 7 liquidation.

The Debtors submit that the Analysis evidences that the Plan satisfies the best interest of creditors test and that, under the Plan, the holders of Claims will receive value that is not less than the amount such holders would receive in a Chapter 7 liquidation. In fact, under a Chapter 7 scenario it is likely that unsecured creditors would receive no distribution.

## GENERAL ASSUMPTIONS

1. Conversion: The Debtors' cases converted to Chapter 7 on July 27, 2009.

2. DIP Facility: The maximum commitment of $2.75 million is borrowed and utilized to fund the Budget including all Chapter 11 administrative expenses, including professional fees, and pre-petition critical vendor payments through the conversion date.

## ASSET ASSUMPTIONS

1. Cash: Balance is based upon anticipated cash on hand as of July 27, 2009.

2. Intangible Assets: The Debtors' primary assets are their proprietary patents and trademarks. In consultation with the Debtors' retained professionals, Debtors' management estimates that the liquidation value of the Debtors' proprietary patents and trademarks is $275,000 based on the following information. The value of the Debtors' intangible assets in any context would be subject to material management assumptions based upon a number of factors, some of which are not in the control of the Debtors, such as the future results of clinical trials, availability of funding of research and development, the probability of obtaining required FDA approvals, and the Debtors' ability to develop markets for their products if FDA approval is obtained. In order to assess management's liquidation value of the Debtors' proprietary patents and trademarks, the Debtors' financial advisors relied upon information obtained from the Debtors' filings with the

Securities and Exchange Commission, financial data of the Debtors, and had discussions with the Debtors' management and officers regarding past attempts to market the patents and the results thereof, the Debtors' current stage of the FDA approval process and the timing of anticipated approval, and the general availability of credit in the current economy. The Debtors have never generated significant revenues from their products and have never been profitable. Prior to filing for bankruptcy, the Debtors undertook substantial efforts to sell their proprietary patents and trademarks, but received no interest. After extensive sale and financing efforts, the only option available to the Debtors was to file for bankruptcy protection and to restructure pursuant to the terms of the Restructuring Agreement. The Restructuring Agreement provides for the financing of $2.75 million for the Debtors to operate through the confirmation of a plan of reorganization.

If these cases were converted to Chapter 7, and the Debtors intangible assets were liquidated, any interruption in the Debtors' operations resulting from the conversion of the cases would likely permanently impair the value of the intangible assets. The Debtors, who are currently seeking FDA approval for certain products, would shut down operations and abandon their facilities if the cases were converted to Chapter 7. The Debtors believe that a conversion could cause substantial disruption and delay in the FDA approval process as all human tissue stored by the Debtors at their facilities would likely need to be destroyed prior to conversion in order to minimize environmental hazards. Although the human tissue stored at the Debtors' facilities may not longer be needed in the Debtors' current phase of the FDA approval process, it is unclear how the Debtors' current FDA approval track would be affected by the sale of the intangible assets as a result of a conversion. Any purchaser of the Debtors' assets would be required to establish, among other things, to the satisfaction of the FDA's procedures, rules and regulations, that they have a proper facility, that all files regarding the Debtors' clinical trials are adequately maintained, and that their current personnel are capable of complying with the FDA's procedures, rules and regulations. It is unlikely that this would occur except under a structured conversion to Chapter 7.

Even if a structured conversion could be accomplished, and management is unaware of any potential parties for such an option, there is no guarantee that any purchaser would receive approval from the FDA to continue with the approval process, and the substantial risk surrounding FDA approval after a sale in liquidation negatively impacts the value of the intangible assets. Even if a potential purchaser is ultimately able to comply with FDA procedures, rules and regulations, FDA approval could be substantially delayed while the purchaser is establishing credibility with the FDA. Any delay in the transition of assets from the Debtors' to estates controlled by a chapter 7 trustee could further delay the FDA approval process or, in the worst case, cause a denial of FDA approval.

As a result of the above-mentioned considerations, and the substantial risk that would be undertaken by a purchaser in inserting themselves into the FDA approval process, the liquidation value of the Debtors' intangible assets utilized in the Analysis is $275,000, which represents at 90% discount from the financing provided in the bankruptcy cases and may only be ascertainable if the intangible assets are actually sold to a third-party.

3.   Equity Interest:  The Debtors' 57% stock interest in Agera is valued at $625,000. The value is derived from an offer received by the Debtors from an independent third-party for said interest obtained within the last six months.

4.   Fixed Assets:  The proceeds from the liquidation of the hard assets of the Debtors, including lab equipment, computer equipment, and other miscellaneous assets are estimated at $50,000.

5.   Avoidance Actions:  Due to the nature of the Debtors' disbursements during the 90-day and one year periods prior to the Petition Date, the estimated recoveries from avoidance actions are zero.

**COST ASSUMPTIONS**

1.   The Chapter 7 Administrative Costs assume that a carve-out agreement is reached with the DIP Agent to allow a chapter 7 trustee to administer these cases.  If a carve-out is not achieved, the DIP Agent would liquidate the assets of the Debtors and apply the proceeds against the DIP Facility.

2.   Trustee and Professional Fees:  The Chapter 7 trustee fees are calculated based upon the statutory escalating scale set for the in section 326 of the Bankruptcy Code, which provides for fees equal to 25% of the first $5,000 of proceeds, 10% of the next $45,000 of proceeds, 5% of the next $950,000 of proceeds and 3% of proceeds in excess of $1,000,000.  It is also assumed that the administration of the Chapter 7 cases would require the retention of legal counsel and accountants.    Additional Chapter 7 administrative costs would also be incurred such as document retention and destruction costs.

3.   Sale Broker:  The sale broker would be retained by the Chapter 7 Trustee to market and sell the Debtors' intangible assets and stock interests in Agera.  The sale broker would likely retain a percentage of the proceeds generated from such a sale plus costs.  The broker percentage is assumed to be 5%.

**LIQUIDATION PROJECTIONS**

The table below presents estimated creditor recoveries in the event these Chapter 11 cases are converted to Chapter 7.

| ASSETS | LIQUIDATION VALUE |
|---|---|
| Cash | $ 50,000 |
| Intangible Assets | $ 275,000 |
| Equity Interest | $ 625,000 |
| Fixed Assets | $ 50,000 |
| Avoidance Actions | $ 0 |
| | $ 1,000,000 |

| COSTS | |
|---|---|
| Chapter 7 Trustee and Professionals | ($ 100,000) |
| Sale Broker Fee and Costs | ($ 50,000) |
| | ($ 150,000) |

| | |
|---|---|
| NET LIQUIDATION PROCEEDS | $ 850,000 |
| DIP FACILITY CLAIM (Maximum Commitment) | $ 2,750,000 |
| CASH AVAILABLE FOR DISTRIBUTION | $ 0 |

| PLAN CLASS | Chapter 7 Liquidation Recovery |
|---|---|
| Chapter 11 Administrative Expense Claims | 0% |
| Priority Non-Tax Claims | 0% |
| Priority Tax Claims | 0% |
| Pre-Petition Lender Claims (Class 1) | 0% |
| Other Secured Claims (Class 2) | 0% |
| 3.5% Convertible Notes (Class 3) | 0% |
| General Unsecured Claims (Class 4) | 0% |
| Old Common Stock (Class 5) | 0% |
| Intercompany Claims (Class 6) | 0% |

EXHIBIT D

In re: Tolagen, Inc., et al.          Case No. 09-12072 (MFW)
Debtor

## CASH FLOW PROJECTIONS FOR THE 12 MONTH PERIOD: September 2009 through August 2010

This schedule must be filed with the Court and a copy submitted to the United States Trustee within 15 days after the entry of the order for relief. Amended cash flow projections should be submitted as necessary.

| | Month Sep-09 | Month Oct-09 | Month Nov-09 | Month Dec-09 | Month Jan-10 | Month Feb-10 | Month Mar-10 | Month Apr-10 | Month May-10 | Month Jun-10 | Month Jul-10 | Month Aug-10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Begining of Month | 20,000 | 887,500 | 71,375 | 3,577,375 | 2,751,875 | 1,880,625 | 10,913,125 | 9,955,625 | 8,995,625 | 7,935,625 | 6,340,625 | 5,315,625 | |
| **RECEIPTS** | | | | | | | | | | | | | |
| CASH SALES | | | | | | | | | | | | | |
| ACCOUNTS RECEIVABLE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LOANS AND ADVANCES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SALE OF ASSETS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| OTHER (3) | 1,750,000 | 0 | 4,400,000 | 0 | 0 | 10,000,000 | 0 | 0 | 0 | 0 | 0 | 0 | 16,150,000 |
| **TOTAL RECEIPTS** | 1,750,000 | 0 | 4,400,000 | 0 | 0 | 10,000,000 | 0 | 0 | 0 | 0 | 0 | 0 | 16,150,000 |
| **DISBURSEMENTS** | | | | | | | | | | | | | |
| NET PAYROLL (4) | 150,000 | 172,500 | 180,000 | 210,000 | 225,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 2,687,500 |
| PAYROLL TAXES (5) | 7,500 | 8,625 | 9,000 | 10,500 | 11,250 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 134,375 |
| SALES, USE, AND OTHER TAXES (6) | | | | | 30,000 | | | | | | | | 30,000 |
| SECURED/RENTAL/LEASES (7) | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 35,000 | 35,000 | 35,000 | 165,000 |
| SUPPLIES/MERCHANDISE | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 127,500 | 127,500 | 127,500 | 127,500 | 1,575,000 |
| INSURANCE (8) | 150,000 | | | | 70,000 | | 70,000 | 127,500 | 127,500 | | 70,000 | 70,000 | 250,000 |
| ADMINISTRATIVE & SELLING (9) | 450,000 | 450,000 | 450,000 | 450,000 | 450,000 | 450,000 | 550,000 | 550,000 | 550,000 | 650,000 | 650,000 | 650,000 | 6,500,000 |
| OTHER (11) | | 100,000 | | | | | 500,000 | | | 500,000 | | | 1,000,000 |
| PROFESSIONAL FEES (12) | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 240,000 |
| **TOTAL DISBURSEMENTS** | 912,500 | 786,125 | 894,000 | 825,500 | 871,250 | 967,500 | 957,500 | 957,500 | 960,000 | 1,060,000 | 1,595,000 | 1,595,000 | 12,519,375 |
| **NET CASH FLOW** | | | | | | | | | | | | | |
| RECEIPTS LESS DISBURSEMENTS | 837,500 | -786,125 | 3,506,000 | -825,500 | -871,250 | 9,032,500 | -957,500 | -960,000 | -1,060,000 | -1,595,000 | -1,025,000 | -1,595,000 | 3,770,625 |
| **Cash End of Month** | 887,500 | 71,375 | 3,577,375 | 2,751,875 | 1,880,625 | 10,913,125 | 9,955,625 | 8,995,625 | 7,935,625 | 6,340,625 | 5,315,625 | 3,790,625 | 3,790,625 |

**Assumptions:**

(1) Assumes approval in January 2010 and assumes six month launch delay at least FDA approved volume level.

(2) Assumes sales on a prepayment basis (i.e., patient payment upfront & physician payment upfront).

(3) Assumes gross capital raises as follows: (a) $2 million exit financing in September 2009, $4,000,000 capital raise in November 2009 (at a higher valuation due to anticipated FDA approval, and $11,000,000 capital raise as a result of FDA approval. Amounts presented are net of financing costs (e.g. commissions and fees).

(4) Assumes addition of new management and increased manufacturing and marketing staff.

(5) Assumption of 5% (federal social security and medicare, with caps) of payroll cost.

(6) Assumes no sales tax (as sale is not to end user, but to intermediate physician) and assumes DE franchise tax of $15,000 (operation is less making at 20 units per month).

(7) Assumes R&D materials and inventory build at a cost of $10,000 per month, plus materials cost of sales of 60%.

(8) Assumes 2% inflation factor on existing Elsom, PA, 86,500 sq. foot lease beginning Apr 2010. Current monthly rent is $125,000. Equipment leased included in Administrative and Selling.

(9) Assumes a reduction of D&O annual insurance premium as $150,000 and P&O liability insurance of $100,000. Health and dental insurance included in "Administrative and Selling"

(10) Estimate based on SG&A costs illustrated in Bankruptcy budget, less rent, legal and payroll (as these are reflected elsewhere herein).

(11) Represents capital expenditures.

(12) Assumes $20,000 per month in legal fees for security, SEC and general launch corporate matters.

(13) Assumes no other studies (e.g. Acne, duration study et al.) funded in budget.

**Strategy:**

Proof of concept via FDA approval and "soft" commercial launch through existing physician base (the physicians)

FORM 2A-1
(4/07)

EXHIBIT E

## RESTRUCTURING AGREEMENT

This RESTRUCTURING AGREEMENT (together with the Term Sheet (as defined below), the "Agreement"), dated as of June __, 2009, is made by and among Isolagen, Inc., a Delaware corporation, Isolagen Technologies, Inc, a Delaware corporation ( collectively, the "Company"), Viriathus Holdings LLC, Viriathus Services LLC Series, as agent for certain pre-petition lenders (the "Agent") and the noteholders who are identified on the signature pages hereto  (the "Participating Holders").

WHEREAS, the Company, the Agent and the Participating Holders have engaged in negotiations with the objective of reaching an agreement for a Restructuring (as defined below) of the Company, including the indebtedness outstanding under the 3.5% Unsecured Convertible Notes (the "Notes;)

WHEREAS, the Company and the Participating Holders now desire to implement a financial restructuring (the "Restructuring") of the Company that is substantially consistent with the terms and conditions set forth in the term sheet (together with the Exhibits and Schedules attached thereto, the "Term Sheet") attached hereto as Exhibit A;

WHEREAS, in order to implement the Restructuring, the Company has agreed, on the terms and conditions set forth in this Agreement and the Term Sheet, to use its best efforts to consummate the Restructuring through a pre-negotiated plan of reorganization (the "Reorganization Plan"), the requisite acceptances of which shall be solicited following commencement of voluntary cases ("Chapter 11 Case") by the Company under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware  (the "Bankruptcy Court");

WHEREAS, to expedite and ensure the implementation of the Restructuring, each of the Participating Holders is prepared to commit, on the terms and subject to the conditions of this Agreement and applicable law, to, if and when solicited in accordance with applicable bankruptcy law, vote (or, in the case of managed or advised accounts, instruct its custodial agents to vote) to accept the Reorganization Plan and support its confirmation and to, in either case, perform its other obligations hereunder.

NOW THEREFORE, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and each Participating Holder hereby agree as follows:

      **1.**    **Term Sheet.** The Term Sheet is incorporated herein and is made part of this Agreement. The general terms and conditions of the Restructuring are set forth in the Term Sheet. In the event of any inconsistencies between the terms of this Agreement and the Term Sheet, the Term Sheet shall govern.  For the avoidance of doubt, upon execution and delivery of this Agreement by all the parties hereto, the terms and provisions of the Term Sheet shall become binding on the parties to this Agreement except for any statements in the Term Sheet to the effect that provisions thereof are not binding, which statements shall be void and of no further force or effect.

      **2.**    **Condition Precedent.** It is a condition precedent to the effectiveness of this Agreement that (i) the Restructuring as set forth in the Term Sheet be approved by the Company's Board of Directors, which approval shall be obtained prior to the consent of the voluntary Chapter 11 Cases and (ii) that the Chapter 11 Cases are commenced no later than 6:00 p.m. (NY Time) on June 11, 2009, unless extended by the parties hereto.

      **3.**    **Means for Effectuating the Restructuring.** The Company shall seek to effectuate the Restructuring through the consent of the voluntary Chapter 11 Case and the confirmation and consummation of the Reorganization Plan.

      **4.**    **Preparation of Restructuring Documents.**

a) No later than the date hereof, the Company shall instruct its counsel in consultation with the Participating Creditors to prepare all of the documents necessary to consent to the Chapter 11 Cases (collectively, the "Chapter 11 Documents"), which shall include, without limitation, the following:

    i    Consents for relief and required schedules under chapter 11 of the Bankruptcy Code for the Company and the filing of a voluntary petition by the Company.(the "Petitions"):

    ii    A disclosure statement, including customary exhibits, related to the Reorganization Plan (the "Disclosure Statement") that complies with section 1125 of the Bankruptcy Code;

    iii    The Reorganization Plan, which shall incorporate the terms and conditions set forth in the Term Sheet and such other terms and conditions agreed upon by the Company and the Participating Holders, including any exhibits and, prior to confirmation, plan supplement documents (which shall include appropriate revised corporate governance documents);

    iv    A proposed order confirming the Reorganization Plan; and

    v    Any other typical or necessary motions and applications for relief filed by the Company on the date of the commencement of the Chapter 11 Cases (the "First Day Pleadings").

Each Chapter 11 Document shall be in the form and substance reasonably acceptable to the Agent and the Participating Holders prior to its filing with the Bankruptcy Court.

b) **Company Undertakings.** The Company hereby agrees to use its best efforts to, as applicable, (i) take all acts reasonably necessary to effectuate and consummate the Restructuring and (ii) implement all reasonable steps necessary to obtain an order of the Bankruptcy Court confirming the Reorganization Plan, in each case, as expeditiously as possible. The Company hereby agrees that it will not take any action inconsistent with this Agreement or the Reorganization Plan.

**5.    Conduct of Business.** The Company agrees that, prior to the Effective Date (as defined below) of the Reorganization Plan and prior to termination of this Agreement pursuant to Section 9 below, unless the Agent and the Participating Holders consent to such actions in writing:

a)    The Company shall not (i) directly or indirectly engage in, agree to or consummate any transaction that is not on an arms' length basis or outside the ordinary course of its business (other than the Restructuring) or incur any liability outside the ordinary course of business, or that is not on an arms' length basis, and, if between unaffiliated parties, also on market terms or (ii) enter into any transaction or perform any act which would constitute any breach by it of any of its representations, warranties, covenants or obligations hereunder;

b)    The Company shall maintain its corporate existence and shall maintain its qualification in good standing under applicable laws;

c)    The Company shall not pay any dividends to holders of common and/or preferred equity (the "Old Equity") or make any distributions to Old Equity prior to confirmation of a Plan;

d)    Except as expressly allowed in this Agreement, the Company shall not directly or indirectly, and shall cause each of its direct and indirect subsidiaries not to directly or indirectly do or permit to occur any of the following: (i) issue, sell, pledge, dispose of, or

2

encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its equity interests; (ii) amend or propose to amend its respective articles of incorporation or comparable organizational documents; (iii) split, combine, or reclassify any outstanding shares of its capital stock or other equity interests, or declare, set aside, or pay any dividend or other distribution payable in cash, stock, property, or otherwise with respect to any of its equity interests; (iv) redeem, purchase, or acquire or offer to acquire any of its equity interests; (v) acquire, transfer, or sell (by merger, exchange, consolidation, acquisition of stock or assets, or otherwise) any corporation, partnership, joint venture, or other business organization or division, or any assets;

e)      The Company shall promptly, and in any event within three (3) business days after receipt or knowledge of the same by any of them, notify (i) the Agent, (ii) the Participating Holders and (ii) counsel for the Agent of any governmental or third party notices, complaints, investigations, hearings, orders, decrees or judgments (or communications indicating that any of the foregoing may be contemplated or threatened) which could reasonably be anticipated to (i) have a Material Adverse Effect (as defined below) or (ii) prevent or delay the timely consummation of the Restructuring. "Material Adverse Effect" shall mean any change, event, occurrence, effect, or state of facts that, individually, or aggregated with other such matters, is materially adverse to the business, assets (including intangible assets), properties, prospects, condition (financial or otherwise), or results of operations of the Company and its subsidiaries taken as a whole, but excluding changes, events, occurrences, effects or states of fact that customarily occur as a result of the commencement of a case under chapter 11 of the Bankruptcy Code.

**6.      Timetable.** The Reorganization Plan and Disclosure Statement shall be filed as soon as practicable after commencement of the Chapter 11 Cases but in no event later than June 24, 2009, unless such time is extended by the Agent and the Participating Holders.

**7.      Termination of Agreement.** At the election of the Agent or Participating Holders holding more than 50%, in the aggregate, of the outstanding Notes (the "Majority Holders") this Agreement shall terminate upon the occurrence of any "Agreement Termination Event" ( as hereinafter defined), unless the occurrence of such Agreement Termination Event is waived in writing by the Agent or all Participating Holders. If any Agreement Termination Event occurs (and has not been waived) or a Company Termination Event occurs at the time when permission of the Bankruptcy Court shall be required for the Agent or the Participating Holders to change or withdraw (or cause to be changed or withdrawn) its votes to accept the Reorganization Plan, the Company shall not oppose any attempt by Agent or the Participating Holders to change or withdraw (or cause to be changed or withdrawn) such votes at such time. Upon the occurrence of an Agreement Termination Event, unless such Agreement Termination Event is waived in accordance with the terms hereof, or upon the occurrence of a Company Termination Event, this Agreement shall terminate and no party hereto shall have any continuing liability or obligation to any other party hereunder and (i) the Agent and the Participating Holders shall have all rights and remedies available to it under the applicable law and (ii) the obligations of each of the parties hereunder shall thereupon terminate and be of no further force and effect with respect to each party.

An "Agreement Termination Event" shall mean any of the following events, upon which the Agreement shall automatically terminate following the occurrence of such event, other than with respect to items (i), (ii), (iv) and (vii), upon which the Agreement shall terminate if such event remains uncured for five (5) days after receipt of written notice from the Agent or the Majority Holders following the occurrence of such event:

i        The Company shall have breached any provision of this Agreement, including but not limited to, ceasing to take any steps that are reasonably necessary to obtain approval of the Disclosure Statement and/or confirmation of the Reorganization Plan, as applicable;

3

ii        Any representation or warranty made by the Company to any Participating Holder in this Agreement or any term of the Term Sheet, including the projected amount of claims, shall have been untrue in any material respect when made or any breach of any covenant or material provision hereof by the Company shall have occurred;

iii        The Company takes formal action (including, without limitation, the filing of a pleading in the Chapter 11 Case), or announces an intention to take or pursue action, inconsistent with (i) the Term Sheet or (ii) any of the Chapter 11 Documents, or selects the treatment of any claim or class from the contemplated alternatives set forth in the Term Sheet without the consent and approval of the Participating Holders;

iv        The Chapter 11 Documents, including, without limitation, the Reorganization Plan, contain any term or condition (a) not set forth in the Term Sheet or (b) inconsistent with the Term Sheet;

v        There shall have been issued or remain in force any order, decree, or ruling by any court or governmental body having jurisdiction restraining or enjoining the consummation of or rendering illegal the transactions contemplated by this Agreement or the Reorganization Plan;

vi        The Company shall propose, consent to, support, acquiesce or participate in the formulation of any out-of-court restructuring, any chapter 7 or chapter 11 plan of reorganization or liquidation or any other such similar reorganization or liquidation (whether foreign or domestic) other than the Restructuring as set forth on the Term Sheet and other than as agreed to by the Agent and the Participating Holders;

vii        The occurrence of a Material Adverse Effect;

viii        If any of the final forms of the documents prepared in connection with or related to the Restructuring (including, without limitation, any stockholders' agreement, any certificate of incorporation, any bylaws, any document concerning the corporate governance of the Company upon the consummation of the Reorganization Plan or any document concerning the rights of Company shareholders or debtholders upon the consummation of the Reorganization Plan) necessary for the implementation of the Restructuring are not reasonably acceptable to the Agent and the Participating Holders , including being inconsistent with any provisions of the Term Sheet;

ix        The exclusive periods (as provided for in section 1121 of the Bankruptcy Code) to (a) file a plan of reorganization or (b) solicit acceptances thereof are terminated or expire as to any party other than the Agent and the Participating Holders ;

x        The Disclosure Statement is not approved by the Bankruptcy Court as containing adequate information (as that term is used in section 1125 of the Bankruptcy Code) on or before twenty-five (25) days following the filing of the Disclosure Statement, subject to Court availability;

xi        The Reorganization Plan shall not have been confirmed by order (the "Confirmation Order") entered by the Bankruptcy Court on or before the later of (x) 60 calendar days following the date that the Chapter 11 Cases have been commenced (the "Petition Date") or (y) the expiration of the 10 week Budget period contained in the Debtors' debtor in possession financing credit agreement:

xii        A trustee or examiner with enlarged powers shall have been appointed under section 1104 or 105 of the Bankruptcy Code for service in the Chapter 11 Cases;

4

xiii    Any of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code;

xiv    The Confirmation Order is not in form and substance reasonably acceptable to counsel for the Agent and the Participating Holders; and

xv.    Any affiliate or subsidiary of the Company object to the terms of this Agreement, the Term Sheet, or the proposed transactions contemplated thereby; or

xvi.    If the projected amount of claims set forth on the Term Sheet is inaccurate and the allowed amount of such claims exceeds the amounts set for on the Term Sheet by at least $25,000 in the aggregate.

Agent and the Participating Holders may rescind their vote on the Reorganization Plan (which vote shall be null and void and have no further force and effect) by giving written notice thereof to the Company if: (a) the Reorganization Plan is amended or modified to provide any term that is inconsistent with the Term Sheet, (b) after filing the Reorganization Plan, the Company (i) submits a second or amended plan of reorganization that changes, modifies, or deletes any provision of the Term Sheet in any respect, or (ii) moves to withdraw the Reorganization Plan, or (c) the Company fails to satisfy any term or condition set forth in this Agreement. After giving notice pursuant to this Section and no cure having occurred within five (5) days after the Company's receipt of such notice, this Agreement shall be of no force and effect.

**8.    Representations and Warranties.** The Company represents and warrants that (i) to the extent applicable, it is duly organized, validly existing, and is or will be in good standing under the laws of the jurisdiction of its formation, (ii) its execution, delivery, and performance of this Agreement are within the power and authority of such party and have been duly authorized by such party and that no other approval or authorization is required, (iii) this Agreement has been duly executed and delivered by it and constitutes its legal, valid, and binding obligation, enforceable in accordance with the terms hereof, subject to bankruptcy, insolvency, fraudulent conveyance, and similar laws affecting the rights or remedies of creditors generally, and (iv) none of the execution and delivery of this Agreement or compliance with the terms and provisions hereof will violate, conflict with, or result in a breach of, its certificate of incorporation or bylaws or other constitutive document, any applicable law or regulation, any order, writ, injunction, or decree of any court or governmental authority or agency, or any agreement or instrument to which it is a party or by which it is bound or to which it is subject.

**9.    Public Disclosures.** Prior to the issuance of any public disclosures regarding the Restructuring (including this Agreement), the Company shall consult with the Participating Holders as to the form and substance of such public disclosures related to the Restructuring (including this Agreement) or the transactions contemplated hereby.

**10.    Covenants.**

a)    The Company and the Agent agree to use best efforts to (i) support and complete the Restructuring and (ii) do all things reasonably necessary and appropriate in furtherance thereof. The Participating Holders shall use commercially reasonable efforts to support and complete the Restructuring and (ii) do all things reasonably necessary and appropriate in furtherance thereof.

b)    Each party hereby further covenants and agrees to negotiate the definitive documents relating to the Restructuring in good faith. The Company shall keep the Agent and the Participating Holders apprised of any discussions, negotiations or meetings with any other creditor constituency.

**11.     Impact of Appointment to Creditors' Committee.** Notwithstanding anything herein to the contrary, if any Participating Holder is appointed to and serves on an official committee of creditors in the Chapter 11 Cases, the terms of this Agreement shall not be construed so as to limit such Participating Holder's exercise (in its sole discretion) of its fiduciary duties, if any, to any person arising from its service on such committee, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement.

**12.     Approval, Acceptance, Waiver, or Consent by Participating Holders.** Where this Agreement provides that the Participating Holders may agree, waive, accept, consent, or approve any action or document, including, but not limited to, the Participating Holder's approval of documents in "form and substance reasonably acceptable" to the Participating Holders, then approval by Participating Holders owning at least 80% in principal amount of the Notes owned by all of the Participating Holders ("Required Participating Holders") will constitute such agreement, waiver, acceptance, consent, or approval, as applicable. The Participating Holders agree that they will respond promptly to any waiver, approval, request for acceptance, or consent sought by the Company .

**13.     Governing Law; Jurisdiction.** This Agreement shall be governed by and construed in accordance with the internal laws of the state of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this agreement, each of the parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought in the United District Court for the District of Delaware and, by execution and delivery of this Agreement, each of the parties hereby irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit, or proceeding and agrees that service of process in connection therewith shall be effective if made by first class mail and shall not contest the form of manner of such service. Notwithstanding the foregoing consent to New York jurisdiction, upon the commencement of the Chapter 11 Cases, the parties agree that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with the parties obligations under this Agreement and that the parties shall not seek to enforce this Agreement in any other court.

**14.     Specific Performance.** It is understood and agreed by the parties to this Agreement that money damages would not be a sufficient remedy for any breach of this Agreement by any party, and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court requiring any party to comply promptly with any of its obligations hereunder.

**15.     Reservation of Rights.** This Agreement and the Reorganization Plan are part of a proposed settlement of disputes among the parties hereto. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of the Company and each of the parties to protect and preserve its rights, remedies and interests, including without limitation, with respect to claims against the Company or its full participation in any bankruptcy case filed by the Company. If the transactions contemplated herein or in the Reorganization Plan are not consummated, or if this Agreement is terminated, the parties hereto fully reserve any and all of their rights. Pursuant to Rule 408 of the Federal Rules of Evidence and any applicable state rules of evidence, this Agreement shall not be admitted into evidence in any proceeding other than a proceeding to enforce its terms.

**16.     Headings.** The headings of the Sections and Subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

**17.     Successors and Assigns.** This Agreement is intended to bind and inure to the benefit of the parties and their respective successors, assigns, heirs, executors, administrators and representatives. The agreements, representations and obligations of the Participating Holders under this Agreement are, in all respects, several and not joint.

**18.     Notice.** Notices given under this agreement shall be to:

6

If to the Company:

> Isolagen, Inc.
> 405 Eagleview Blvd
> Exton, PA. 19341

## If to Any Participating Holder or the Participating Holders:

> At the address set forth on the signature pages hereto

> If to the Agent:

> Viriathus Holdings, LLC
> Attn: David Batista
> Two Rector Street, 16th Floor
> New York, NY 10006-1840

> and-

> Olshan Grundman Frome Rosenzweig & Wolosky LLP
> Park Avenue Tower
> 65 East 55th Street
> New York, New York 10022-1106
> Attn: Adam H. Friedman, Esq.

19. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. This Agreement may be executed and delivered by hand, facsimile, or by electronic mail in portable document format.

20. **Amendments and Waivers.** This Agreement may not be modified, amended, or supplemented except in writing signed by the signatories to this Agreement.

21. **No Third Party Beneficiaries.** Unless expressly stated herein, this Agreement shall be solely for the benefit of the parties hereto and no other person or entity.

22.. **No Solicitation.** This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Reorganization Plan in the Chapter 11 Cases. Each of the Participating Holders' votes with respect to the Reorganization Plan will not be solicited until such Participating Holder has received the Reorganization Plan and Disclosure Statement. Each party hereto acknowledges that it has been represented by counsel (or has had the opportunity to and has waived its right to do so) in connection with this Agreement and the transactions contemplated hereby. The provisions of this Agreement shall be interpreted in a reasonable manner to effectuate the intent of the parties hereto.

23.. **Consideration.** It is hereby acknowledged by the parties hereto that no consideration shall be due or paid to the Participating Holders for their agreement to vote to accept the Reorganization Plan in accordance with the terms and conditions of this Agreement other than the Company's agreement to commence the Chapter 11 Cases and, if applicable, to use its best efforts to take all steps necessary to obtain approval of the Disclosure Statement and to seek to confirm, consummate and implement the Reorganization Plan in accordance with the terms and conditions of the transaction contemplated by the Restructuring and this Agreement.

7

24. **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

26. **No Group.** The Participating Holders and the parties hereto agree and acknowledge that this Agreement and the transactions contemplated hereby and by the Restructuring and under the Plan shall not in any way constitute or imply the formation of a group (as contemplated by Rule 13d-1(k) of the Securities Exchange Act of 1934, as amended, or otherwise). No agreements, arrangements, commitments or understandings with respect to the securities of the Company or the new common stock of the Reorganized Debtor exists or shall be deemed to exist between or among the parties hereto by virtue of this Agreement and transactions contemplated hereby.

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

ISOLAGEN, INC.

By: _____
Name: DECLAN DALY
Title: CEO

ISOLAGEN TECHNOLOGIES, INC

By: _____
Name: DECLAN DALY
Title: CEO

PARTICIPATING HOLDER:

By: _____
Name: Thomas F. Lake III
Title: Managing Director
Address: 535 Madison Ave. 12th flr, NY NY 10022

PARTICIPATING HOLDER:

By: _____
Name:
Title:
Address:

PARTICIPATING HOLDER:

By: _____
Name:
Title:

8

**24. Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

26. **No Group.** The Participating Holders and the parties hereto agree and acknowledge that this Agreement and the transactions contemplated hereby and by the Restructuring and under the Plan shall not in any way constitute or imply the formation of a group (as contemplated by Rule 13d-1(k) of the Securities Exchange Act of 1934, as amended, or otherwise). No agreements, arrangements, commitments or understandings with respect to the securities of the Company or the new common stock of the Reorganized Debtor exists or shall be deemed to exist between or among the parties hereto by virtue of this Agreement and transactions contemplated hereby.

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

**ISOLAGEN, INC.**

By: _____

      Name:

      Title:

**ISOLAGEN TECHNOLOGIES, INC**

By: _____

      Name:

      Title:

**PARTICIPATING HOLDER:**

For: _CSA_ _____

By: _____

Name: Nicholas D. Schoewe

Title: Member Manger

Address: 175 W. Jackson Blvd Suite 440

        Chicago, IL 60506

**PARTICIPATING HOLDER:**

By: _____

Name:

Title:

Address:

**PARTICIPATING HOLDER:**

By: _____

Name:

Title:

8

**24. Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**26. No Group.** The Participating Holders and the parties hereto agree and acknowledge that this Agreement and the transactions contemplated hereby and by the Restructuring and under the Plan shall not in any way constitute or imply the formation of a group (as contemplated by Rule 13d-1(k) of the Securities Exchange Act of 1934, as amended, or otherwise). No agreements, arrangements, commitments or understandings with respect to the securities of the Company or the new common stock of the Reorganized Debtor exists or shall be deemed to exist between or among the parties hereto by virtue of this Agreement and transactions contemplated hereby.

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

**ISOLAGEN, INC.**

By: _____

     Name:

     Title:

**ISOLAGEN TECHNOLOGIES, INC**

By: _____

     Name:

     Title:

**PARTICIPATING HOLDER:** Highbridge International, LLC by Highbridge Capital Management as trading advisor

By: _Mark Vannacore_

Name: Mark Vannacore

Title: Managing Director

Address: 9 W 57th St

NY NY 10019

**PARTICIPATING HOLDER:**

By: _____

Name:

Title:

Address:

**PARTICIPATING HOLDER:**

By: _____

Name:

Title:

8

**24.Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**26.   No Group.** The Participating Holders and the parties hereto agree and acknowledge that this Agreement and the transactions contemplated hereby and by the Restructuring and under the Plan shall not in any way constitute or imply the formation of a group (as contemplated by Rule 13d-1(k) of the Securities Exchange Act of 1934, as amended, or otherwise).  No agreements, arrangements, commitments or understandings with respect to the securities of the Company or the new common stock of the Reorganized Debtor exists or shall be deemed to exist between or among the parties hereto by virtue of this Agreement and transactions contemplated hereby.

> **IN WITNESS WHEREOF,** each of the parties hereto has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

> **ISOLAGEN, INC.**

> By: _____
> > Name:
> > Title:

> **ISOLAGEN TECHNOLOGIES, INC**

> By: _____
> > Name:
> > Title:

**PARTICIPATING HOLDER:**

By: _____
Name:   Michael Kao
Title:   Manager/CEO of Akanthos Capital Management LLC,
Address: General Partner of Akanthos Arbitrage Master Fund, LP
         21700 Oxnard St, Suite 1520 Woodland Hills CA 91367

**PARTICIPATING HOLDER:**

By: _____
Name:
Title:
Address:

**PARTICIPATING HOLDER:**

By: _____
Name:
Title:

8

26. **No Group.** The Participating Holders and the parties hereto agree and acknowledge that this Agreement and the transactions contemplated hereby and by the Restructuring and under the Plan shall not in any way constitute or imply the formation of a group (as contemplated by Rule 13d-1(k) of the Securities Exchange Act of 1934, as amended, or otherwise). No agreements, arrangements, commitments or understandings with respect to the securities of the Company or the new common stock of the Reorganized Debtor exists or shall be deemed to exist between or among the parties hereto by virtue of this Agreement and transactions contemplated hereby.

**IN WITNESS WHEREOF,** each of the parties hereto has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

**ISOLAGEN, INC.**

By: _____
     Name:
     Title:

**ISOLAGEN TECHNOLOGIES, INC**

By: _____
     Name:
     Title:

**PARTICIPATING HOLDER:**

By: _Ronald Phillips_
Name: _Ronald Phillips_
Title:
Address: _6 Stillwater Lane_
     _Weston CT 06883_

**PARTICIPATING HOLDER:**

By: _____
Name:
Title:
Address:

**PARTICIPATING HOLDER:**

By: _____
Name:
Title:
Address:

**PARTICIPATING HOLDER:**

By: _____
Name:
Title:

616735-7

**PARTICIPATING HOLDER:**

By: _____

Name: Douglas A. O. Tanaka

Title: Director

Address: Credit Suisse Securities (USA)LLC
11 Madison Avenue
NY NY 10013

**VIRIATHUS SERVICES LLC SERIES, LLC , as Agent**

By: _____

Name:

Title:

10

$1,560,000 PAR

Address:

**PARTICIPATING HOLDER:**                    michael s. rosen

By:
Name: CONTEXT ADVANTAGE MASTER FUND, L.P.
Title: CEO # CONTEXT CAPITAL MGMT, LLC
Address: 705 PALOMAR AIRPORT RD #100
         CARLSBAD CA 92011

**PARTICIPATING HOLDER:**

By:
Name:
Title:
Address:

**PARTICIPATING HOLDER:**

By:
Name:
Title:
Address:

**PARTICIPATING HOLDER:**

By:
Name:
Title:
Address:

**PARTICIPATING HOLDER:**

By:
Name:
Title
Address:

**PARTICIPATING HOLDER:**

By
Name
Title
Address

9

$ 1, 150, 000   PAR

PARTICIPATING HOLDER:                  michael S. Raven

By: _____

Name: ALTMA FUND   SICAV PLC

Title:       GRAFTON   SUB FUND

Address:   CEO  CONTEXT CAPITAL MGMT, LLC

705   PALOMAR  AIRPORT  RD  # 100

CARLSBAD , CA  92001

VIRIATHUS SERVICES LLC SERIES, LLC , as Agent

By: _____

Name:

Title:

**VIRIATHUS SERVICES LLC SERIES, as Agent**

By: _____
Name:  David Batista
Title:  Senior Managing Director

**ISOLAGEN INC., et al. NON-BINDING TERM SHEET FOR PROPOSED RESTRUCTURING**

The following is an outline of the principal terms and conditions of a proposed restructuring (the "Restructuring") submitted by Viriathus Holdings LLC , as agent (the "Agent") for certain individual holders of or managers of accounts that hold promissory notes dated April 30, 2009 (the "Pre-Petition Lenders") issued by Isolagen, Inc. ("ILE," and together with its subsidiaries and affiliates, the "Company"). This term sheet ("Term Sheet") is subject to, and among other things, definitive documentation and is for discussion purposes only. This Term Sheet and the proposals contained herein are subject to, among other conditions, the completion of legal, financial and other due diligence by the Pre-Petition Lenders and their advisors and does not, and shall not be construed to, indicate the agreement by any parties, including the Pre-Petition Lenders and the holders of certain 3.5% Convertible Notes under that certain Indenture (the "Indenture") dated as of November 3, 2004 (the "Participating Noteholders"), to support the Restructuring contemplated hereby until mutually agreeable, definitive documentation is executed and delivered. This Term Sheet does not contain all of the terms of any proposed restructuring and shall not be construed as (i) an offer capable of acceptance, (ii) a binding agreement of any kind, (iii) a commitment to enter into, or offer to enter into, any agreement or (iv) an agreement to file any plan of reorganization or disclosure statement or consummate any transaction or to vote for or otherwise support any plan of reorganization or any restructuring. Nothing in this Term Sheet shall affect in any way, nor be deemed a waiver of, any of the rights of any Pre-Petition Lender under the existing Secured Promissory Note and Security Agreement or any other document under applicable law or of any Participating Noteholder under the Indenture.

This Term Sheet is not a solicitation of acceptances or rejections with respect to any restructuring plan or reorganization. Any such solicitation will be conducted in accordance with the Bankruptcy Code and/or applicable securities laws.

This Term Sheet and all related communications are for discussion and settlement purposes only and shall be deemed to be settlement negotiations and subject to Rule 408 of the Federal Rules of Evidence and any other allocable state or federal law or rule.

### I.    TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

The Restructuring shall be implemented through consummation of a confirmed chapter 11 plan of reorganization of ILE and its necessary affiliates satisfactory to the Lenders. the Participating Noteholders and the Company (the "Plan"); *provided*, however, that in the event that the parties jointly determine that it is in the best interests of the Company or necessary to implement the restructuring or its intended purpose, chapter 11 cases shall be commenced for any subsidiary or affiliate of ILE for which the parties so determine. Any plan for such subsidiary or affiliate or other disposition of such subsidiary's or affiliate's assets shall be satisfactory to the Pre-Petition Lenders and the Participating Noteholders and shall be consummated no later than at consummation of the Plan. The Company may file a joint plan for all affiliated companies. The Plan shall classify and provide treatment for claims and interests as described below. Except as specified below, claims and interests shall be satisfied in full by

the delivery of the applicable consideration on or, with respect to any class other than the Pre-Petition Lender class, as soon as practicable after the effective date of the Plan (the "Effective Date").

| | |
|---|---|
| **Administrative Expense Claims** | Each holder of an allowed Administrative Expense Claim shall, in full and final satisfaction of such allowed Administrative Expense Claim, be paid either (i) in cash, in full on the later of (x) the Effective Date and (y) the date such claim becomes allowed, or due and payable in the ordinary course of business or (ii) on such other terms and conditions as may be agreed between the holder of such claim, on the one hand, and ILE and the Pre-Petition Lenders, on the other hand. |
| **Priority Non-Tax Claims** | Each holder of an allowed Priority Non-Tax Claim shall, in full and final satisfaction of such Priority Non-Tax Claim, be paid in full in cash on the Effective Date. |
| **Priority Tax Claims** | Each holder of an allowed Priority Tax Claim shall, in full and final satisfaction of such allowed Priority Tax Claim, be paid in full through deferred cash payments in an aggregate principal amount equal to the amount of the allowed claim plus interest on the unpaid portion at the rate of 4% per annum from the Effective Date through the date of payment thereof (which may be as long as six years from the date of assessment). |
| **(x) Pre-Petition Lender Claims (in the outstanding principal amount of $500,417) and (y) approved Senior Secured Post-Petition Debtor-In-Possession Facility Claims (currently estimated to be in the amount of up to $3,000,000) ("DIP Facility Claim")** | Each holder of an allowed Pre-Petition Lender Claim and/or a DIP Facility Claim shall receive, in full and final satisfaction of such allowed Pre-Petition Lender Claim and DIP Facility Claim its pro-rata share of up to 61% of the New Common Stock of Reorganized ILE subject to dilution by the Exit Financing as set forth on Schedule A. Under the Plan, Pre-Petition Lender Claims may be classified separately from the DIP Facility Claim. The allocation of the New Common stock shall be pro rata amongst the Pre-Petition Lender Claims and the DIP Facility Claim. |
| **3.5% Unsecured Convertible Notes**<br><br>**(Approximately $81 million)** | Each holder of an Allowed Convertible Noteholder Claim shall receive, in full and final satisfaction of such Allowed Claim the following:<br><br>(i) its pro rata share of an unsecured note in the principal amount of $6 million (the "Note"). The Note shall have the following features:<br><br>Type of Security:    Unsecured Debentures<br><br>Interest:    12.5% payable quarterly in Cash or, at the Reorganized ILE's option, 15% payable in kind ("PIK") by capitalizing such unpaid amount and added it to principal as of the date it |

|  | was due. |
|---|---|
|  | **Maturity Date:** June 1, 2012 |
|  | **Redemption Rights:** At any time prior to the maturity date, the Company may redeem any portion of the outstanding principle of the Debentures in cash at 125% of the stated face value of the Debentures. |
|  | **Mandatory Redemption:** The Company will be obligated to redeem all outstanding notes upon the following events:<br><br>a) The Company successfully completes a capital campaign in excess of US$10,000,000; or<br>b) The Company is acquired by, or sells a majority stake to, an outside party |
|  | **Negative** |
|  | **Covenants:** The Notes shall contain customary representations, warranties and covenants, including a covenant that the Company shall be prohibited from the incurrence of additional debt without obtaining the consent of 66 ⅔% of the Debenture holders. |
|  | (ii) its pro-rata share of 33% of the newly issued common stock of reorganized ILE (the "Reorganized ILE") under a confirmed plan of reorganization (the "New Common Stock") subject to dilution by the Exit Financing (defined below) as set forth on Schedule A hereto.<br><br>The Plan shall allow the Convertible Note Claims in the amount of outstanding principal and accrued and unpaid interest as of the petition date in the approximate amount of $81 million (plus any other amounts due under the indenture and allowable under the Bankruptcy Code). |
| **General Unsecured Claims**<br>**(Approximately $750,000)** | Each holder of an allowed General Unsecured Claim shall, in full and final satisfaction of such allowed Unsecured Trade Claim, be paid their pro rata portion of 1% the New Common Stock. |
| **Common and Preferred**<br>**Equity in ILE (the "Old** | All common and preferred equity interests of any kind in ILE, including any options, warrants, and other agreements to acquire the same (including any arising under or in connection with any purchase or employment agreement), shall be cancelled and |

| Equity") | extinguished under the Plan and holders thereof shall neither retain nor receive any distribution of property or assets on account of their interests. |
|---|---|
| Intercompany Claims | No distributions shall be made under the Plan on account of intercompany claims among ILE or any of its affiliates or subsidiaries, and any and all liability on account of such intercompany claims shall be deemed discharged. |

## II.   GOVERNANCE AND MISCELLANEOUS ISSUES

| Board of Directors | The initial Board of Directors of Reorganized ILE shall be determined by the DIP Lenders and the Plan Funders (defined below). |
|---|---|
| Management Team | The management team of reorganized ILE and its subsidiaries shall be selected by and report to the New Board. The Plan shall provided general releases to all officers and directors who are continuing to provide services to the Debtors or the Reorganized ILE, to the maximum extent allowable under applicable law. |
| Management Incentive Plan | The management team of Reorganized ILE and its subsidiaries shall receive 5% of the New Equity, subject to dilution by the Exit Financing. The management team's equity state shall be subject to a 3-year vesting schedule whereby 50% shall vest on the first anniversary, 25% shall vest on the second anniversary, and 25% shall vest on the third anniversary. |
| Change of Control | Any acceleration, vesting or similar change of control rights under employment, benefit or other arrangements triggered by the consummation of the Plan shall be waived or otherwise cancelled under the Plan. |
| Conditions | The Restructuring contemplated by the Term Sheet is subject to the approval of ILE's Board of Directors prior to the filing of the chapter 11 cases.<br><br>The Agreement set forth in the Term Sheet shall be null and void and of no further force and effect (i) if ILE does not commence a chapter 11 case by 6:00 p.m. (New York time) on June 11, 2009 and (ii) if ILE, the Pre-Petition Lenders and not less than 70% in amount and 50% in number of the holders of the 3.5% Unsecured Convertible Notes have not entered into an acceptable restructuring agreement by June 10, 2009, prior to the chapter 11 filing, or such later date as may be agreed to be the parties. |
| Revesting of Property | Except as expressly set forth herein, all property of ILE and its bankruptcy estate and any and all claims or causes of action of ILE and its bankruptcy estate shall be retained by ILE and shall revest in Reorganized ILE upon the consummation of the Plan. |

| | |
|---|---|
| **NOLs** | The Company shall take all reasonable and appropriate steps to attempt to preserve some or all of the "net operating losses" (NOLs) and to structure any transactions contemplated herein in a manner to preserve NOLs; provided, however, that to the extent that the restructuring set forth herein will not result in a preservation of some or all of the NOLs, it is expressly understood by and between the parties that the Company will move forward with the terms of the restructuring set forth herein, regardless of the potential loss of the NOLs. |
| **Fees and Expenses** | ILE shall pay all accrued and unpaid fees and expenses of professionals currently retained by the Senior Lenders, through the date immediately preceding the anticipated filing date. |
| **Documentation** | Any plan of reorganization and related disclosure statement and related documentation shall be in form and substance reasonably satisfactory to the Senior Lenders. |
| **Releases and Exculpation** | The Plan will include releases and exculpation provision that are customary and proper to the maximum extent allowable under applicable law—including, without limitation, third-party releases to the maximum allowable scope and breadth. |

## III.    EXIT FINANCING

| | |
|---|---|
| **Issue Size** | $2,000,000.00 in new equity by funders of the plan (the "Plan Funders"). |
| **Security** | Newly issued common stock of Reorganized ILE (the "New Common Stock"). The New Common Stock shall be issued under the Plan and shall be exempt from registration requirements under the exemptions under Bankruptcy Code section 1145. The Company is not obligated to obtain a "no action letter" from the SEC. |
| **Valuation** | The New Common Stock issued to the Plan Funders shall be issued at 1.5x the DIP Facility conversion valuation. See Schedule A. |
| **Rights of Participation** | Rights of participation as a Plan Funder shall be extended to all classes of creditors receiving New Common Stock under the Plan up to an aggregate amount of $2,000,000. A right to participate in future financings of the Reorganized ILE (other than with respect to (x) issuances pursuant to option or employee plans (y) the sale of equity or equity linked securities by the Reorganized ILE pursuant to a bona fide, firm underwritten public offering, or (z) the issuance of equity or equity linked securities by the Reorganized ILE in connection with a bona fide strategic alliance, so long as the equity being offered does not exceed 5% of the equity on a fully diluted basis immediately prior to such issuance) are extended to (i) the convertible note holders, (ii) the pre-petition lenders, and (iii) the DIP lenders (collectively the "Covered Investors") such that, for any future equity or equity-linked capital raise done by the Company the Covered Investors will have the right to invest in such raise up to an amount that would allow them to preserve their existing equity ownership stake on a fully diluted basis. |

## Schedule A

| Class | Before Exit Financing | | After Financing |
|---|---|---|---|
| | % | Shares | *0% Participation* |
| Pre-Petition Lender Claims and DIP Facility Claims, collectively | 61% | 3,660,000 | 49.91% |
| Convertible Note Holders | 33% | 1,980,000 | 27.00% |
| Management | 5% | 300,000 | 4.09% |
| General Unsecured Claims | 1% | 60,000 | 0.82% |
| | 100% | 6,000,000 | 81.82% |

Exit Financing = 1,333,333 shares at 1.5x DIP Valuation
18.18%